## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ULYSSES MURPHY,

               Petitioner,

          -vs-

MARGARET BRADSHAW, Warden,

               Respondent.

:

:

:

Case No. 1:03-cv-053

District Judge Walter Herbert Rice
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS ON THE MERITS

In the early morning hours of May 11, 1997, André Brooks was robbed and murdered in the parking lot of an after-hours lounge located in Franklin County, Ohio. Petitioner Ulysses Murphy was subsequently tried and convicted of aggravated murder in the course of an aggravated robbery and sentenced to death for Brooks' murder. (Appendix to Return of Writ ("Appendix"), Vol. 2 at 259-60, 376, 415-21.) Murphy filed a Petition for Writ of Habeas Corpus in this Court on January 21, 2003, challenging his convictions and death sentence on the following nine grounds:

### First Ground for Relief

The trial court violated Petitioner's Fifth and Fourteenth Amendment rights when it overruled Petitioner Murphy's motion to suppress, failing to recognize that during a custodial interrogation, when a suspect says that he is "ready to quit talking" the police fail to "scrupulously honor" this assertion of his right to remain silent when they do not immediately cease the interrogation.

### Second Ground for Relief

The trial court violated Petitioner's Sixth and Fourteenth Amendment rights to a fair trial and due process when it sanctioned the inclusion of alternate jurors in the jury deliberation room with the regular jurors.

### Third Ground for Relief

Petitioner was denied his rights to a fair and impartial jury guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the trial court failed to grant challenges for cause against jurors who could not consider mitigating evidence in determining whether the death penalty was appropriate.

**Fourth Ground for Relief**

Petitioner was denied his right to effective assistance of counsel at his capital trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

**Fifth Ground for Relief**

Defense counsel did not conduct a reasonable investigation into Petitioner's character, history, and background, thus failing to provide effective assistance during the penalty phase of Petitioner's capital trial.

**Sixth Ground for Relief**

Petitioner was denied his right to effective assistance of counsel in his direct appeal to the Ohio Supreme Court, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

**Seventh Ground for Relief**

The prosecutors committed acts of misconduct during the capital trial, violating Petitioner's substantive and procedural due process rights to a fair trial and reliable sentence under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Eighth Ground for Relief**

The Ohio Supreme Court's arbitrary refusal to review life sentences imposed in similar cases as part of the statutorily mandated proportionality review denied Petitioner Murphy due process of law guaranteed by the Fourteenth Amendment.

**Ninth Ground for Relief**

Petitioner Murphy's convictions and death sentence are invalid because the cumulative effect of the constitutional errors set forth in this Habeas Corpus Petition violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

(Petition, Doc. No. 10.)  Respondent has filed her Return of Writ (Doc. No. 12), and Murphy filed his

traverse (Doc. No. 21); on Petitioner's motion, the Court held an evidentiary hearing in February and

March, 2005.  The parties filed post-hearing briefs and the case is now ripe for decision.

## FACTS

The following are the facts of the case as recited in the Ohio Supreme Court's decision:

> André Brooks lived in Mansfield[, Ohio].  His sister, Condrea Webber, lived in Columbus[, Ohio].  On a weekend in May 1997, Webber went to Mansfield to visit her family.  On Saturday, May 10, she drove back to Columbus with Brooks.
>
> They went to the C&S Lounge, a bar on the [e]ast [s]ide of Columbus.  Arriving sometime before 1:00 a.m., May 11, they left around 2:00 a.m. and went to the F & H Grill.
>
> The F & H occupied a two-story building; the second floor was an "after-hours bar," *i.e.*, an establishment that serves liquor after the lawful closing time.  Webber and Brooks stayed until about 3:30 a.m.
>
> Murphy was also in the F & H that night.  Frank Green, who frequented the F & H and knew Murphy, later testified that Murphy left "[m]aybe a couple minutes after Brooks and Webber.  Brooks was wearing several gold chains around his neck that evening.  These had attracted Murphy's notice, and he decided to rob Brooks to get them.
>
> Brooks and Webber were near the[ir] car when Murphy told them to put their hands up and ordered Brooks "to take off his gold."  Brooks asked Murphy to let Webber get into the car.
>
> As Webber fumbled with the keys, she accidentally set off the car alarm.  Brooks told her how to shut it off, while continuing to ask Murphy to give her a chance to get in.  Murphy was pointing his gun at Brooks the entire time.  Finally, Webber got in, started the car, and put it in drive.  Brooks and Murphy were standing at the rear of the car and Webber could see them in her rear-view mirror.  (Although it was night, and the car's rear windshield appears to be tinted, the car was near an outdoor light.)
>
> Brooks tried to take his gold chains off, with Murphy continually demanding that he "hurry up."  Then Brooks tried to scare Murphy away by telling his sister to "reach underneath the seat."  But Webber, afraid to support Brooks's bluff, opened the door and turned around to assure Murphy that she had no gun.  It was then that she got her best look at Murphy.
>
> Webber then closed the car door but continued to watch the robbery in the rear-view mirror.  Murphy kept yelling at Brooks that he was

"moving too slow."  Webber then saw Murphy, who was standing slightly over an arm's length from Books, take a step back.  She heard two quick shots; then her brother screamed and fell.  According to Webber, Brooks was shot while still trying to take his chains off. Webber hit the gas pedal and sped to a nearby White Castle restaurant to summon a police officer.

An autopsy showed that Brooks died of two gunshot wounds.  One bullet entered the inside of Brooks's upper left arm near the armpit and went into his torso, breaking a rib, which lacerated his lung and caused bleeding.  The other entered his lower back and severed an artery.

Police found three spent shell casings where Brooks was shot.  Mark Hardy, a Columbus police criminalist and firearms specialist, examined the casings.  Based on firing-pin impressions, extractor and ejector marks, and breech marks found on each casing, Hardy concluded that all three had been ejected from the same gun.  Hardy also concluded that both bullets extracted from Brooks's corpse were fired from one gun.

Police showed Webber a photographic array, and she identified Murphy as her brother's killer.  She later identified him again in court.

Murphy was arrested and interrogated.  At first he denied everything. Ultimately, he admitted that he had shot Brooks while trying to rob him of his chains.  He claimed that the gun had accidentally gone off because Brooks tried to grab it.  However, he admitted firing a second shot at Brooks when, according to Murphy, Brooks tried to run away after the first shot.

*State v. Murphy*, 91 Ohio St. 3d 516, 516-17 (2001).  Murphy was subsequently convicted of aggravated murder with a capital specification, aggravated robbery, and having a weapon under disability, and sentenced to death.  *Id.*


## PROCEDURAL HISTORY

Murphy filed an appeal from his convictions and sentence on February 24, 1999, to the Ohio

Supreme Court,[1] raising twenty propositions of law, all of which were overruled.  (Appendix, Vol. 3

---

[1]In cases in which a death sentence was imposed after January 1, 1995, appeals to the intermediate court of appeals have been abolished in Ohio, and the appeal proceeds instead directly to the Ohio Supreme Court.  Ohio Rev. Code § 2929.05(A).

at 49-223); *State v. Murphy*, 91 Ohio St. 3d 516 (2001). A motion for reconsideration was summarily rejected. (Appendix, Vol. 4 at 89-98.)

At the same time, Murphy was pursuing post-conviction relief in the Franklin County Common Pleas Court. He filed his petition on May 5, 1999, asserting thirty-four grounds for relief. (Appendix, Vol. 5 at 24-128.) He later filed an amendment to his petition, adding a thirty-fifth claim for relief. (Appendix, Vol. 5 at 365-69.) All were rejected, and Murphy's petition was dismissed on January 28, 2000. (Appendix, Vol. 5 at 446-63.) Murphy appealed to the Franklin County Court of Appeals on April 19, 2000, advancing three assignments of error (Appendix, Vol. 6 at 61-111.) The court of appeals affirmed the trial court, *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 (Ohio App. 10th Dist. Dec. 26, 2000), and was subsequently affirmed itself by the Ohio Supreme Court, *State v. Murphy*, 92 Ohio St. 3d 1441 (2001).

On August 31, 2001, Murphy filed an application to reopen his direct appeal pursuant to Ohio Sup. Ct. Prac. R. XI, § 5, claiming his appellate counsel were ineffective in failing to raise six propositions of law which he identified. (Appendix, Vol. 4 at 123-32.) The Ohio Supreme Court denied Murphy's application without elaboration on November 7, 2001. (Appendix, Vol. 4 at 172.)

Murphy filed his Petition here on January 21, 2003. (Doc. No. 10.)

## GENERALLY APPLICABLE LAW

Since Murphy filed his petition for a writ of habeas corpus well after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214 (hereinafter "AEDPA"), the amendments to 28 U.S.C. § 2254 embodied in that Act are applicable to his Petition. The standard of review under 28 U.S.C. § 2254 as amended by the AEDPA is as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court

shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e).

A state court's decision is contrary to the Supreme Court's clearly established precedent if (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case."  *Williams*, 529 U.S. at 407-08.  For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable."  *Wiggins v. Smith*, 539 U.S. 510, 511 (2003), *quoting Williams*, 529 U.S. at 409.

In *Jamison v. Collins*, 100 F. Supp. 2d 647 (2000), this Court noted that:

Principles of comity necessary to a federal system narrow a federal court's review of a petition for a writ of habeas corpus brought by a state prisoner. *See Coleman v. Thompson*, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  The Supreme Court explains that "[u]nder our federal system, the federal and the state 'courts [are] equally bound to guard and protect rights secured by the

-6-

[C]onstitution.'" *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (quoting *Ex parte Royall*, 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886)); *see Coleman*, 501 U.S. at 731, 111 S.Ct. 2546 (quoting same). Thus, to ensure the states an opportunity to protect these rights, the doctrine of procedural default requires that the state courts retain "the first opportunity to address and correct alleged violations of state prisoner's [sic] rights." *Coleman*, 501 U.S. at 731, 111 S.Ct. 2546. The doctrine of procedural default provides that, if a state court previously dismisses a state prisoner's federal claim on the grounds that the prisoner failed to comply with a state procedural rule, then a federal court ordinarily cannot consider the merits of that federal claim. *Id*. at 729-730, 111 S.Ct. 2546.

This procedural default doctrine bars federal habeas review of a state court ruling only if the following requirements have been satisfied:

(1)     the petitioner actually violated an applicable state procedural rule;

(2)     the procedural violation provides an "adequate and independent state ground" for denying the petitioner's federal constitutional claim; and

(3)     the state court actually enforced the procedural violation; that is, the highest state court to rule on the claim clearly and unambiguously relied upon the procedural violation as the reason for rejecting the claim.

*See generally Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. However, the petitioner can excuse the procedural default by demonstrating either:

(a)     that there was "cause" for the procedural default and actual prejudice by the alleged constitutional error; or

(b)     that the case falls within the category of cases considered [a] "fundamental miscarriage of justice."

See *id*. . . .; *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *Harris v. Reed*, 489 U.S. 255, 260-62, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Ylst v. Nunnemaker*, 501 U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

For the cause and prejudice standard, the petitioner must provide a "substantial" reason that is "external" to the petitioner as the cause for the procedural default. *See Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Rust v. Zent*, 17 F.3d 155,

161 (6th Cir. 1994).  In addition, the petitioner must show that the alleged trial errors "not merely . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed. 2d 816 (1982).

To demonstrate a "fundamental miscarriage of justice," a petitioner must show that the alleged constitutional violation probably resulted in the conviction of one who is actually innocent.  *Murray*, 477 U.S. at 496, 106 S.Ct. 2639.  This exception applies only in "extraordinary cases."  *Id.*  The standard requires a petitioner to show that he is "actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  To establish a probability of innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Id*.

*Jamison*, 100 F. Supp.2d at 669-70.  These principles govern the Court's discussion of Murphy's asserted grounds for relief.

## ANALYSIS

**First Ground for Relief**

In his first ground for relief, Murphy contends he was deprived of his Fifth Amendment right to remain silent during his interrogation by police when Detectives Robert Viduya and Larry Yates ignored his unambiguous invocation of his right to remain silent and continued questioning him about the murder, eventually eliciting a confession.  (Petition, Doc. No. 10 at 9-13.)  Respondent acknowledges the claim is preserved for habeas corpus review, but argues it is meritless.  (Return of Writ, Doc. No. 12 at 30-35.)  To facilitate consideration of Murphy's claim, a rather extensive discussion of his interrogation is necessary.

At approximately 10:35 p.m. on May 11, 1997, Detective Robert Viduya began interrogating Murphy by administering to him his *Miranda* rights.  (Videotape 1, Doc. No. 14 at 10:35.)  Viduya

-8-

explained to Murphy that if he wanted to talk, he could and if he did not, or if he decided to stop talking after the interrogation began, he could not be compelled to continue. *Id*. at 10:35-42. Viduya repeatedly informed Murphy that he could stop the interview at any time. *Id*. At about 10:56 p.m., the following exchange occurred:

> Viduya:  Let me talk to my partner real quick. I got to ask him some questions. Like I said, I'm working on this homicide, but I'm not the primary investigator. I'm going to see if I can get a hold of him because he knows more details about this than I do.

> Murphy:  I'm ready to quit talking now and I'm ready to go home, too. . . .

> Viduya:  Okay. Just let me ask him a couple of questions before I come back. . . . .

(Videotape 1, Doc. No. 14.) Viduya then left the interrogation room for approximately two minutes, returning with Detective Larry Yates, who had previously been observing Viduya's conversation with Murphy through a two-way mirror. *Id*. Viduya introduced Yates to Murphy after which Yates immediately began questioning Murphy about the murder. *Id*. Neither Yates nor Viduya reread Murphy's rights to him. *Id*. Instead, the next several minutes consisted of both officers trying to convince Murphy to confess to the murder:

> Yates:  I did all of the interviews out at the [F & H Grill]. I processed the scene and all the blood trail and all the other things. Let me see the bottom of your shoes there.

> (Murphy lifts up his feet.)

> Yates:  Okay. You know how they came up with your name on this, how we came up with your name?

> Murphy:  He [indicating Viduya] said people in the bar gave my name.

> Yates:  Okay. I interviewed sixteen people out there, okay? Right now, we were debating whether to even

interview you or not, because the only thing you can do during this interview is help yourself because we don't need your interview. I tell you right now we've got a pat case against you. [Viduya] decided he wanted to interview you, the other detective, the primary, [Viduya's] the secondary, isn't here, so that means [Viduya's] in charge, so I do what he says. He wanted to interview that client.  This is your opportunity to help out yourself, okay?  We did a thorough interview of every person out there.  I was there all day and that's why I look tired because I am tired from interviewing these people.  I processed the scene.  I fingerprinted everything, okay? We showed photo arrays with your picture in it and picture was picked as the person.  You need our help now, okay? If you want to cooperate, it's my opinion right now, and this is between you, me and [Viduya] that I think you were going to rob this guy.  He had a lot of jewelry on.  He had a lot of money.  He had a couple hundred dollars in his pocket and all of that jewelry and shit.  I don't think you intended to shoot this guy.  There's a difference.  If you're going to plan on killing somebody, if I say I'm going to kill you and I kill you, then that's aggravated murder.  If I'm going to take your jewelry and take your shit, that's just robbery.  If I kill you in the meantime by accident, that's different.  Do you see what I'm saying –

Murphy:     (Nods head.)

Yates:      Do you see a difference? Okay.  I don't think you had planned on shooting this guy because we only found one shell casing out there, okay?  Right by the blood where he first started bleeding there was one shell casing, which is what we found.  There might have been others kicked around that we didn't find, but I found one shell casing and he was shot, okay?  That would indicate to me if you were planning on killing somebody, you'd shoot them more than one time.  Okay, you're not just going to shoot, if you want to kill somebody you're not just going to shoot him just one time, but if you shoot one time, you're going to shoot them in the head.  Generally on these robberies, robberies and homicides like this, it's hey, yeah, I was going to take his jewelry, which, you know, shit happens, but I didn't plan on killing him, which is usually what comes out.  One way or another they

come out and say, "yeah, I planned on taking his jewelry" but they just don't say anything at all, okay? This is your time to help yourself out. It's up to you what you want to do, okay. But I tell you right now, it's going to be worked two ways. We're either going to go into court. Him and the primary detective are going to go through the whole thing. They're going to call me in and I'm going to sit there and say, "This is the scene. This is what I had. This is the trail. This is the interviews I did, the extensive interviews I did, okay. The photo array that we did. This is what you had to tell me."

You have nobody to help you right now but us, okay. When we go in there, I'm either going to tell the prosecutor one of two things: he was cooperative. It was robbery. The guy wasn't supposed to get killed. It was an accident. Or I'm going to go in there and say, "He lied to me. Let's put him away." This is your time to decide which way it's going to be. Like I said, I didn't want to interview you. He did. He's the boss, so we interview you. Okay. This is the time for you to help yourself out. You need to make a decision now whether you want to help yourself out or if you want to roll the dice. I'll tell you right now the case is pat against you.

Viduya:     I want to say just something while you're thinking about that. The reason I was asking you about the fight. This guy is a big guy, the guy that was killed. He's about 230, 240 [pounds]. He wasn't fat. I mean, he was muscular. People in there said they heard some fighting. If it was a robbery and this guy tried to take you out and if you had a gun and take the gun, that's different. That's why I was asking. You know, did you see a fight, somebody say something to you? Like he said, that's different if you go out there and walk up behind somebody and put a bullet in the back of the head, okay? This guy was only shot one time. And where he was shot at, it was just a fluke of nature that he died. One time. One bullet. Killed him. That's not the mark of a killer. That's somebody that was probably screwed up or something. But he looked like he had been in a fight and whoever he was fighting probably didn't have a chance because this guy was pretty big. You're pretty big, but this guy was big. Like he said, this is your opportunity to tell

us what happened. We don't know. We can only go on what we got at the scene. We got a dead body. We got a bullet. One bullet hit the guy. He's dead and it's a fluke of nature that he died. The bullet bounced off something and hit his heart or something. It –

Yates:  It bounced off one of his ribs and shot upwards. It's up to you. If you want us to go ahead and tell the prosecutor that you were cooperative. This was an accident or –

Murphy:  I'll try to cooperate but I don't know no more than what I told you.

Yates:  Do you have any doubt that from what I did out there at the scene that I am one hundred percent sure and I can prove in a court that you killed this guy? Do you have any doubt in your mind at all?

Murphy:  I don't have no doubt.

Yates:  Okay. The only thing you can do now is help yourself out. Did you plan on killing this guy?

Murphy:  I didn't kill him.

Yates:  Okay. Did you plan on just taking his jewelry?

Murphy:  I didn't take his jewelry.

Yates:  Well, he had a lot of jewelry on. He had money in his pocket and I think that it was just going to just be a robbery. That's what I think. But only you can tell me that, because I'm going to sit up in that jury box and say, "This guy's dead. He had a lot of jewelry. He had a couple hundred dollars in his pocket. What do you guys think happened ?" And there's going to be twelve of them. We can influence the jury one way or another. That's the prosecutor's job and that's our job. By what we gathered at the scene, the evidence we gathered. There were fingerprints on the car. I know you were back by the rear of the car when the other girl got in the car. We printed the car. I don't know if we got your prints off of there yet or not, but we did lift prints off the car. You said you didn't walk by the car –

Viduya:      This is what you're telling us.  Your car was parked back there.  You said you went back there like so. Nothing with your evidence should be back there, right?

Murphy:      No.

Yates:       You throw out the sixteen interviews I did, okay. You throw out the girl that got in the car.  She's an eyewitness.  You throw her statement out.  All we have is the print that we get off the back of that car and one of them comes back to you and what do you think is going to happen?  Then it's going to be too late for you to say, "I want to talk now" because I will say right now we will not interview you after tonight. Okay.  We give them one shot, if we give them one shot at all.  A case like this, if I had been the primary detective, we wouldn't be in here talking to you, okay?  Like I said, he's the man in charge and if he wants to come in here, I'll tell you what we have.  I told you basically what we have.  I didn't tell you who told me what.  I didn't you who picked you out of an interview.

Viduya:      The thing is we don't like to charge people with the wrong thing, right?  If you were going to rob the guy and it got out of control or the guy took a swing at you or something, it's different.  Right now it looks like cold-blooded murder, because we're not getting anything.  But like I said, the way this guy was shot, that's not the way you execute somebody.  I mean, if you had a beef with the guy and you wanted to kill him, you wouldn't have shot him the way he was shot.  He was shot, like, in the side of the shoulder and the bullet bounced into his heart.  If you wanted to kill somebody, you'd pop him in the head or pop, pop, pop right him in the heart.  So we know this wasn't an execution.  Something else went on back there and we know this guy was in some kind of struggle.  So, if can help us on it, man, it's going to help you out better –

Murphy:      I told you all I know, brother.

Yates:       I tell you right now.  How old are you?

Murphy:      Twenty-six.

Yates:        Twenty-six?  You ain't going to get out of jail.  The minimum on aggravated murder, and we're going to convict you of aggravated murder, okay?   I'm guaranteeing you that right now.  The minimum on aggravated murder is twenty years, plus three years for a gun, thirty years, plus three years for a gun, okay? You're not going to get life probably out of it.  The new laws that took affect [sic] last July first say if you get twenty years, you do twenty years.  If you get thirty years, you do twenty [sic] years.  That shit where you get a three-to-five sentence and you do one-and-a-half years and out, that's all gone . That was abolished last July first, okay?  You want to spend the next thirty-three, twenty-three to thirty-three years in jail or do you want to help yourself out?  After today, the prosecutor is not going to come to you and I'm going to come to you unless he tells me to.

Murphy:       I didn't kill him, man.  You know, I ain't ever seen the boy before.

Viduya:       Well, like I said, I'm not the primary.  Jeff Collins is the primary.  He's pushing for a death penalty case.  I remember telling you that this morning.

Murphy:       (inaudible)

Viduya:       Anytime you kill a person out of another felony, using a gun, they try to push for a death penalty case.  That's why I was like, "Let's interview this guy.  Let's see what happens."  Because I don't know if this was an accidental shooting, you intended to shoot him.  If you intended to shoot him then, hey, you intended to shoot him.  We shouldn't be wasting our time.  You killed him, all right.  Hey, if you was out there, you wanted to rob a guy.   Look here.  Aggravated robbery and aggravated murder are two different things.  One of them you might not die for the one.  But aggravated murder out of a robbery, they're going to push for a death penalty case.  I know.  I'm in one right now. Same thing.  This guy that talked to us. He said, "Hey.  I wanted to kill the guy.  I was going to rob him and I was going to kill him."  And he did.  So now he's up for a death penalty case.

-14-

We don't know.  That's why we're in here bugging you . We don't know.  If it comes up later that you was, that hey, people say hey, this was the guy that did it, it's going to be too late.  It's going to be too late.  I mean, this is your opportunity, man.  If you don't want to say it, you don't have to, but –

Murphy:  There's nobody saying I did it.

Yates:  We've already have people that picked you out –

Viduya:  We've got witnesses.  They used your picture as –

Murphy:  They'd seen me in the bar.  I was in the bar –

Viduya:  Yeah, and they saw you leave the bar –

Yates:  You left directly after the –

Viduya:  And right you left, something went on out there. That's what I was saying.  Did you hear an argument out there?  Did you hear a fight?  They heard arguing and fighting going on out there and they heard a gunshot, and you were gone and we had a body in the alley.  That's what I was saying.  Between the time you left and the time you were supposedly got to, or the time you got pulled over on Cleveland Avenue, that's when the homicide happened.  So you had to at least heard something out there.  If you saw four people in the alley, and you didn't see anybody fighting back there, you didn't see anybody shoot, so you're pushing as a prime suspect.

Yates:  And you know that you left an eyewitness, she's from me to him to you, which was his distance, you know as well as we do that we talked to her, okay?  She's going to get up on that stand.  She's going to pick you out, Ulysses.  You killed me brother.  That's what she's going to say, and it's going to be up to one of us to help you –

Murphy:  I didn't kill her brother.

Yates:  Well –

Viduya:  Like I said –

-15-

Yates:      From the interviews I've done out there and the evidence that I collected at the scene, I processed that whole scene and I did all them interviews of all them people –

Murphy:     You got evidence over me?

Yates:      We got, like I said, I don't know if we have your prints on that car yet. We have prints on the car that we towed, but we don't need prints. You've been picked out as an eyewitness. We've got eyewitnesses picking you out. We got you leaving the bar directly after them, okay? This guy had a lot of flashy jewelry and all that shit, and I know that. And it's my opinion that's what you were going after. There was jewelry left at the scene where the struggle took place. There was some jewelry on at the alley, when he was taking off running, okay? That's only going to come out if I want it to come out. Is there any reason I'm going to want that to come out?

Murphy:     Don't know.

Viduya:     Like I said, it's a fluke that this guy died, man. I mean, most people that get shot the way was shot live. The bullet hit a bone or something. It bounced right into his heart. So –

Yates:      The autopsy's going to be tomorrow and we'll find out exactly what did it hit and which route it took.

Viduya:     When he was shot it wasn't, to me, it doesn't look intentional. Everybody else is like, it was intentional, but you don't kill anybody shooting them in the shoulder, you don't.

Yates:      You already told me that you have no doubt that I'm going to convict you, okay. I don't –

Murphy:     I don't (inaudible) like that –

Yates:      Nothing personal, Ulysses. Nothing personal. I don't know you from Adam, okay? But I know from doing these interviews and talking to these people and some of these pictures that you shot this guy last night. I just don't know the circumstances surrounding it. I told these guys when they guys when they got out to

-16-

the scene that I'm sure he drove by and looked because everybody always drives back, okay? And I'm sure you saw how it was all taped off and there were (inaudible) everywhere because everybody's curious, you know. If I just had been involved in something like this, I'd drive by or walked by or looked or something. So you know where we were at. You know the boob joint, we didn't fuck with the boob joint. We didn't shut it down because everybody told us what we needed to know at that boob joint and we're not going to fuck with that boob joint, okay? I know this guy had all his jewelry on, okay? I know you wear a lot of jewelry. You had rings on all your fingers last night and necklaces and all that other junk, okay? And this guy had, so you might think he had, so you either wanted the jewelry or you wanted the money. I don't know if he was flashing money around when he was buying beers but it's my understanding that his sister was the one buying beers all night. So I don't think you saw how much money he had in his pockets. I think all you saw was that jewelry and all you wanted was the jewelry.

Viduya: Would there be any reason why these people would lie? I mean –

Murphy: (Inaudible)

Viduya: I mean, you told me that you know them, right?

Murphy: I know them.

Viduya: Would there be any reason they'd lie on me?

Murphy: (Shakes head)

Yates: The bar is run, the bar is run by Pamalee Jackson and Frank Green. Those are the two that run the bar. We talked to them too. We talked to everybody there. There was like, fifteen, fourteen, fifteen people there and we got an eyewitness that saw the struggle take place outside, saw you leave in a blue, four-door, small blue or black four-door car.

Viduya: Is that the same car that you have?

Murphy:     (Nods head.)  But it ain't a four door.

Yates:     (Inaudible) like that.  If you're watching somebody fighting, somebody get shot.  We can justify to somebody being afraid.  Well, I didn't get that two-door or four-door.  We have small, blue or black car and we have you picked out as the person.  The eyewitness that you left, the sister, okay?  You know you left her there.  You knew that we'd talk to her. You had to have been scared today.  You're probably scared now because you don't know what's going to happen, okay?  We can sit down.  We can tell you what's going to happen if we help you out.  If we don't help you out, if they push for a death penalty, that's up to them.  I only go for twenty-two, twenty-three years and thirty-three years myself, but I'm not the man.  Him [sic] and his partner are the men that are going to be in charge of it.  Even if you don't get the death penalty, you get twenty-two years or twenty-three years, what are you going to do in twenty-three years?  Are you going to be worth anything?  Do you want to spend twenty-three years of your life in prison?

Murphy:     I don't want to spend no time in jail.

Yates:     Well, the least amount of time, I can tell you right now you're going to spend some time in jail because I think this was intended as a robbery and you're going to have to spend serve the time for that.

Viduya:     But it's a big difference between a murder and a robbery and that's what we're trying to get through your head, man.  There's a big difference between a robbery and a murder, you know.  We make mistakes. I mean, I plan to do stuff, not robberies or something, but you make plans to do something and it just don't work out.  We know it's the spur of the moment.  You didn't stalk this guy.  I mean, if you sat out there and you was picking people out every Friday to Saturday night, if you was sitting out there and robbing somebody once a week out there, it would be different, but we think this was the spur of the moment.  You probably, you said you had a beer, you probably was buzzed, maybe had been high, whatever.  You wanted to take this guy's stuff.  He's a big guy, a big guy.  I wouldn't have wanted to take

-18-

this guy on. I mean, he's a big guy. He get a hold of you and you got a fight on your hands. The way he looked, he looks like the kind of guy you'd probably have to shoot because he doesn't look like he's going to punk, you know. If you could punk somebody like that, he looks like he's going to try you, so. He's a big guy. I think, I think he tried to try you, took a swing at you or whatever. And it was just an accident that happened.

Yates: If he jumped on you, and you can go through this with me, because you know this is exactly how this happened, he told his sister to go get in the car while you had the gun on him. His sister went and got in the car, okay. This is how you can follow along with me so you can tell if we're bullshitting you or not. She got in the car. That's when you and him got in the struggle. I never went to the hospital. I never looked at this guy. Them guys did. They said he was a big boy, okay? I wouldn't let somebody rob me if I'm with my sister. If he jumped on you and the gun went off or if he pushed on you or whatever he did, if he helped caused himself to get shot, okay, you were going to steal jewelry, I realize that. But if he caused himself to get shot, then we want to know that. If you were planning on shooting him, don't, don't tell us that, okay? Because if you were planning on it, which is what we're going to probably have to say is going to happen in court unless you end up telling us the truth, if you were planning on it, you don't want to talk to us about that, okay? If this guy jumped on you when you were robbing him or whatever, okay? Like I said, I found the one shell casing and he was shot one time, then you need to let us know. We're here to help you out. I'm willing to help you out, Ulysses, okay? But only if you tell me one hundred percent of the truth.

Murphy: OK, man. I wasn't trying to shoot the brother.

Yates: Were you trying to rob him?

Murphy: Yeah. I was going to (inaudible).

Yates: Have you ever shot anybody before that we don't know about?

| | |
|---|---|
| Murphy: | No. |
| Yates: | You only shot him one time? Is that correct? |
| Murphy: | Yeah. |
| Viduya: | Was it an accident? |
| Murphy: | He tried to grab the gun. |

(Videotape 1, Doc. No. 14, at 11:18.)

Prior to his trial, Murphy sought to have his confession suppressed on the ground that he had unequivocally invoked his right to terminate the interrogation when he said he was "ready to quit talking." *Id*. at 10:56:54. Larry Yates was the only witness called at that hearing. (Transcript of Suppression Hearing, Doc. No. 17.) He testified that Murphy's request to stop the interrogation was not honored, but claimed that neither he nor Viduya heard Murphy's "I'm ready to stop talking" statement until they reviewed the interrogation tape the day after the interview. (Tr. of Supp. Hrg., Doc. No. 17 at 35.) Yates insisted that Murphy never invoked his right to terminate the interrogation, testifying that "at one point he didn't want to talk, but obviously he went on in the interview. . . . Nobody made him continue to talk to us." (Tr. of Supp. Hrg., Doc. No. 17 at 36.) He further acknowledged that Murphy "said he didn't want to talk." *Id*. The prosecutor asked Yates only two questions:

| | |
|---|---|
| Prosecutor: | Sir, did the defendant clearly state either to you or to detective Viduya that he wanted an attorney present? |
| Yates: | No, he never said he wanted an attorney. |
| Prosecutor: | Did the defendant ever clearly state to you, or to Detective Viduya, that he wanted to termiate this interview, and he didn't want to answer any further questions? |
| Yates: | No, he never specifically stated that, either. |

(Tr. of Supp. Hrg., Doc. No. 17 at 40.) The first question is irrelevant since Murphy's claim is not

that he requested an attorney and was denied, but rather that he requested to terminate the interview by stating he was ready to quit talking, and that his request was not honored. In answering the prosecutor's second question, Yates contradicts his earlier testimony that he understood Murphy's statement that he was "ready to quit talking" to mean that he did not want to continue the interview. *Id.* at 36. Furthermore, Yates' testimony that Viduya did not hear Murphy's request to terminate the interview until he reviewed the videotape of the interview the next day is flatly contradicted by the videotape itself, which shows that Viduya verbally acknowledged hearing Murphy's statement by saying "Okay" immediately after Murphy spoke. How Yates could know what Viduya did or did not hear is also problematic, but since that testimony came out during the defense's questioning, the Court has no need to resolve that question.

The trial court found Murphy's statement to be less than a clear and unambiguous indication of his desire to terminate the interrogation. (Tr. of Supp. Hrg., Doc. No. 17 at 57.) The court explained that Murphy had not said he was ready to quit talking *now*, and that Murphy's continuing to answer questions after the statement was "further evidence" that he was willing to continue the interview. *Id.* at 57-58. In addition, the court found that since there was "no yelling and screaming, no even raising of voices by the interrogators" that there was no "long, drawn-out thing where you can see that a person is really getting worn down." *Id.* at 58.

On direct appeal to the Ohio Supreme Court, Murphy claimed in his second proposition of law that the trial court had erred in admitting his post-"I'm ready to quit talking" statements at trial. (Appendix, Vol. 3 at 18-22.) The court addressed the merits of Murphy's claim as follows:

> *Michigan v. Mosley*, [423 U.S 96 (1975)], holds that once a suspect invokes his right to remain silent, police must cease to question him. The invocation does not bar further questioning altogether, but police must scrupulously honor the defendant's exercise of his right to cut off questioning. *Mosley*, 423 U.S. at 104, *citing Miranda*, 384 U.S. at 479.

In this case, [Murphy] told Detective Viduya that he had not been involved in the crime. After telling his version, he said, "I'm ready to quit talking now and I'm ready to go home, too." Viduya left the interrogation room for a few minutes to consult another detective. When he came back, he brought a crime scene technician with him, and the interrogation resumed. [Murphy] answered without apparent reluctance, and ultimately confessed to holding Brooks up and shooting him.

[Murphy] contends that his statement to Viduya that he was "ready to quit talking, and * * * go home, too" was an expression of his desire to stop talking, hence an invocation of his right to remain silent. Since Viduya did not "scrupulously honor" that invocation, [Murphy] contends, his confession should have been suppressed.

However, police must honor an invocation of the right to cut off questioning only if it is unambiguous. *Davis v. United States* (1994), 512 U.S. 452, holds that "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests and attorney. * * * [W]e decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-462.

Although *Davis* dealt with invocations of the right to counsel, we think it also applies to the right to remain silent. "[E]very circuit that has addressed the issue squarely has concluded that *Davis* applies to both components of *Miranda*: the right to counsel and the right to remain silent." *Bui v. DiPaolo* (C.A.1, 1999), 170 F.3d 232, 239.

Although a suspect "need not 'speak with the discrimination of an Oxford don,'" *Davis*, 512 U.S. at 459, quoting *id.* [sic] at 476 (Souter, J., concurring in judgment), a suspect "must articulate his or her desire to remain silent or cut off questioning 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' and invocation of the right to remain silent." *State v. Ross* (1996), 203 Wis.2d 66, 78, quoting *Davis*, 512 U.S. at 459; see, also, *United States v. Mikell* (C.A. 11, 1996), 102 F.3d 470, 476. If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation or try to clear up the ambiguity. See *Ross*, 203 Wis.2d at 75-76, (citing cases); *State v. Owen* (La. 1997), 696 So.2d 715-717-718; *State v. King* (Me. 1998), 708 A.2d 1014, 1017. Thus, [Murphy's] claim turns on whether his statement was an unambiguous invocation of his right to stop talking.

> The first part of his statement – "I'm ready to quit talking" – might well be read as an unambiguous invocation of the right to remain silent if examined in isolation. However, we must examine [Murphy's] words not in isolation but in context. His full statement was: "I'm ready to quit talking *and I'm ready to go home, too*." (Emphasis added.)
>
> This statement can be interpreted as meaning simply that [Murphy] was ready to "go home." In *Moore v. Dugger* (C.A.11, 1988), 856 F.2d 129, 134, the question "When will you all let me go home?" did not amount to so much as an equivocal invocation of the right to silence. Obviously, if [Murphy] had gone home, he would also have stopped talking to the police. What is not clear, however, is whether his readiness to stop talking was independent of his desire to go home.
>
> What [Murphy] appears to have wanted was to be released. Talking to the police was a means to that end; he was trying to persuade them that he was innocent. Thus, his words did not necessarily mean that he wanted to stop talking, no matter what. If the police were not ready to let him go, he may well have wanted to keep trying to persuade them of his innocence.
>
> We conclude that [Murphy's] statement was not an unequivocal assertion of his right to remain silent. Such an ambiguous statement could create no obligation for the police to suspend their questioning of a criminal suspect. We therefore overrule [Murphy's] second proposition of law.

*State v. Murphy*, 91 Ohio St. 3d 516, 519-21 (2001)(parallel citations omitted).

The relevant question is compound, each part building upon the one before: (1) did Murphy unambiguously invoke his right to remain silent; (2) if so, did Viduya and Yates fail to scrupulously honor Murphy's request; and (3) if so, was Murphy prejudiced by their failure to do so? If all three parts of the question are answered "yes" when viewed through the lens of the AEDPA, then Murphy is entitled to habeas corpus relief. A "no" answer to any part means no habeas corpus relief is unwarranted.

In *Miranda v. Arizona*, 484 U.S. 436, 473-74 (1966), the Supreme Court explained the procedure to be followed when a suspect invokes the right to remain silent as follows:

Once warnings have been given, the subsequent procedure is clear.
If the individual indicates in any manner, at any time prior to or
during questioning, that he wishes to remain silent, the interrogation
must cease.  At this point he has shown that he intends to exercise his
Fifth Amendment privilege; any statement taken after the person
invokes his privilege cannot be other than the product of compulsion,
subtle or otherwise.  Without the right to cut off questioning, the
setting of in-custody interrogation operates on the individual to
overcome free choice in producing a statement after the privilege has
been once invoked.

The inquiry whether an individual has invoked his right to remain silent is an objective one.

*Davis v. United States*, 512 U.S. 452, 459 (1994).  Thus, an invocation of the right to remain silent

must be clear enough that "a reasonable police officer in the circumstances would understand the

statement to be [an assertion of the right]."  *Id.*

In *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1096-97 (6th Cir. 1990), the court held that the

statement, "I can't tell you no more tonight," was an unambiguous indication that the suspect wished

to terminate the interview, even though the interrogating officer testified, *albeit* "disingenuously,"

that he never drew that conclusion from the statement.  Here, in contrast, Detective Yates testified

at the suppression hearing that he understood Murphy's "I'm ready to quit talking" statement to

mean that Murphy did not want to talk, but denied it constituted an invocation of his right to remain

silent, a difficult position to explain or defend.  (Doc. No. 17 at 36.)  Rather than take on that task,

the Ohio Supreme Court misinterpreted Murphy's words into a finding that Murphy really just

wanted to be released, and that "[o]bviously, if [he] had gone home, he would also have stopped

talking to the police."  *State v. Murphy*, 91 Ohio St. 3d 516, 520-21, 747 N.E.2d 765 (2001).  To be

sure, questioning would have been unlikely to continue had Murphy gone home, but the state court's

interpretation of his spoken words in that manner was objectively unreasonable because it

obliterated the meaning of nearly half of the words in his statement.  As the Sixth Circuit Court of

Appeals has observed, it is simply unreasonable not to take an individual's words at face value.

-24-

*McGraw v. Holland*, 257 F.3d 513, 519 (6th Cir. 2001.)

Although the state court was correct in stating that Murphy's words must be examined not in isolation but in context, even doing so, Murphy clearly expressed two desires:  (1) to terminate the interview, and (2) to go home.  Those two desires are not incompatible, and neither are they two ways of saying the same thing, as the Ohio Supreme Court determined when it suggested that all Murphy really wanted was to go home.  *Id*. at 521.  But the state court did not stop there.  It went on to suggest that Murphy might actually have wanted to keep talking in an attempt to persuade Yates and Viduya of his innocence, effectively turning the meaning of Murphy's words completely upside down.  *State v. Murphy*, 91 Ohio St. 3d 516 (2001).  Undoubtedly Murphy did want to be released, but that desire did not eliminate his concurrent desire to terminate the interrogation as the Ohio Supreme Court opined.  In addition, short of employing a Yogi Berra-like approach to language, Murphy's use of the word "too" at the end of his statement constitutes a clear and unambiguous indication that he was expressing two separate desires, each independent of the other. The Ohio Supreme Court's conclusion that the first part of Murphy's statement had no meaning at all is objectively unreasonable and contrary to federal law as articulated by the United States Supreme Court in *Miranda* and its progeny.  This Court concludes that Murphy did indeed unambiguously invoke his right to remain silent by telling Detective Viduya that he was "ready to quit talking," and that his request to terminate the interview was not diluted or undone by his concurrent desire to be released.

Next, the Court considers whether the officers scrupulously honored Murphy's request that the interrogation stop.  The Court observes that the Ohio Supreme Court did not address this prong of the analysis since it found Murphy had not invoked his right to remain silent.  Consequently, this Court addresses the question *de novo*.

*Edwards v. Arizona* added a second layer of protection to the

> *Miranda* rules, holding that 'when an accused has invoked his right
> to have counsel present during custodial interrogation, a valid waiver
> of that right cannot be established by showing only that he responded
> to further police-initiated custodial interrogation even if he has been
> advised of his rights.'

*Michigan v. Harvey*, 494 U.S. 344, 350 (1990), *quoting Edwards*, 451 U.S. at 484. *Edwards* thus

established another prophylactic rule designed to prevent police from badgering a defendant into

waiving his previously asserted *Miranda* rights. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1044

(1983) (plurality opinion). Although *Edwards* concerned a suspect's invocation of his right to

counsel during interrogation, its logic extends to situations where the suspect stops short of

requesting counsel and seeks only to invoke his right to remain silent. *See Michigan v. Mosley*, 423

U.S. 96 (1975).

During the suppression hearing, Detective Yates testified first that neither he nor Viduya

heard Murphy say he did not want to talk anymore until they viewed the videotape of the

interrogation the next day. (Doc. No. 17 at 33.) The falsity of that testimony is clearly demonstrated

by the videotape of the interrogation, as was noted by Justice Cook in her concurrence on direct

appeal:

> According to Detective Yates, Detective Viduya "didn't catch"
> Murphy's attempted invocation of the right to remain silent at the
> time he made it because Murphy was "mumbling." If this were true,
> the state's argument that Murphy failed to invoke clearly and
> unambiguously the right to cut off questioning would be more
> persuasive, for an inaudible invocation of the right to cut off
> questioning can hardly be described as a clear and unambiguous one.
>
> But Detective Yates's testimony at the suppression hearing is flatly
> contradicted by the videotape recording of the interrogation, which
> is also a part of the record here. At approximately 10:57 p.m. on the
> videotape, Detective Viduya, seated directly in front of Murphy at a
> small table, said to Murphy, "I'm working on this homicide, but I'm
> not the primary investigator, [okay]? I'm going to see if I can get
> ahold of him, because he knows more details about this than I do."
> With Detective Viduya still seated at the table and looking directly
> at him, Murphy responded indignantly (and in a volume *at least* as

> loud as his previous responses, if not noticeably louder), "I'm ready
> to quit talking now[2] and I'm ready to go home, too." Still looking
> directly at Murphy, Detective Viduya responded, "[*Okay.*] *Just let
> me ask him a couple of questions before I come back, all right? You
> just chill out right there.*" (Emphasis added.) The videotape
> contradicts Detective Yates's suppression hearing testimony, for it
> confirms not only that Murphy's statement was clearly audible, but
> also that Detective Viduya both heard and responded to the
> statement.

*State v. Murphy*, 91 Ohio St. 3d 516, 552, 747 N.E.2d 765 (2001)(Cook, J., concurring.) With the

single exception as noted in footnote 2, below, and having repeatedly viewed the videotape, this

Court finds Justice Cook's description of events on the videotape to be accurate.[3] Detective Yates'

testimony to the contrary is completely at odds with the videotaped evidence, and it consequently

provides no excuse for his and Viduya's failure to honor Murphy's invocation of his right to remain

silent.

Yates also testified that "[Murphy] stated at one time he didn't want to talk, but obviously

he went on in the interview. . . . Nobody made him continue to talk to us." (Tr. of Supp. Hrg., Doc.

No. 17 at 35-36.) The trial court seemed to credit Yates' rationalization, stating

> [W]hen the detectives come back in [to the interrogation room about
> two minutes after Murphy said he was ready to stop talking], there's
> no hesitation on his part. He just keeps talking with them. At no
> point during this interview, as I have seen on some other
> interrogations, it's not a long, drawn-out thing where you can see that
> a person is really getting worn down. There's no yelling and
> screaming, no even raising of voices by the interrogators to say there

---

[2]As noted, both the majority and the concurrence agree that Murphy included the word "now" in his expression of his desire to stop talking, *State v. Murphy*, 91 Ohio St. 3d at 519, 550 (Cook, J., concurring), although the majority omitted the word without so indicating in its further discussion, *State v. Murphy*, 91 Ohio St. 3d at 520-21.

[3]At the end of the suppression hearing, the trial court ruled from the bench, rejecting Murphy's motion to suppress his confession. (Tr. of Supp. Hrg., Doc. No. 17 at 56.) The judge concluded that Viduya was talking on his way out of the room, *id.*, which is clearly in conflict with the videotape evidence. The judge acknowledged that, even though Murphy was mumbling, Murphy's words were "an indication to me of, hey, I'm just ready to quit talking and kind of have this over with." *Id.* at 57. Because the trial court did not think Murphy said "I'm ready to stop talking *now*," however, the court did not find Murphy's request to be an unequivocal invocation of his right to remain silent. *Id.* at 57. The trial court's factual finding that Murphy did not include the word "now" in his request was implicitly overruled by the Ohio Supreme Court's finding that he had. *See* footnote 2, above.

is any kind of coercion going on here.

*Id*. at 58.  This sort of *ex post facto* rationalization for violating an individual's right to remain silent has been condemned by the United States Supreme Court.  *Smith v. Illinois*, 469 U.S. 91, 99-100 (1984)(holding that "*post request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself"); *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)(holding that following invocation of the right to counsel, a valid waiver cannot be established by showing that the suspect responded to further police interrogation); *see also United States v. Harrison*, No. CR-3-92-93, 1993 WL 1367348 at *2 (S.D.Ohio, Feb. 19, 1993)(noting that "[s]eeking 'cooperation' after a suspect invokes the right to silence is but another coercive method to violate the right to silence by eliciting incriminating statements").  Nothing in the law requires officers to yell or scream or raise their voices at a suspect who invokes his right to remain silent before a violation of his right is manifest.  Thus, Yates' and the trial court's explanations as to why Murphy's request to terminate the interrogation was not "scrupulously honored" as required by *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), is transparently and obviously a violation of Murphy's right to remain silent.

The last question to be answered by this Court with respect to Murphy's first ground for relief, is whether he suffered prejudice from the erroneous admission of his confession into evidence at his trial.  A review of the evidence before the jury excluding Murphy's post-invocation statements, therefore, is in order.

Frank Green, a patron of the F & H Grill on the night of the murder, testified that the after-hours bar was crowded that night with fifty or sixty people inside.  (Trial Tr. at 1058.)  He was familiar with André Brooks' sister, CondreaWebber, because he worked with her and he testified that he saw her at the F & H Grill in the wee hours of May 11, 1997.  *Id*. at 1059.  Green was also acquainted with Murphy through Murphy's parents.  *Id*. at 1062-63.  Green saw Murphy at the F &

H Grill that night as well. *Id.* at 1066. Green testified that he saw Webber and her brother leave the bar via the only exit, and that Murphy followed them out shortly afterwards. *Id.* at 1067. Some time later, Green was unable to say precisely how much later, a woman yelled up the stairs that there had been a shooting outside. *Id.* at 1060-61, 1068.

On cross-examination, Green admitted that he worked at the bar, that it was a "boob joint,"[4] that it did not possess a liquor license, and that it was an illegal establishment. *Id.* at 1069-71. Green acknowledged that the parking lot of the bar was a gravel lot with only one light, making it "fairly dark" in the parking area. *Id.* at 1071-73.

Condrea Webber testified that she and her brother visited a friend of hers the night of May 10, 1997, then the three went to the C & S Lounge in Columbus, where she had one alcoholic beverage and her brother had four or five. (Trial Tr. at 1001-02.) They remained at that bar until closing, at which point they went to the F & H Grill. *Id.* at 1002. There she had one more alcoholic drink while her brother consumed two or more drinks and smoked some marijuana. *Id.* at 1004, 1011. Webber and her brother stayed at the F & H Grill for about an hour and decided to leave at approximately 3:30 a.m. *Id.* at 1005. By that time, Brooks was "pretty drunk or stoned." *Id.* at 1011. He was walking slower than she, and when she heard a "shuffling of feet" behind her, she turned to see him standing at the rear of their car with his hands in the air and another man telling Brooks to take off his gold jewelery. *Id.* at 1006. Brooks implored the man to let Webber get in the car while she fumbled for the car keys, ultimately setting off the car alarm system. *Id.* Brooks told her how to turn the alarm off, and she got into the car then started the engine, watching what was going on behind the car in the rear view mirror. *Id.* From that vantage point, she could clearly see both men from the waist up. *Id.* at 1025. All the while, the man held a handgun pointed at Brooks.

---

[4]The transcript calls the business a "boot joint," but the Court is certain the proper term is "boob joint" and will refer to it as such.

*Id*. The robber was impatient with Brooks and told him to hurry up as Brooks tried to remove his gold chains. *Id*. at 1007. In an apparent attempt to dissuade his attacker, Brooks told her to reach under the seat, presumably to make the robber think there was a weapon there, after which Webber opened the car door and told the man they did not have any weapons. *Id*. at 1007-8, 1026. The robber kept telling Brooks he was moving too slow, and Webber could see her brother shaking as he tried to unclasp his several gold chains. *Id*. at 1026-27. She saw the gunman step back, heard a gunshot, heard her brother scream, then saw him fall to the ground. *Id*. at 1027-28. She wasted no time pressing on the gas pedal of the car to get away, and as she did so, she heard a second shot. *Id*. at 1028-29. Webber fled to a nearby fast food restaurant where she found a police officer and reported to him what had happened. *Id*. at 1009. When she returned to the scene, police had already arrived. *Id*. at 1009. The officers apparently rounded up several people in the vicinity, whom Webber identified as having *not* been her brother's attacker. *Id*. at 1030. She testified that she had seen Brooks' murderer come into the F & H Grill that night, and that if she saw a picture of him, she could identify him. *Id*. at 1031. Later, when she was at the hospital, she was presented with an unknown number of pictures, told the perpetrator's picture may or may not be among them, and told not to identify any of the individuals portrayed as the killer if she was uncertain as to whether he was the killer. *Id*. at 1034. She identified Murphy's photograph as the one depicting the person who accosted her and her brother, and she later identified him at trial. *Id*. at 1035, 1039.

Dr. Larry Tate performed the autopsy on Brooks' body and testified that his blood alcohol level was .4 when he died, a level he described as "profoundly high" and "in [the] severe toxic range." (Trial Tr. at 1144.) Brooks was also under the influence of marijuana at the time of his death. *Id*. Dr. Tate explained that those levels of intoxication would cause a person to be terribly uncoordinated (Trial Tr. at 1145), explaining Brooks' difficulty with removing his gold chains when demanded by his killer. After describing the appearance of Brooks' wounds, and the trajectory of

the projectiles fired from the murder weapon, Dr. Tate testified that at least one of Brooks' arms was in the air when he was shot.  *Id.* at 1150-51.  He concluded to a reasonable degree of scientific certainty that Brooks died of multiple gunshot wounds to his torso.  *Id.* at 1151-52.

William Snyder, a detective with the Columbus Police Department, testified that the rear window of the car through which Webber viewed her brother's murder was tinted, and that the lighting in the vicinity of the murder was not designed to light the parking lot.  (Trial Tr. at 1110-14.)

Next, the Court determines whether, in light of the other evidence presented at trial, admission of Murphy's confession was harmless error beyond a reasonable doubt.  *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991).  Murphy contends Webber's testimony was unreliable. (Petition, Doc. No. 10 at 11-12.)  Murphy claims Webber's testimony was unreliable because she was recounting events she viewed through a tinted window in a dark parking lot, that took place at about 3:00 a.m., after an evening of drinking.  (Petition, Doc. No. 10 at 11-12.)  He further suggests that Webber's credibility is questionable because she testified at the suppression hearing that the window of the car through which she saw the murder was tinted, but at trial she testified that they were not tinted.  *Id.*  Those facts do not undermine Murphy's conviction and sentence.  It is true that Webber was drinking on the night in question.  She testified, however, that she was the designated driver, and that she consequently had only one drink at each of the two establishments she and her brother visited that night.  (Trial Tr. at 1001-4.)  There is no other evidence in the record to support Murphy's insinuation that Webber was impaired or intoxicated.  Furthermore, even though the window of the car may have been tinted and the parking lot "wasn't that bright" (Trial Tr. at 1017), Webber testified that she saw Murphy come into the bar after she and her brother arrived there, and that she had a clear view of both men through the window via the rear view mirror, as noted above. In addition, she testified that she had her best look at Murphy when she leaned out of the car and

looked back at him in the process of reassuring Murphy that she and her brother did not have a weapon.  (Trial Tr. at 1021-22.)  Nor did her testimony rely exclusively on her ability to see what was happening behind the car.  She testified that she heard Murphy order her brother to take his gold chains off, that he repeatedly ordered Brooks to hurry up, and that when Brooks was either unable or unwilling to do so, she heard two gunshots.  (Trial Tr. at 1008, 1021, 1027.)

Most importantly, however, is that Webber's testimony is corroborated by that of Frank Green, who knew Murphy and testified that he was at the bar and followed Webber and Brooks out to the parking lot just before Brooks was murdered.  Murphy does not challenge Green's credibility.  Logically, it is next to impossible for the Court to accept Green's testimony, and reject Webber's as incredible, or the product of inebriation, poor lighting, and window tint.

Murphy also claims that the prosecutor's reliance on Murphy's confession during his arguments in the guilt and penalty phases of the trial prejudiced his defense.  (Petition, Doc. No. 10 at 11-12.)  It is true that the prosecutor referenced Murphy's confession in both closing arguments.  (Trial Tr. at 1239, 1240, 1243, 1246, 1247, 1256, 1262, 1544-45.)  Argument was devoted to the other substantial independent evidence of Murphy's guilt and the absence of any mitigating effect in the nature and circumstances of the offense as well, however.  (Trial Tr. at 1239, 1244-47, 1259, 1261-62, 1540-46, 1556-61.)  Where there is strong independent evidence of a defendant's guilt, particularly where there is eyewitness evidence presented at trial, the erroneous admission of a confession is harmless error.  *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1099-1100 (6th Cir. 1990).  In *Kordenbrock*, there was evidence that the defendant committed the offense from sources other than the defendant's confession, but there was no other evidence introduced to contradict the defendant's claim at trial that he was under the influence of drugs and alcohol at the time and had not intended to cause death.  *Id*.  In his confession, Kordenbrock had provided the prosecution with the most damaging evidence respecting the intent element of the offense.  *Id*. at 1095.  The Sixth

Circuit Court of Appeals distinguished Kordenbrock's situation from that of the defendant in *Burks v. Perini*, 810 F.2d 199, 1986 WL 18388 (6th Cir. 1986), where there was strong independent evidence pointing to Burks' guilt other than his confession. Because Kordenbrock's confession contained statements for which there was no independent evidentiary support, admission of the confession was not harmless. In *Burks*, however, the court found the admission of the statement into evidence was harmless since the confession contained no statement that was not also supported by independent evidence. *Burks*, 1986 WL 18388 at *1. Murphy is in a position more similar to that of Burks than Kordenbrock because of the testimony provided by Green, Webber, and Dr. Tate, summarized above, each of which was factually consistent with the others. Amalgamation of the testimony before the jury, excluding Murphy's confession, provides ample evidence that Murphy purposely murdered Brooks in the course of an aggravated robbery. Therefore, even if Murphy's confession had not been admitted into evidence, the damaging substance of it was before the jury through the testimony of those other witnesses, and the prosecutor could have persuasively made the same arguments with regard to the legitimately admitted evidence.

Murphy also suggests that trial counsels' strategy may have been different had the confession not been admitted into evidence. (Petition, Doc. No. 10 at 12. At the evidentiary hearing in these proceedings, however, Murphy's trial counsel Terry Sherman stated that the after-hours bar patrons' acquaintance with and identification of Murphy as having been at the bar the night of the murder, Condrea Webber's expected testimony as the only eyewitness to the murder, and Murphy's own demeanor also factored into his formulation of the theory of the defense. (Evid. Hrg. Tr., Doc. No. 79 at 20-26.) To be sure, he considered Murphy's confession as well, but Sherman never indicated it was the sole or primary reason he decided to try the case the way he and his co-counsel did, nor did he indicate his approach to the defense would have been different had Murphy's confession been excluded. (Evid. Hrg. Tr., Doc. No. 79 at 21.) Having considered Murphy's arguments respecting

-33-

prejudice from the erroneous admission of his confession, this Court concludes that admission of the confession into evidence, though unquestionably constitutional error, was harmless. This is not a case akin to *Fulminante* where the prosecutor acknowledged the weakness of his case without the defendant's confession, and where the trial court and the prosecutor agreed that a conviction depended upon the jury believing the confession. *Arizona v. Fulminante*, 499 U.S. 279, 297-98 (1991). Consequently, Murphy is not entitled to habeas corpus relief on his first ground for relief, and it should accordingly be denied.


**Second Ground for Relief**

In his second ground for relief, Murphy contends his rights to a fair trial and to due process of law were violated when the alternate jurors were permitted to join the jurors in the deliberation room during both phases of the trial. (Petition, Doc. No. 10 at 14.) Respondent answers that the claim is both procedurally defaulted and meritless. (Return of Writ, Doc. No. 12 at 35-41.) Murphy argues that his trial counsels' ineffectiveness constitutes cause for his default. (Traverse, Doc. No. 21 at 30.)

Murphy presented the instant issue as his seventh proposition of law on direct appeal to the Ohio Supreme Court. (Appendix, Vol. 3 at 125-28.) The court recognized the validity of Murphy's claim that it is error to permit alternate jurors to be present with the jury during deliberations, but ultimately rejected the claim on procedural grounds. *State v. Murphy*, 91 Ohio St. 3d 516, 531-32 (2001). As Respondent asserts, the court found Murphy had failed to object to allowing the alternate jurors in the deliberation room, and thereby waived any error. *Id*. at 532. Furthermore, the court found no plain error to permit consideration of the merits of Murphy's claim, and it was overruled. *Id*. at 533-34.

Ohio's rule requiring a contemporaneous objection to trial errors is an independent and

adequate state procedural rule. *Scott v. Mitchell*, 209 F.3d 854, 867-68 (6th Cir. 2000), *citing Engle v. Isaac*, 456 U.S. 107, 124-29 (1982).  In addition, a state appellate court's review for plain error is enforcement, not waiver, of a procedural default.  *Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001), *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)(plain error review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604, 635 (6th Cir. 2003).  Thus, Murphy's claim is procedurally defaulted unless he can demonstrate cause and prejudice for the default.

As noted, Murphy contends the ineffectiveness of his trial counsel constitutes cause and excuses the default.  (Traverse, Doc. No. 21 at 29.)  He raises his counsels' ineffectiveness in his fourth ground for relief (Traverse, Doc. No. 10 at 18-24), and identifies their failure to object to the presence of the alternate jurors in the deliberations as one of the errors illustrating their ineffectiveness (Traverse, Doc. No. 21 at 20).  As this Court concludes, *infra*, that Murphy's counsel were not ineffective, Murphy's attempt to demonstrate cause and prejudice for the default of the instant claim fails, and it should be denied as procedurally defaulted.

Even if that were not so, however, Murphy's claim would nevertheless fail on the merits.  Both in the state court (Appendix, Vol. 3 at 53-54), and in these habeas proceedings (Traverse, Doc. No. 21 at 30-31), Murphy advocates a presumption of prejudice in situations where alternate jurors are erroneously permitted into the jury deliberation room.  Since the Ohio Supreme Court relied upon a state procedural rule in rejecting Murphy's claim, it did not address whether Murphy had suffered prejudice as a result of the error.  Here, Murphy argues that Ohio R. Evid. 606(B) forecloses the discovery of evidence that could assist him in demonstrating prejudice from the claimed error.  (Traverse, Doc. No. 21 at 30.)  Murphy posits that since the rule makes it impossible for him to prove prejudice, prejudice should be presumed.  *Id*.  Whether the state rule so handicaps Murphy would be irrelevant to this Court's analysis since the Federal Rules of Evidence apply in federal

habeas corpus.  *See Spencer v. Georgia*, 500 U.S. 960, 961 (1991)(observing that "[s]tate rules of evidence have no direct application in federal habeas courts"); *In re Byrd*, No. C-1-01-698, 2001 WL 1512986 at *12 (S.D. Ohio Nov. 29, 2001) (noting that "Fed. R.Evid. 1101(e) provides that the Rules of Evidence are to be applied to habeas corpus proceedings 'to the extent that matters of evidence are not provided for in the statutes which govern procedure therein or in other Rules prescribed by the Supreme Court pursuant to statutory authority.' . . . The Rules Governing § 2254 Cases do not adopt any special rules of evidence for habeas corpus proceedings").

Federal Rule of Evidence 606(b) provides as follows:

> Upon inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or to dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that  a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Accordingly, when Murphy asked that he be permitted to depose the jurors to support the instant claim (Doc. No. 18 at 5-6), his request was denied on the basis that it contravened Fed. R. Evid. 606(b) (Doc. No. 26 at 6-8; Doc. No. 38).[5]  Murphy's request to call unspecified jurors as witnesses at his evidentiary hearing was denied for the same reason.  (Doc. Nos. 31 at 9; 34 at 7; 36.)  Finally, Murphy's contention that prejudice should be presumed when an evidentiary rule interferes with a petitioner's ability to conduct discovery to support his claim is flatly contradicted by *United States v. Olano*, 507 U.S. 725, 737-38 (1993), where the Court declined to presume prejudice from the

---

[5]An interesting question is whether alternate jurors are strangers to the jury once deliberations begin.  In other words, might the alternate jurors be "extraneous" to or an "outside influence" on the deliberating jurors?  Since no such argument has been advanced here or in the state courts in Murphy's case, however, the Court has no reason to address the question.

presence of two alternate jurors in deliberations.  Admittedly, the issue before the Supreme Court

in that case had more to do with the requirements of Fed. R. Crim. Proc. 24(c) than Fed. R. Evid.

606(b), but there is no reason to believe that the Court's reasoning would be different in the context

of the evidentiary rules.  In fact, the Court's observation that "[w]e cannot imagine why egregious

comments by a bailiff to a juror, or an apparent bribe followed by an official investigation should

be evaluated in terms of 'prejudice,' while the mere *presence* of alternate jurors during jury

deliberations should not," *id.* at 739 (citations omitted), is equally applicable in both contexts.  Thus,

the Court declines Murphy's invitation to presume prejudice from the alternate jurors' presence in

deliberations in his case.

Murphy's second ground for relief is procedurally defaulted and should be denied on that

basis.  Even if it had been properly preserved, he has failed to demonstrate prejudice from the error

and the Court would have recommended denial on that ground.  Consequently, it is recommended

that Murphy's second ground for relief be denied.


**Third Ground for Relief**

In his third ground for relief, Murphy argues that the fairness of his trial was compromised

when the trial court refused to grant his challenges for cause against three prospective jurors.

(Petition, Doc. No. 10 at 16-17.)  Respondent acknowledges the claim is preserved for habeas corpus

review, but contends it is without merit.  (Return of Writ, Doc. No. 12 at 41-45.)

In considering the merits of Murphy's proposition of law, the Ohio Supreme Court reasoned

as follows:

> A juror whose views on capital punishment are such that they would
> prevent or substantially impair his ability to consider mitigating
> factors, as the law requires, is disqualified.  See *Morgan v. Illinois*
> (1992), 504 U.S. 719, 729; *State v. Williams* (1997), 79 Ohio St.3d 1,
> 5-6, 679 N.E.2d 646, 653; *State v. Rogers* (1985), 17 Ohio St.3d 174,

178-179, 478 N.E.2d 984, 989-990. [Murphy] claims that the trial court improperly overruled his challenges for cause of three such jurors.

Venireman Roe said that he "would be able to" impose a sentence other than death, although he "[couldn't] imagine any [such circumstances] right now." Roe stated that he "would start with death and go from there. * * * [I]f conditions are presented to me that make me think that [the sentence] should not be the maximum, then I would consider that." Roe gave examples: if the victim's family asked the jury to spare the defendant's life, or the defendant suffered from a "psychological imbalance." Failing that, Roe would vote for a sentence of death "or at least life without parole." Once Roe was told that the law required the jury to consider mitigating factors, he agreed that he could fully and fairly consider all the evidence.

[Murphy] challenged Roe for cause; the challenge was overruled, and [Murphy] struck Roe with a peremptory challenge.

Venireman Hector stated at the outset that he would not automatically vote to recommend death after a finding of guilty but would decide whether death was appropriate only after listening to the mitigation presented and deciding what weight to give it. While he said that he would give little weight to certain mitigating factors, he never refused to consider them, and he specifically mentioned others that he would consider.

Under defense examination, Hector seemed to contradict himself, stating that "if the intent was to kill, I would have to ask for death." Hector then clarified these statements: they referred to a situation where there were no mitigating factors.

The trial judge found that Hector had misunderstood defense counsel to be talking about a case with no mitigating circumstances. Thus, the judge overruled the challenge, and Hector sat on the jury.

Venireman Arnold was seated as an alternate. She stated that "I think I want to listen to everything and look at all sides before I would make a decision." Specifically, she thought "I would want to listen to the mitigation evidence * * * [because] I don't think you get the whole picture unless you do." Only once did she waver from this position, saying, "There is a possibility I would not." However, on further inquiry, it turned out that she had not understood defense counsel's questions.

The record affords no basis to overturn the trial judge's rulings on

> these jurors. As soon as each juror understood that he or she would have a legal duty to consider mitigation, each one said he or she could do so. The trial judge could reasonably find that these jurors' ability to weigh mitigating circumstances would not be substantially impaired. We note that the judge was sensitive to this issue and granted other _Morgan_ challenges by the defense when called for. We do not think she abused her discretion in denying the ones at issue here.

_State v. Murphy_, 91 Ohio St. 3d 516, 526-27 (2001).

Murphy identifies _Morgan v. Illinois_, 504 U.S. 719 (1992), as the law governing his claim (Petition, Doc. No. 10 at 16; Traverse, Doc. No. 21 at 32), as did the Ohio Supreme Court in its consideration of Murphy's proposition of law raising the issue. _Morgan_ is, in fact, the only case Murphy cites in his arguments relating to the instant ground for relief (Petition, Doc. No. 10 at 16-17; Traverse, Doc. No. 21 at 32-34), and the only federal case mentioned by the Ohio Supreme Court in its discussion, _Murphy_, 91 Ohio St. 3d at 526-27. That case, however, is factually dissimilar to Murphy's.

In _Morgan_, the prosecutor requested that the trial court ask the prospective jurors if they "would in all instances refuse to impose the death penalty upon conviction of the offense," and the trial court did so.[6] 504 U.S. at 722. Later in _voir dire_, defense counsel requested that the jurors also be asked if they would "automatically vote to impose the death penalty no matter what the facts are." _Id._ at 723. The defense request was denied by the trial court. _Id._ The question before the United States Supreme Court in _Morgan_, therefore, was "whether, during _voir dire_ for a capital offense, a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction

---

[6]"In accordance with Illinois law, the trial court, rather than the attorneys, conducted _voir dire_" in Morgan's case. _Morgan_, 504 U.S. at 722.

of the defendant." *Morgan*, 504 U.S. at 721.[7] Murphy, however, does not contend his opportunity to *voir dire* prospective jurors was limited in any way. Instead, he argues that the *voir dire* revealed that three prospective jurors were unable to "follow the law and would automatically impose the death penalty after a finding of guilt," implicitly conceding the adequacy of the *voir dire*. (Petition, Doc. No. 10 at 16.) Thus *Morgan* is inapposite.

The United States Supreme Court has articulated a defendant's right to an impartial jury as it relates to prospective jurors' views on the death penalty as follows:

> In *Witherspoon* [*v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d. 776 (1968)], this Court held that a capital defendant's right, under the Sixth and Fourteenth Amendments, to an impartial jury prohibited the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S., at 522 . . . . It reasoned that the exclusion of venire members must be limited to those who were "irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings, "and to those whose views would prevent them from making an impartial decision on the question of guilt. *Id*., at 522, n. 21 . . . . We have reexamined the *Witherspoon* rule on several occasions, one of them being *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), where we clarified the standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment. We there held that the relevant inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424, . . . quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

*Gray v. Mississippi*, 481 U.S. 648, 657-58 (1987). In addition, the Supreme Court has long rejected the notion that the erroneous dismissal of a prospective juror on account of her views on the death penalty is amenable to harmless error analysis. *Id.* at 668, *citing Chapman v. California*, 386 U.S.

---

[7]The *Morgan* Court did include in its *dicta* a brief review of the cases that establish the standard for challenging a prospective juror based on his or her views on the death penalty, *Morgan*, 504 U.S. at 728-29, but that was not a holding of the case, and consequently is not the "clearly established" federal law referred to in 28 U.S.C. § 2254(d)(1). *Williams v. Taylor*, 529 U.S. 362, 412 (2000)(explaining that "that statutory phrase refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.")

18, 23 (1967).  "The nature of the jury selection process defies any attempt to establish that an erroneous *Witherspoon-Witt* exclusion of a juror is harmless."  *Gray*, 481 U.S. at 665.  As argued by Respondent, *Witt* is the governing law relevant to Murphy's claim, and his claim will be evaluated in light of that case, even though neither the state court nor Murphy have relied upon it.

First, Murphy contends his challenge for cause against prospective juror Eugene Roe[8] should have been granted by the trial court.  (Petition, Doc. No. 10 at 16-17.)  Roe stated he believed the death penalty was a "legitimate punishment in the scheme of punishments" and that he did not believe it should be automatically imposed whenever one person kills another.  (Trial Tr. at 279.)  He acknowledged that killing another puts one's own life in jeopardy but that differing circumstances and situations might result in different punishments for similar crimes.  (Trial Tr. at 279-81.)  Roe denied that death was the only sentence he could impose where an aggravated murder was committed in connection with an aggravated robbery, indicating instead that he would "start with death and go from there."  (Trial Tr. at 282.)  Circumstances surrounding the murder and characteristics of the offender, including remorse, the wishes of the victim's family, and a psychological or chemical imbalance, could cause him to temper his belief as to the appropriate penalty.  (Trial Tr. at 283-84.)  Roe expressed openness to the idea that something that happened in a person's childhood could affect them as an adult, but stated it would be difficult for him to impose a life sentence rather than death based on that factor alone.  (Trial Tr. at 286-87.)  Roe said he could fully and fairly consider all the evidence presented during the mitigation phase, should it come to pass, and that he would take an oath to do so.  (Trial Tr. at 291.)

Following his *voir dire*, defense counsel challenged Roe for cause on the ground that he was

---

[8]Murphy did not cite to the record in claiming to have made a challenge for cause against Roe in either his state-court proceedings or in these proceedings, but the Court finds that the challenge appears on page 292 of the trial transcript.  It bears repeating that the Court is not required to search the record for support for parties' arguments.

predisposed to the death penalty. (Trial Tr. at 292.) The judge denied the challenge stating that he understood Roe's statements to be that he would follow the law. (Trial Tr. at 294.) Read in context of Roe's entire *voir dire*, there is no indication that his "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424. The most troubling of his comments was that he would "start with death" when considering punishment and work his way back from there in light of the evidence in mitigation. In essence, what Roe stated was that at the conclusion of the guilt phase where there were guilty verdicts on a capital offense and its aggravating circumstance(s), he would presume death was the appropriate penalty and would only impose a life sentence if there was mitigation evidence sufficient to justify the lesser penalty. Although not couched in terms of a presumption, Roe's explanation of the process he would employ matches Ohio's death penalty statutory requirement that a jury must return a death verdict if the aggravating circumstances outweigh the mitigating factors. Ohio Rev. Code § 2929.03(D)(3). To get to the mitigation phase of a capital trial, a jury must have found the aggravating circumstances beyond a reasonable doubt in the guilt phase of the trial. Ohio Rev. Code § 2929.03(B). Therefore, following conviction, and in the absence of any or sufficient mitigation evidence, the presumption is a death sentence. Roe's other statements also demonstrate his willingness to consider mitigation evidence and to follow the law.

Murphy's argument consists of nothing more than an out-of-context repetition of a few of Roe's statements and broad conclusions based upon them. (Petition, Doc. No. 10 at 16-17; Traverse, Doc. No. 21 at 32-33.) Murphy has consequently failed to demonstrate that the Ohio Supreme Court's rejection of his claim respecting prospective juror Roe was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

Murphy also claims his challenge for cause against juror Rick Hector was erroneously denied and that the Ohio Supreme Court's decision to the contrary violates federal law. (Petition, Doc. No.

10 at 17.)  He contends that Hector's admission that he probably would not give much weight to a defendant's background (Trial Tr. at 484) displayed a predisposition for imposition of the death penalty.[9]  No United States Supreme Court case holds that a juror is required to give any particular weight at all to any particular mitigation evidence, and Murphy does not contend such law exists. In addition, Hector's statement that he "probably" would not give Murphy's "history, schooling, jobs, upbringing, [and] any background information . . . much weight" (Trial Tr. at 484) does not mean he absolutely would not give such evidence any weight, especially when it is remembered that Hector was commenting in a vacuum as he had no details of Murphy's background during *voir dire*. Furthermore, Hector rejected the notion of an automatic death penalty (Trial Tr. at 483) and professed an ability to listen to mitigation evidence, assign it appropriate weight, perform the balancing process between the aggravating circumstances and mitigating factors, and then decide the appropriate penalty (Trial Tr. at 486).  Murphy has not demonstrated that the Ohio Supreme Court's resolution of his claim respecting juror Hector was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

Finally, Murphy contends his challenge for cause against prospective alternate juror Dianne Arthur should have been granted.  (Petition, Doc. No. 10 at 17.)  Both the Ohio Supreme Court and Murphy misstate Arthur's role in the trial; they agree that she served as an alternate juror, *State v. Murphy*, 91 Ohio St. 3d 516, 526, 747 N.E.2d 765 (2001), (Petition, Doc. No. 10 at 17; Traverse, Doc. No. 21 at 33).  The record, however, demonstrates that Arthur was peremptorily challenged by the defense, and replaced by alternate juror Jeffrey Leonard, who did not ultimately have a hand in Murphy's conviction or death sentence.  (Trial Tr. at 938; Appendix, Vol. 2 at 259-60, 376.)

---

[9]Murphy also claims Hector stated he would start with death in determining the appropriate penalty (Petition, Doc. No. 10 at 17), but no comment capable of being so described appears in the transcript of Hector's *voir dire* (Trial Tr. at 483-93), and Murphy provides no citation.  Therefore, that portion of Murphy's argument will not be addressed.

Conspicuously missing from Murphy's argument respecting Arthur, and for that matter Roe and Hector, too, is any assertion that he used all of his peremptory challenges, or that the trial court's denial of any particular challenge for cause resulted in the seating of a juror Murphy otherwise would have peremptorily challenged, but could not because he had been unfairly forced to use peremptory challenges where challenges for cause should have been granted. In Arnold's case, it is particularly detrimental to Murphy's claim that he has not done so because without a showing that he was forced to use a peremptory challenge on prospective alternate juror Arthur which he would have used to excuse someone who actually served, Murphy is completely unable to demonstrate how he was harmed by the trial court's denial of his challenge for cause. Murphy does not claim that he was forced to accept an undesirable juror as a consequence of his having to use a peremptory challenge to excuse prospective alternate juror Arthur. Thus, that his challenge for cause was denied and his claim that his federal constitutional right to an impartial jury was somehow violated by the denial is inchoate, and provides no basis for habeas corpus relief.

For the reasons stated, Murphy's third ground for relief should be denied.

**Fourth Ground for Relief**

In his fourth ground for relief, Murphy contends his trial counsel were ineffective during the guilt phase of his trial for (1) not presenting "independent" evidence of his intoxication on the night of the murder, (2) not objecting to the presence of the alternate jurors in deliberations during both phases of the trial, (3) failing to object to prosecutorial misconduct, and (4) conceding Murphy's guilt during the trial against his wishes. (Petition, Doc. No. 10 at 18-24.) Respondent argues only the last of these sub-claims is procedurally defaulted, but all are meritless. (Return of Writ, Doc. No. 12 at 45-52.) Each sub-claim will be considered in turn following a recitation of the applicable federal law.

The governing standard for evaluating claims of ineffective assistance of counsel is found

in *Strickland v. Washington*, 466 U.S. 668 (1984), which states as follows:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Wong v.* Money, 142

F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177, 1180-81 (6th Cir. 1987).

Murphy claims his trial counsel should have presented "independent" evidence of his

-45-

intoxication, and that their failure to do so constituted unprofessional error.[10] (Petition, Doc. No. 10 at 18-20.) Respondent argues the sub-claim is preserved for habeas review, but meritless. (Return of Writ, Doc. No. 12 at 45-47.) Specifically, Respondent relied upon the state post-conviction court's finding that the evidence Murphy claims his attorneys should have presented was already before the jury, and that additional evidence of that type would have been merely cumulative. (Return of Writ, Doc. No. 12 at 49, *citing* Appendix, Vol. 5 at 456.) Not mentioned by Respondent is the state court of appeals' determination that Murphy's sub-claim was inappropriately raised in post-conviction and barred by the doctrine of *res judicata*, as it could have been raised on direct appeal. *See State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *4 (Ohio App. 10th Dist. Dec. 26, 2000). A claim that trial counsel were ineffective for failing to present certain evidence, however, can never be appropriately raised on direct appeal in Ohio because the appellate courts are confined to the record on appeal. Ohio R. App. Proc. 9(A), 16(A)(7). By its very nature then, a claim that evidence was erroneously omitted by attorney error requires a party to provide the reviewing court with the substance of the omitted evidence, obviously material from outside the record on appeal. Ohio R. App. Proc. 9(A). The court of appeals also seemed to imply that Murphy could not rely on the additional evidence of intoxication since it was "clearly available at the time of trial," 2000 WL 1877526 at *4, but the availability of the evidence at trial is an essential component to Murphy's claim that his trial counsel should have presented it to the jury and that not doing so constituted ineffective assistance. In the end, though, the court of appeals' decision respecting this sub-claim is merely a curiosity since Respondent does not suggest the claim is

---

[10]At the time of Murphy's offenses and trial, presentation of evidence of voluntary intoxication was a legitimate tactic for a criminal defendant to use in attempting to cast reasonable doubt on his or her intent to commit the charged offense. *See State v. Fox*, 68 Ohio St. 2d 53, 428 N.E.2d 410 (1981). *But cf. State v. Cooey*, 46 Ohio St. 3d 20, 26, 544 N.E.2d 895 (1989)(prohibiting guilt-phase introduction of expert psychiatric testimony unrelated to an insanity defense to show that a defendant lacked the mental capacity to form the mental state required for a particular offense, *citing State v. Wilcox*, 70 Ohio St. 2d 182, 436 N.E.2d 523 (1982)(paragraph two of the syllabus)). In 2000, however, the Ohio legislature closed that avenue. Ohio Rev. Code § 2901.21(C).

procedurally defaulted.

The Court observes, too, that Murphy has misconstrued the court of appeals' decision, contending that the court rejected his claim because he had not shown prejudice.  (Traverse, Doc. No. 21 at 37.)  The court of appeals' decision rested on an independent and adequate state procedural rule, *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Coleman v. Mitchell,* 268 F.3d 417, 427 (6th Cir. 2001), and its comment about the lack of a showing of prejudice was immediately preceded by the phrase "even if this particular argument was [sic] not *res judicata* . . .," 2000 WL 18775626 at *4, a phrase clearly at odds with Murphy's characterization of what followed as a holding (Traverse, Doc. No. 21 at 37).  Thus, the Court declines Murphy's invitation to review the state court's decision *de novo* and instead applies the AEDPA standard.  28 U.S.C. § 2254(d).

Murphy argues that the only direct evidence of intoxication his counsel presented came from Murphy's taped custodial interrogation, and that counsel should have anticipated a great deal of juror skepticism toward his words.  (Traverse, Doc. No. 21 at 36-37.)  He contends that evidence of his intoxication from other sources was critical to establishing his lack of intent to murder Brooks. *Id.*  Murphy directs the Court's attention to a 1999 psychological report from Dr. Robert Smith, the director of a chemical dependency treatment facility (Appendix, Vol. 5 at 218-28); the affidavit of Murphy's cousin Regina Head (Appendix, Vol. 5 at 189-90); and the affidavit of Murphy's former girlfriend and mother of his child, Bobette Peters (Appendix, Vol. 5 at 183-84).

As noted in footnote 10, above, the Ohio Supreme Court has rejected the notion that jurors need expert testimony to determine whether an accused possessed the intent necessary to commit the offense with which he or she is charged, and in fact has held such testimony is inadmissible. *State v. Cooey*, 46 Ohio St. 3d 20, 26 (1989); *State v. Wilcox*, 70 Ohio St. 2d 182 (1982) (paragraph two of the syllabus).  Consequently, even if Murphy's attorneys had sought to present the testimony of Dr. Smith in the guilt phase of his trial, the evidence would have been excluded under *Cooey* and

*Wilcox.* In addition, Murphy's suggestion that Dr. Smith should have been called to testify about the effects of alcohol on judgment and impulsivity, stopping short of rendering an ultimate opinion on whether Murphy was able to form the requisite intent to commit the murder (Petitioner's Post-Evid. Hrg. Brief, Doc. No. 72 at 40) misapprehends *Cooey.* In Ohio, evidence of voluntary intoxication sufficient to negate intent must demonstrate that the accused was so intoxicated that he was "unable to intend anything." *State v. Jackson*, 32 Ohio St. 2d 203, 206 (1972). Poor judgment and poor impulse control do not reflect on one's intent to perform an act, and are factors more relevant to the mitigation phase of a capital trial than the guilt phase. Furthermore, Dr. Smith's understanding of the quantity of alcohol Murphy may have ingested prior to the murder was based primarily upon Murphy's statements.[11] (Evid. Hrg. Tr., Doc. No. 70 at 160, 169, 171, 174, 176.) For these reasons, Murphy's counsel were not ineffective in failing to present Dr. Smith as an expert witness during the guilt phase. The state post-conviction court's determination that the evidence Murphy claims should have been presented through Dr. Smith was cumulative is neither contrary to nor an unreasonable application of federal law.

As for Regina Head, nothing she has stated in her affidavit (Appendix, Vol. 5 at 189-90) or testified to at the evidentiary hearing in these proceedings (Doc. No. 70 at 110-27) would have helped Murphy in the guilt phase of his trial. Murphy contends Head's testimony that he was drinking heavily and was drunk the night of the murder would have convinced the jury that he did not possess the intent to kill Brooks in a way that Murphy's own words could not. (Petition, Doc. No. 10 at 18-19; Traverse, Doc. No. 21 at 35-37; Petitioner's Post-Evidentiary Hearing Brief, Doc.

---

[11]Although Dr. Smith states he learned about the amount of alcohol available to or ingested by Murphy on the night of the murder from "affidavits that were provided," he does not specify which affidavits those were. (Doc. No. 70, Evid. Hrg. Tr. at 160.) The Court assumes the affidavits referred to are the same ones Murphy claims support his contention that he was too intoxicated to form the intent to murder, namely those of Regina Head and Bobette Peters. Also, Dr. Smith did state he placed primary reliance upon Murphy's report of his drinking on the relevant night (Doc. No. 70, Evid. Hrg. Tr. at 169), and that Murphy's statements to him and to the police were the data that he had respecting how much alcohol Murphy had consumed prior to the murder (Doc. No. 70, Evid. Hrg. Tr. at 176).

No. 72 at 39-41.)  That he was drunk, however, even very drunk, is insufficient to demonstrate that Murphy was "unable to intend anything," especially in light of Head's inability to say what time it was when she and Murphy parted company the night of the murder.  (Evid. Hrg. Tr., Doc. No. 70 at 123, 126.)  In other words, even if Murphy was so intoxicated that he was "unable to intend anything" when Head last saw him that night, it does not necessarily follow that he was still in that condition at the time of the murder.  In addition, Head did not testify to any conduct or condition that would suggest Murphy was so impaired by the alcohol he drank that he was "unable to intend anything."  In fact, she denied he was "sloppy drunk" or "falling around and all of that" as a result of his drinking that night.  (Evid. Hrg. Tr., Doc. No. 70 at 121.)  Since Head's testimony would not have demonstrated that Murphy was "unable to intend anything" at the time of the murder, Murphy's attorneys' failure to call her as a witness at trial did not constitute ineffective assistance.

The same is true, only more so, of Bobette Peters' affidavit, which reads in its entirety as follows:

> I, Bobette Peters, being duly sworn, hereby depose and state:
>
> 1.   Ulysses Murphy is the father of my son, Ulysses C.W. Murphy, Jr.
>
> 2.   I saw Ulysses on May 10-11, 1997.  We were at a party at a friend's house, Bookie, that night.  Ulysses was already there when I arrived.  He was drinking gin.
>
> 3.   Ulysses was upset, I think because I was at the party with a date.  His friends who were there encouraged him to drink more.  Ulysses became very drunk.
>
> 4.   At the time of Ulysses' trial, no one from the defense ever contacted me.  I was never asked to testify on Ulysses' behalf.  If I had been asked to testify, I would have done so and would have testified to the above information.

(Appendix, Vol. 5 at 183-84.)  Based upon the sparse information contained within the affidavit, it

is not surprising that Peters was not called to testify. The affidavit includes no time at which Murphy was at the party, nor any information about his intoxication other than that he was very drunk. What led Peters to conclude Murphy was very intoxicated remains a mystery. Was he stumbling? Was his speech unintelligible? Did he lose consciousness? Peters does not say, and without more, her description of Murphy as "very drunk" at some time prior to the murder would have added very little to the evidence of intoxication presented at trial.

To summarize, Dr. Smith's testimony about Murphy's drinking the night of the murder would not have been admissible during the guilt phase of the trial under Ohio law, and Head and Peters' testimony that Murphy was drinking alcohol and very intoxicated the night of the murder was, as the state post-conviction court found, cumulative to Murphy's own statements which were admitted at trial. That the information may have been more credible coming from Head and Peters is meaningless since together their testimony was highly unlikely to have convinced a reasonable juror that Murphy was so intoxicated that he was "unable to intend anything." Accordingly, his first sub-claim regarding ineffective assistance of trial counsel should be denied.

In his second sub-claim, Murphy contends his trial counsel were ineffective for not objecting to the presence of the alternate jurors in the jury's guilt and penalty phase deliberations. (Petition, Doc. No. 10 at 20.) Respondent counters that neither the Ohio Supreme Court's determination on direct appeal that Murphy had made no attempt to demonstrate prejudice nor its rejection of Murphy's argument that prejudice should be presumed was contrary to or an unreasonable application of federal law. (Return of Writ, Doc. No. 12 at 50.) Murphy argues, as he did in his second ground for relief, that Ohio R. Evid. 606(B) made it impossible for him to demonstrate prejudice, and that it is "unreasonable" not to presume prejudice in such situations. (Traverse, Doc. No. 21 at 39.)

In order for this Court to grant habeas corpus relief, however, Murphy must show that the

state court's resolution of his claim was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  *Strickland* certainly does not require a presumption of prejudice when alternate jurors are present in the jury's deliberations, and Murphy cites no United States Supreme Court case that does.  Instead, he cites *Manning v. Huffman*, 269 F.3d 720, 725-26 (6th Cir. 2001), but there the trial court, with apparent consent of the parties, decided to "try something unique in trial," and allow two alternate jurors to participate in the deliberations.  *Id*. at 722.  Unlike Murphy's case, the alternates in *Manning* were instructed to "take part in the discussions and deliberations," and it was undisputed that one of the alternates "actively participated in the deliberations."  *Id*.  Thus, *Manning* is distinguishable from Murphy's situation.

Although not mentioned in Murphy's argument respecting his second ground for relief, *see* footnote 2, *supra*, here Murphy does contend that the alternate jurors are strangers to the jury at the commencement of deliberations.  (Traverse, Doc. No. 21 at 38.)  Yet in the very next paragraph, he argues that Ohio R. Evid. 606(B) precludes any inquiry into the deliberations, presumably including questioning the alternates as to their participation, if any, in the discussions.  Murphy cannot have it both ways.  Either the alternates are part of the jury even into the deliberations stage and are subject to Ohio R. Evid. 606(B), or they are outside the jury as he contends and are not subject to the evidentiary rule.  If, as he contends, the alternates are extraneous to the jury during deliberations, an argument that has some appeal, then there would have been no evidentiary bar to his presentation of their depositions or testimony in order to show prejudice from their presence and any participation they may have had in the deliberations.

In any case, Murphy did not argue that the alternates were an outside influence on the jury when he requested discovery and an evidentiary hearing in these proceedings (*see* Motion for Discovery, Doc. No. 18 at 3-5; Motion for Evidentiary Hearing, Doc. No. 31 at 9), and has instead

-51-

consistently urged the state courts and now the federal court to presume prejudice from the alternates' presence in deliberations. (*See e.g.*, Appendix, Vol. 3 at 126; Petition, Doc. No. 10 at 15, 20; Traverse, Doc. No. 21 at 39.) The state court rejected Murphy's suggestion, *State v. Murphy*, 91 Ohio St. 3d 516, 533 (2001), and Murphy has not persuaded this Court that that determination was contrary to federal law or that the state court's application of the law was objectively unreasonable. Consequently, Murphy is not entitled to habeas corpus relief on his second sub-claim of his fourth ground for relief.

In his third sub-claim, Murphy contends his trial counsel provided ineffective assistance when they failed to object to two instances of alleged prosecutorial misconduct, one involving the elicitation of victim impact evidence, and the other concerning the prosecutor's reference to facts not in evidence during closing argument. (Petition, Doc. No. 10 at 20-21.) Respondent argues that the state court's consideration of the merits of Murphy's claim preserved it for habeas review, but that it is meritless. (Return of Writ, Doc. No. 12 at 50-51.)

In her argument, Respondent relies on the Ohio Supreme Court's consideration of Murphy's ineffective assistance of trial counsel claim on direct appeal. (Return of Writ, Doc. No. 12 at 50-51.) There, the court held that trial counsels' failure to object to prosecutorial misconduct was likely the product of strategy rather than error. *State v. Murphy*, 91 Ohio St. 3d 516, 539 (2001). A review of Murphy's appellate brief to that court, however, reveals that he never raised there the issue he now presents here. In the state court, Murphy claimed his counsel should have objected to the prosecutor's guilt-phase argument that Brooks' mother had to drive to Columbus on Mother's Day to identify her son's body. (Appendix, Vol. 3 at 130, 144-45.) Here, Murphy contends it was error for his counsel to sit silent while the prosecutor elicited testimony about the number and ages of Brooks' children, and argued that Murphy "got rid of the gun" to prevent the prosecutors from demonstrating the unlikelihood of an accidental discharge of the weapon. (Petition, Doc. No. 10 at

21).  Thus, on direct appeal, the state court was not presented with the same claim as Murphy brings here.

Murphy, on the other hand, claims he raised the issue as his third claim for relief in his state post-conviction petition.  (Petition, Doc. No. 21 at 39.)  Murphy did raise a claim based upon his trial counsels' failure to object to the prosecutor's victim impact arguments, but failed to identify either the statements or the place in the transcript where the statements could be found.  (Appendix, Vol. 5 at 39.)  Nevertheless, the trial court rejected the claim on *res judicata* grounds finding that it could have been raised on direct appeal as any error was apparent in the trial record.  (Appendix, Vol. 5 at 454-55.)  On appeal from denial of his post-conviction petition, the court of appeals did not specifically address the issue.  *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 (Ohio App. 10th Dist. Dec. 26, 2000).

Consequently, Murphy's ineffective assistance of trial counsel sub-claim is procedurally defaulted for two reasons:  (1) he could have but did not raise the claim on direct appeal in the state courts; (2) he either raised the claim in his post-conviction proceedings (giving him the benefit of the doubt) and it was rejected on *res judicata* grounds rendering it procedurally defaulted for habeas purposes, or he did not raise the claim since he did not identify the offending victim impact evidence and it is resultantly procedurally defaulted for that reason.

Ordinarily, a federal court is reluctant to raise procedural default of a claim in habeas corpus where a respondent does not advance the defense.  It is not inappropriate for a procedural default to be raised *sua sponte*, however.  *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).  *See also Trest v. Cain*, 522 U.S. 87, 89 (1997) (noting a circuit court is not obliged to raise a procedural default *sua sponte*); *United States v. Willis*, 273 F.3d 592, 596-97 (5th Cir. 2001) (acknowledging federal courts' authority to invoke a procedural default *sua sponte*).  It may not be desirable for the Court to raise a procedural default in all or even most cases where it has been overlooked by the

state.  Here, however, where both parties' descriptions have so misstated the procedural status of the claim, and where the procedural default of the claim is clear[12] from every angle from which it can be viewed, the Court is comfortable exercising its authority to raise the procedural default defense *sua sponte*.  Therefore, the Court recommends that Murphy's third sub-claim in his fourth ground for relief be denied as procedurally defaulted.

Finally, Murphy contends his trial counsel were ineffective when they proceeded with a strategy to which he strenuously objected.  (Petition, Doc. No. 10 at 21-24.)  Respondent argues the claim is procedurally defaulted and, in the alternative, meritless.  (Return of Writ, Doc. No. 12 at 45-47, 51-52.)  Murphy disputes both of Respondent's arguments.  (Traverse, Doc. No. 21 at 42-45.)

Respondent erroneously contends Murphy failed to raise the instant sub-claim on direct appeal.  It was raised in Murphy's fourth proposition of law on appeal to the Ohio Supreme Court (Appendix, Vol. 5 at 101-107), and that court addressed the claim on its merits, *State v. Murphy*, 91 Ohio St. 3d 516, 524 (2001).  Specifically, the court stated as follows:

> [A]ppellant contends that his counsel rendered ineffective assistance by pursuing a strategy against his wishes.  Appellant cannot and does not contend that the Constitution reserves the selection of trial strategy to the defendant's personal choice.  Decisions about "the viability of certain defenses: are "within the exclusive province of defense counsel to make after consultation with his client." *Lewis v. Alexander* (C.A.6, 1993), 11 F.3d 1349, 1354 [_____].
>
> Instead, [A]ppellant argues that counsel were ineffective in rejecting his desired course, because it was "just as reasonable" as the course counsel pursued.  However, that implies that counsel's strategy was also as reasonable as [A]ppellant's – a concession that dooms [A]ppellant's ineffective-assistance claim.  To prevail on such a claim, a defendant must show that counsel's actions were professionally unreasonable.  Appellant can hardly claim that counsel's strategic choice was unreasonable in light of his confession.  Hence, he cannot prevail on his ineffective-assistance claim.

---

[12]That is not to say that tracing the procedural status of the instant sub-claim is an easy or simple endeavor.  Indeed, sifting through years of appeals and post-conviction history is a complex and sometimes exasperating task.

*Id.*  Respondent, however, advances a procedural default defense based on the state courts' resolution of Murphy's claim in post-conviction (Return of Writ, Doc. No. 12 at 45-46), but the issue presented is one that is not cognizable in post-conviction as the error, if there is one, is apparent on the record as evidenced by the Ohio Supreme Court's treatment of the claim.  In addition, Murphy's assertion that the state court did not address the merits of his claim and that this Court should consequently address it *de novo* is plainly wrong.  Thus, Murphy's sub-claim is properly preserved for habeas corpus review.

 The claim fails, however.  At trial, Murphy's counsel made the following arguments:

> André Brooks is dead and this is sad.  He died during a robbery attempt on May 11 and he died at the hands of Ulysses Murphy.
>
> . . .
>
> I know, as you know, that Ulysses was involved in the death of André Brooks.  And, . . . I know, as you know, that Ulysses admitted this.
>
> . . .
>
> [Murphy] committed aggravated robbery and during that robbery, he caused the death of André Brooks.  That is manslaughter and that is wrong. . . .  He didn't specifically intend to take the life of André Brooks, and the evidence shows you that.

(Trial Tr. at 992, 1248, 1255.)  Murphy contends these admissions by his attorneys constituted the entry of a guilty plea and was against his wishes.  (Traverse, Doc. No. 21 at 44.)  He correctly notes that the decision whether to plead guilty to an offense is one for the accused to make, not his attorneys.  *Id.*, *citing Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Murphy also relies on *Nixon v. Singletary*, 758 So.2d 618, 624 (Fla. 2000), in arguing that a client's "'silent acquiescence is not enough' to show he consented to the strategy."  (Traverse, Doc. No. 21 at 44-45.)  That case, however, was overruled by the United States Supreme Court on December 13, 2004, after Murphy filed his traverse.  *Florida v. Nixon*, 543 U.S. 175 (2004).  There the Court observed that although

Nixon's attorney conceded his client had been responsible for the victim's death, "Nixon retained the rights accorded a defendant in a criminal trial." *Id*. at 188.  The Court reiterated that "a guilty plea is 'more than a confession which admits that the accused did various acts.' it is a 'stipulation that no proof by the prosecution need be advanced.'" *Id*., *citing Boykin v. Alabama*, 395 U.S. 238, 242-43 and n. 4 (1969).  The Court also acknowledged the unique challenges facing capital defense counsel:

> Although . . . a concession in a run-of-the-mine trial might present a closer question, the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus.  Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear.  Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous.  See Goodpaster, The Trial for Life:  Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 329 (1983).  In such cases, "avoiding execution [may be] the best and only realistic result possible."  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed.2003), reprinted in 31 Hofstra L.Rev. 913, 1040 (2003).

> Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared.  Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course.  See Lyon, Defending the Death Penalty Case:  What Makes Death Different?, 42 Mercer L.Rev. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation.  This just does not work.  The jury will give the death penalty to the client and, in essence, the attorney."); Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1589-1591 (1998) (interviews of jurors in capital trials indicate that juries approach the sentencing phase "cynically" where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense) . . . .  In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade."  *See* [*United States v.*] *Cronic*, 466 U.S. [648], . . . 656-57, n. 19.

. . .

> To summarize, in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.

*Nixon*, 543 U.S. at 190-92.

In Murphy's case, his attorneys had sought suppression of his in-custody confession, but the trial court had denied their request.[13] Thus, at trial, they were faced with defending Murphy in light of his confession, Condrea Webber's testimony, and the testimony of other witnesses who saw Murphy at the F & H Bar and Grill and saw him leave shortly after Brooks and Webber. In addition, it should be noted that Murphy's counsel did not admit the offense charged. Instead, they strenuously advocated at trial that Murphy did not possess the intent to murder Brooks necessary for the State to convict him of aggravated murder. (Trial Tr. at 993, 1249-55.) Had the jury been convinced, Murphy would have been convicted of a lesser included offense, or acquitted of the murder charge altogether. As the Supreme Court observed in *Nixon*, admitting some elements of an offense without admitting all of them does not amount to a guilty plea and is usually a strategic decision by counsel. 543 U.S. at 190-92. Murphy provides no reason to believe his counsel's decision to admit his involvement in Brooks' murder, to the extent that they did so, was anything other than a reasonable strategy given the evidence against Murphy. The Ohio Supreme Court acknowledged Murphy's admission of the reasonableness of his attorneys' strategy in its decision, and concluded that Murphy consequently could not prevail on an ineffective assistance of trial

---

[13]The facts and citations to the record surrounding the motion to suppress and its outcome are recited in detail in the Court's discussion of Murphy's first ground for relief and need not be repeated here.

counsel claim. Nothing about the Ohio Supreme Court's resolution of the claim was contrary to or an unreasonable application of federal law. Murphy's fourth sub-claim in his fourth ground for relief should therefore be denied.

Having considered each of Murphy's ineffective assistance of trial counsel sub-claims individually and found them to be meritless, and having considered them cumulatively as well with similar result, the Magistrate Judge recommends that Murphy's fourth ground for relief be denied.

**Fifth Ground for Relief**

In his fifth ground for relief, Murphy contends his trial counsel provided ineffective assistance during the mitigation phase of his capital trial. (Petition, Doc. No. 10 at 25-41.) Specifically, Murphy claims his attorneys were ineffective for

    1.     Failing to seek the services of a qualified substance abuse expert;

    2.     Failing to present evidence of an impoverished life;

    3.     Failing to investigate and prepare witnesses;

    4.     Failing to conduct a reasonable investigation with expert assistance;

    5.     Failing to seek the appointment of a cultural expert;

    6.     Failing to investigate, prepare, and present the psychological expert witness;

    7.     Failing to present evidence that Murphy was a loving father;

    8.     Failing to object to prosecutorial misconduct in the penalty phase:

        a.     Prosecutor's improper reference to victim impact evidence;

        b.     Prosecutor's improper reference to the "lenient prison system" including reference to recreation time and the

availability of video games, movies, and television to inmates;

c.    Prosecutor's improper argument that "alcohol does not make you murder someone";

d.    Prosecutor's improper intimation that Murphy had been a disciplinary problem while incarcerated pending trial.

(Petition, Doc. No. 10 at 25-41.)  Respondent argues the first, fifth, and eighth sub-claim are procedurally defaulted, and that all eight are meritless.  (Return of Writ, Doc. No. 12 at 52-59.)  As in the fourth ground for relief, above, the Court will consider each sub-claim, including its procedural status, in turn.

**1.    Failure to Obtain a Qualified Substance Abuse Expert**

First, Murphy claims his trial counsel were ineffective in failing to obtain the services of a qualified substance abuse expert.  (Petition, Doc. No. 10 at 25-28.)  Murphy correctly states that he raised the issue in his twenty-first claim for relief in his state post-conviction petition.  (Traverse, Doc. No. 21 at 46-47; Appendix, Vol. 5 at 89-91.)  The trial court rejected the claim on *res judicata* grounds (Appendix, Vol. 5 at 460), as Respondent contends (Return of Writ, Doc. No. 12 at 52-53), and when Murphy raised the issue on appeal from denial of his post-conviction petition (Appendix, Vol. 6 at 96-98), the court of appeals affirmed on the same procedural ground, *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *5 (Ohio App. 10th Dist. Dec. 26, 2000).

Ordinarily, when a state court relies upon an independent and adequate state procedural rule in rejecting a claim in direct appeal, post-conviction proceedings, or in an application to reopen a direct appeal, the claim is procedurally defaulted for federal habeas corpus purposes.  *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  In *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001), however, the Sixth Circuit Court of Appeals concluded that "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude

-59-

categorically that federal habeas review of the purportedly defaulted claim is precluded." *Hill v. Mitchell*, 400 F.3d 308, 314 (2005). When such circumstances arise, the district court is permitted to conduct *de novo* review on the merits of the claim. *Id.*

Here, the Ohio courts misapplied the doctrine of *res judicata* with regard to Murphy's claim. The claim was that Murphy's trial counsel should have presented the testimony of an expert in substance abuse in the mitigation phase of his trial. In order to demonstrate prejudice from their failure to do so, Murphy had to present and rely on evidence from outside the trial record, specifically, he had to present the post-conviction court with the substance of the expert's proposed testimony. Although the state courts concluded the claim could have been brought on direct appeal, it would have been impossible for the courts to determine whether Murphy had suffered prejudice from the omission of the expert's testimony without knowing what the expert would have testified to had he been called. In *State v. Madrigal*, 87 Ohio St. 3d 378, 390-91 (2000), the Ohio Supreme Court recognized that claims contending counsel should have presented expert or other mitigating evidence at trial necessarily requires reliance on evidence from outside the record as follows:

> Nothing in the record indicates what kind of testimony an eyewitness identification expert could have provided. Establishing that would require proof outside the record, such as affidavits demonstrating the probable testimony. Such a claim is not appropriately considered on a direct appeal. See *State v. Keith* (1997), 79 Ohio St.3d 514, 536, 684 N.E.2d 47, 67; *State v. Scott* (1989), 63 Ohio App.3d 304, 308, 578 N.E.2d 841, 844 (claim of failure to present mitigating evidence is properly considered in a post-conviction proceeding because evidence in support of claim could not be presented on direct appeal).

Since the Ohio Supreme Court misapplied its own procedural rule respecting Murphy's first sub-claim, this Court is not bound by the state court's procedural findings, and will consider the merits of his claimed error *de novo*.

In evaluating Murphy's claim, it is necessary to compare the evidence presented on substance abuse in the mitigation phase of the trial with the evidence Murphy claims should have

been presented. The following is a summary of the relevant evidence presented at trial:

Barbara Murphy, Murphy' mother, testified that she was an alcoholic but stopped drinking in 1981. (Trial Tr. at 1420.) She stated she would go out drinking every night except Sunday. *Id.* She assumed Murphy was drinking when he was away from her because she could smell alcohol on him. *Id.* at 1422.

Ulysses Woods, Murphy's father, testified that he'd been at the bar at which he was employed and had been drinking before showing up at court on the day of his testimony. (Trial Tr. at 1385, 1387-88.) He stated that Barbara Murphy drank every other day and couldn't handle her alcohol, and that she was an alcoholic during the three years prior to Murphy's birth. *Id.* at 1386-87. Woods testified that when Murphy was four years old, Murphy would come visit him at the bar where he worked. *Id.* at 1389. When Murphy was sixteen years old and living with his father and his father's wife, Murphy came home more intoxicated than Woods had ever been in his thirty-five or so years of drinking. *Id.* at 1392. He believed Murphy let the alcohol control him. *Id.* at 1394.

Social worker Valerie Thomas testified that Murphy's grandmother, Elnora Woods, had made allegations that Barbara Murphy "may have had a drinking problem" (Trial Tr. at 1373). Elnora Woods also testified to that effect, and that Ulysses Murphy was an alcoholic. *Id.* at 1436. Murphy was drinking at age fifteen or sixteen when he came to live with her. *Id.* at 1438-39.

Finally, Dr. Jolie Brams, a clinical psychologist, testified that both of Murphy's parents were alcoholics, as were over 80% of his extended family members. (Trial Tr. at 1472-73.) Dr. Brams explained that there is a high correlation between the propensity for alcoholism and genetics. *Id.* at 1476. She testified that Murphy began drinking in elementary school, that he has a predisposition for alcoholism, and that alcohol destroys goal-driven behavior. *Id.* at 1476-80. Murphy was markedly intoxicated on the night of the murder. *Id.* at 1491. Dr. Brams noted, however, that alcohol abuse by Murphy or his family members was "not the thrust" of the Children's Services involvement with the family during Murphy's childhood. *Id.* at 1505. She could recall no mention in the Children's Services reports of Murphy's alcohol use at the age of eleven or twelve, and that the people who noticed his drinking at that age would not have been ones she would have expected to make a record of it. *Id.* at 1507-09. In the records she reviewed, there was no significant commentary about Murphy's alcohol use. *Id.* at 1509. Dr. Brams testified that she received information from Murphy's family members via Jerry Knoblaugh, an investigator hired by the defense and that she did not

interview them herself. *Id*. at 1517. Murphy admitted the crime to her, but said he was very intoxicated, and while his intoxication is consistent with the history of alcoholism in his family, she had no source other than Murphy's word concerning his intoxication the night of the murder. *Id*. at 1518-20.

Murphy argues his trial counsel should have presented the testimony of Dr. Robert Smith, an expert on substance abuse (Doc. No. 70, Evid. Hrg. Tr. at 136), who would have testified about the connection between Murphy's substance abuse and his poor judgment. (Petition, Doc. No. 10 at 28.) At the evidentiary hearing in these proceedings, Dr. Smith testified that because of the complexity of addiction illnesses, and because graduate programs in psychology offer only superficial exposure to the subject, a general practitioner who completes her Ph.D. in psychology would have only a basic understanding of the issues surrounding addiction. (Doc. No. 70, Evid. Hrg. Tr. at 135.) Dr. Smith administered the Michigan Alcoholism Screening Test to Murphy, reviewed affidavits provided by Murphy's friends and family in the state post-conviction proceedings, and reviewed Dr. Brams' mitigation phase trial testimony and post-conviction affidavit. (Doc. No. 70, Evid. Hrg. Tr. at 138.) He testified about the connection between genetics and alcoholism and the environmental role in alcoholism. (Doc. No. 70, Evid. Hrg. Tr. at 141-42.) He further discussed the progression of alcoholism as a psychological and physical disease. *Id*. at 142-45, 148. Dr. Smith evaluated Murphy in 1999 in preparation for Murphy's state post-conviction proceedings, and at that time diagnosed him with alcohol dependence, cannabis dependence, and paranoid personality disorder, a condition that can be considered a serious mental disease or defect depending upon the severity of symptoms. *Id*. at 137, 145, 190. He discussed the relationship between alcohol use and paranoid personality disorder and described the Murphy family history of alcoholism and its impact on Murphy's childhood and adolescence. *Id*. at 151-52. Dr. Smith further explained that alcohol intoxication may influence behavior by reducing inhibitions, increasing impulsivity and aggressiveness, and by affecting mood. (Doc. No. 70, Evid. Hrg. Tr. at 157.) In

addition, alcohol is recognized in the American Psychiatric Association's Diagnostic and Statistical Manual, Fourth Edition, as an agent that increases violent behavior. *Id.* at 157-58.

As to Murphy's experience with alcohol, Dr. Smith testified that Murphy was drinking regularly by the age of fifteen or sixteen. (Doc. No. 70, Evid. Hrg. Tr. at 159.) At the time of Brooks' murder, Murphy was drinking up to a fifth of hard liquor and a twelve-pack of beer a day. *Id.* at 159-60. Dr. Smith described how that quantity of alcohol would affect Murphy. *Id.* at 161. Dr. Smith's knowledge of Murphy's drinking habits was acquired from Murphy himself and from the affidavits Murphy submitted to the state courts in his post-conviction proceedings. *Id.* at 160. He also stated that although Dr. Brams had testified at trial about Murphy's drinking at an early age, she did not explain its correlation to Murphy's conduct on the night of the murder, nor did she explain how a chronic alcoholic might not appear to be drunk. (Doc. No. 70, Evid. Hrg. Tr. at 161-62.)

On cross-examination at the evidentiary hearing, Dr. Smith reiterated that in his opinion, a generally trained clinical psychologist would have to demonstrate competence in substance abuse issues to testify as an expert in a capital trial. (Doc. No. 70, Evid. Hrg. Tr. at 163.) He disputed that some of the effects of substance abuse are common knowledge among those who use alcohol. *Id.* at 166. Dr. Smith acknowledged that preparation for a capital case should include an extensive background investigation consisting of interviews of nuclear and extended family members, neighbors, teachers, and others. *Id.* at 168-69. In preparing his report submitted in Murphy's post-conviction proceedings in the state courts, his primary source of information was Murphy himself. *Id.* at 169. He did not interview Murphy's mother, cousins, aunts, or uncles, nor did he consider any information from them that may have been obtained through another source. *Id.* at 170-71. His report lists Dr. Brams' report, and various school, hospital, children's services, court, prison, and probation records as being the documents he reviewed in preparing his report. (Appendix, Vol. 5

at 219A.) Dr. Smith confirmed that those documents were his sole sources relied upon in preparing his post-conviction report, other than Murphy's videotaped confession and his personal interviews with Murphy. (Doc. No. 70, Evid. Hrg. Tr. at 171.) Murphy told Dr. Smith that he and a friend had driven around the day before the murder purchasing and consuming alcohol. *Id*. at 172. Although Murphy stated how much alcohol he and his friend had purchased, he did not explain to Dr. Smith how much he himself had actually consumed, saying instead that he and his friend had shared it. *Id*. at 173-74. Dr. Smith made no attempt to corroborate Murphy's report of the amount of alcohol he consumed the day before and the night of the murder. *Id*. at 176. Dr. Smith acknowledged that there were discrepancies between Murphy's description of events to police and his description to Dr. Smith, but he did not record them in his report and instead recounted only what Murphy had told him. *Id*. at 177-78. Murphy was capable of forming the purpose to place the murder weapon in a concealed location of the automobile he was driving, even in his intoxicated state, although Dr. Smith was reluctant to ascribe a motivation for such action. *Id*. at 183. Dr. Smith similarly declined to agree with Respondent that when Murphy was stopped by a patrol car soon after the murder, he acted with the purpose of avoiding detention. *Id*. at 185.

On redirect examination, Dr. Smith explained that Dr. Brams' affidavit and mitigation phase testimony corroborated the information he relied upon in his report, but that he had gone beyond her conclusions and had provided more information on Murphy's addiction and addiction in general. (Doc. No. 70, Evid. Hrg. Tr. at 192.) Dr. Smith testified that Murphy had been unwilling to discuss the dysfunction within his family the first time they met, and that Murphy gave him "a little more information" on the second visit. *Id*. at 193. When this Court asked Dr. Smith why Murphy's statement to police that he hid the murder weapon under the hood of his car had no relevance to Dr. Smith's diagnosis, he explained that individuals who are under the influence of alcohol are able to perform purposeful acts. *Id*. at 193-94. That they are often misperceiving circumstances, and

consequently overreacting or behaving impulsively does not negate the purposefulness of their conduct.  *Id*. at 194.  Rather, an intoxicated person's purposeful acts may be inconsistent and impulsive, and the product of poor decision making rather than being well thought out.  *Id*.  It is possible, too, for a person to be intoxicated to the point of cognitive impairment with few outward indications of intoxication.  *Id*. at 195.

Under examination by the Court, Dr. Smith explained his understanding of events the night of the murder as being that there was some sort of physical contact between Murphy and his victim inside the F & H bar, and that that provocation, if it can be called that, along with Murphy's paranoid personality disorder and intoxication and Brooks' attempt to grab Murphy's gun or strike Murphy resulted in an accidental discharge of the weapon.

It is unlikely that Dr. Smith's testimony would have impacted the outcome of the mitigation phase of Murphy's trial.  As noted in the fourth ground for relief, above, Dr. Smith indicated he relied in part on affidavits submitted with Murphy's state post-conviction petition in making his conclusions about the volume of alcohol Murphy had consumed on the night of the murder.  As there, the Court assumes Smith refers to the same affidavits Murphy has cited as support for his contention that his attorneys failed to call witnesses to corroborate his description of the level of his intoxication at the time of the murder, specifically, the affidavits of Regina Head and Bobette Peters.  For the same reasons stated in the Court's discussion of the relevant portions of Murphy's fourth ground for relief, those affidavits provide little support for Dr. Smith's description of the amount of alcohol Murphy consumed in the hours prior to the murder.  In addition, Dr. Smith admittedly placed primary reliance on Murphy's own statements about how much he had had to drink that night.  (Doc. No. 70, Evid. Hrg. Tr. at 160, 169, 176.)  Further, Dr. Smith testified that he became involved in Murphy's case and met with him twice in early 1999; no other meetings were mentioned and the Court assumes no others took place.  *Id*. at 137.  His May 1, 1999, report following those

meetings (Appendix, Vol. 5 at 218-28) and his review of the materials listed in the report, *id*. at 219A, aligns closely with his testimony in these proceedings, so it is reasonable to infer that his subsequent review of Head's and Peters' affidavits (dated April 30, 1999, and May 1, 1999, respectively)[14] did not cause him to change his understanding of Murphy's drinking on the night of the murder in any significant way.

The document Dr. Smith relied upon for information obtained from Murphy's family members was Dr. Brams' report, and he acknowledged that he never interviewed any of Murphy's relatives. (Doc. No. 70, Evid. Hrg. Tr. at 170-71.) Dr. Brams, however, also testified at trial that she never interviewed Murphy's family members, and that she instead gained whatever information she attributed to them from a defense investigator. (Trial Tr. at 1517.) The transmission of the information from Murphy's relatives to this Court, then, strongly resembles the well-known game of telephone, where one person gives a second person a tidbit of information, who passes it along to the next person, and he to the next, and so on until the information, usually unrecognizable by that time, returns to its originator. Murphy's family members presumably told the investigator something, which he communicated to Dr. Brams, who in turn testified to it at trial, the transcript of which was read and relied upon by Dr. Smith, who testified in these evidentiary hearing proceedings. The pathway traveled by the information provided by Murphy's relatives devalues it for evidentiary purposes. Furthermore, Dr. Brams testified at trial that she had no source other than Murphy's word as to how much alcohol he had consumed the night of the murder. (Trial Tr. at 1518-20.)

In the end, Dr. Smith could offer no evidence of Murphy's drinking the night Brooks was murdered other than repeating what Murphy had told him. Since the jurors heard Murphy's version

---

[14]Dr. Smith did not include Peters' and Head's affidavits in the list of materials he relied on in compiling the information contained in his 1999 report. (Appendix, Vol. 5 at 219A.)

of events that night, including his own report of his alcohol consumption, via the confession videotape, there is little reason to think an expert witness' testimony about what Murphy told him would carry anymore weight than Murphy's own words. The jury apparently either did not believe Murphy's statements about his drinking that night, or accorded them little weight in mitigation. Moreover, the Ohio Supreme Court has repeatedly recognized that voluntary intoxication is "at most a weak mitigating factor." *State v. Turner*, 105 Ohio St. 3d 331, 346 (2005); *State v. Fitzpatrick*, 102 Ohio St. 3d 321, 338-39 (2004); *State v. Brown*, 100 Ohio St. 3d 51, 65 (2003); *State v. White*, 82 Ohio St. 3d 16, 28 (1998); *State v. Moore*, 81 Ohio St. 3d 22, 37 (1998); *State v. Dennis*, 79 Ohio St. 3d 421, 439 (1997); *State v. D'Ambrosio*, 73 Ohio St. 3d 141, 145 (1995); *State v. Carter*, 72 Ohio St. 3d 545, 561-62 (1995). The same has been found true of evidence of a defendant's chronic alcoholism when it has been submitted in the mitigation phase of a capital trial. *State v. Foust*, 105 Ohio St. 3d 137, 170 (2004); *State v. Gapen*, 104 Ohio St. 3d 358, 387 (2004); *State v. Nields*, 93 Ohio St. 3d 6, 43 (2001); *State v. Wilson*, 74 Ohio St. 3d 381, 401(1996); *State v. Slagle*, 65 Ohio St. 3d 597, 614(1992). *But cf.*, *State v. Haight*, 98 Ohio App.3d 639, 671-72 (Ohio App. 10th Dist. 1994)(noting medical profession's acceptance of alcoholism as being a disease, finding defendant's alcoholism and intoxication played a significant role in his criminal conduct, and concluding it should be given significant weight in mitigation). Thus, it is unlikely Murphy's statements about his intoxication, or the repetition of them by Dr. Smith, would have been entitled to any significant weight during the mitigation phase of the trial.

Even if that were not so, however, Murphy has not demonstrated that his trial counsels' failure to present more intoxication evidence in the mitigation phase was attributable to ineptitude rather than strategy. As Terry Sherman, one of Murphy's trial counsel repeatedly testified in the evidentiary hearing before this Court, nothing he knew at the time of trial gave him reason to believe that alcohol was a factor in Murphy's commission of the murder. (Doc. No. 79, Evid. Hrg. Tr. at

26-27, 52, 60-62, 71.) Furthermore, Murphy's preference during the trial was that his attorneys put

forth an "I wasn't there" defense, which they refused to do in light of the identification evidence via

Condrea Webber's and Frank Green's testimonies, and Murphy's confession, and instead defended

the case the only way he thought is could be defended, specifically that the shooting was accidental

and presenting a mitigation case centering on his neglected childhood. (Doc. No. 79, Evid. Hrg. Tr.

at 21, 25-29, 37-38.) Sherman testified that Murphy was not cooperative before or during the trial,

and that he insisted he was not involved in the murder in spite of his confession, an eyewitness to

the murder, and other witnesses who saw him at the F & H bar just prior to the killing. *Id*. at 21, 25-

29, 36. Sherman specifically noted the uniformed officers' traffic stop of Murphy not long after the

murder, and reasoned that if Murphy had been intoxicated, the officers would have taken appropriate

action rather than letting Murphy go with a warning about his having failed to stop at a red light.

(Doc. No. 79, Evid. Hrg. Tr. at 27, 62.) Murphy offers no evidence that trial counsels' decision not

to present additional evidence of intoxication at the time of the murder in mitigation fell below the

minimum standard of professional conduct.

For the foregoing reasons, Murphy's first sub-claim in his fifth ground for relief should be

denied.

## 2.    Failure to Present Evidence of an Impoverished Life

In his second sub-claim, Murphy contends his trial counsel were ineffective in failing to

present the testimony of several of Murphy's relatives and friends during the mitigation phase of his

trial. (Petition, Doc. No. 10 at 28-32.) His attorneys' lapse provided the prosecutor with an

opportunity to argue to the jury that the only evidence of Murphy's troubled life had come from

Murphy himself. *Id*. at 50. Respondent argues that defense counsel effectively presented the

mitigation case, that the state post-conviction court was correct when it held the omitted information

was cumulative to that presented, and that Murphy has failed to demonstrate prejudice from the

claimed attorney error.  (Return of Writ, Doc. No. 12 at 55.)

Murphy contends his trial counsel should have produced the testimony of several of his relatives and friends in the mitigation phase of his trial.  Specifically, he claims the testimony of Jamie Vargas, his stepsister; Regina Head, his cousin; Sandie Head, his second cousin; Joseph C. Woods, Sr., his great uncle; Lamar Murphy, his half-brother; Bobette Peters, mother of Murphy's son; Drema Woods, his stepmother; Joseph C. Woods, Jr., his uncle; Sunserraye Bates, mother of his daughter; Adrian McConnell, his former Big Brother; and Michelle Murphy, his half-sister. (Petition, Doc. No. 10 at 29.)  Murphy raised as error his trial counsels' failure to call those individuals as his eighth, ninth, tenth, twelfth, thirteenth, fourteenth, fifteenth, seventeenth, eighteenth, and thirty-fifth claims for relief in his state post-conviction proceedings.  (Appendix, Vol. 5 at 50-58, 62-73, 77-82, 370-71.[15])  The state post-conviction court summarized the relevant evidence presented in the mitigation phase of Murphy's trial as follows:

> At the mitigation hearing, [d]efense counsel called Defendant's mother, father, and paternal grandmother, as well as professional witnesses to testify as to Defendant's unstable and neglected childhood.  Jane Bowman, a former school nurse, testified to finding children left alone when she made a home visit when Defendant was five years old.  She further described deplorable housekeeping standards. (Tr. Vol. XI, 1326-29.) John Rice, a school social worker, testified to making a referral to Franklin County Children's Services because he found young children left alone in the Murphy home. (Tr. Vol. XI, 1341-45.)  Gail Peterson, a supervisor at Franklin County Children's Services testified to that agency's involvement with the family and the neglectful conditions in the home.
>
> Valerie Thomas, a Franklin County Children's services caseworker for the family testified that Mrs. Murphy's parenting skills had always been "marginal" and that she had not been able to "effectively parent over the years." (Tr. Vol. XI, 1372.) She further testified that Defendant was left to his own devices.  (Tr. Vol. XI, 1374-78.)

---

[15]Once again, Murphy has not cited to the record as he should have, and did not provide a citation to the Appendix where the affidavits of the named individuals could be found.  Furthermore, where any citation at all is provided, he cites to "PC Ex. 3," as an example, which tells the Court that the document he refers to was attached as exhibit 3 to the post-conviction petition, but not where that document might be found in the Appendix.

> Patricia Brown, Defendant's sixth grade teacher, testified that
> Defendant was not a happy child and neither parent ever came to
> conferences or kept in contact with the school. (Tr. Vol. XI, 1399-
> 1403). Finally, counsel called a former neighbor to testify that
> Defendant's mother frequently locked her unattended children in the
> house and that Defendant frequently came to her house requesting
> food. (Tr. Vol. XI, 1406-10.)

(Appendix, Vol. 5 at 457-58.) To that summary, this Court adds that Barbara Murphy, Murphy's

mother, testified in the mitigation phase that she went out every night except Sundays to drink when

Murphy was a child. (Trial Tr. at 1420.) As an adult, Murphy told his mother that his older siblings

refused to give him food when Mrs. Murphy was away. *Id*. at 1421. She acknowledged that she was

supposed to be watching over her children in the evenings, but attempted to defend her absences by

pointing out that "Children Services never contacted me about the evenings. That was about the

mornings." *Id*. at 1423-24. Later, however, she testified that a childcare provider approved by the

welfare department was paid to watch the children in the mornings and evenings when she was

"supposed to come home." (Trial Tr. at 1428.) Mrs. Murphy did nothing when Murphy's grades

dropped to "F" because there was nothing she could do being away from the home as much as she

was. *Id*. at 1424-25. There was a period of about ten years when Children's Services was not

involved with the Murphy family from 1977 to 1986. *Id*. at 1431.

Ulysses Woods, Murphy's father, also testified in mitigation. He testified that Murphy was

conceived in a relationship he had with Barbara Murphy when he was married to Drema Woods.

(Trial Tr. at 1385.) He had little contact with the family after Murphy was born, and was not aware

that Barbara Murphy left her five children, including the youngest, Murphy, alone regularly, or that

Children's Services had had dealings with the family . *Id*. at 1387-88. The only time Murphy would

see his father is when he would ride his Big Wheel to the bar in which the Woods was employed.

*Id*. at 1389. Woods explained that Barbara Murphy had a restraining order against him preventing

him from visiting the Murphy home. *Id*. at 1390. Woods testified that Murphy would sometimes

"run away" from home and go spend time at Murphy's grandmother's or stepmother's homes.  *Id*. Woods acknowledged he was a violent person when Murphy was growing up, that he had beaten Murphy with a belt numerous times, and that one beating resulted in Murphy's visit to a doctor for a "lip busted" when Murphy was sixteen years old.  *Id*. at 1391, 1395.

Elnora Woods, Murphy's paternal grandmother, testified that when Murphy was six or seven years old, he would "run away" from his home to her house, telling her that his brothers were not treating him right, were fighting with him, and would not feed him.  (Trial Tr. at 1437-38.)  Murphy came to live with her when he was in his mid-teens.  *Id*. at 1438.  He told her he felt unloved and like the "black sheep of the family."  *Id*. at 1439.  She described Murphy as respectful toward her, knowledgeable about the difference between right and wrong, and compliant with the rules she had for her home.  *Id*. at 1442.

Murphy contends that more background evidence was available and should have been submitted during the mitigation phase of his trial.  (Petition, Doc. No. 10 at 28-32; Traverse, Doc. No. 21 at 50-52.)  Rather than demonstrate how the Ohio Supreme Court's decision was contrary to or an unreasonable application of federal law, however, Murphy urges this court to perform what sounds like *de novo* review of the claim because, as he puts it, the state court's decision was a "cursory summary application" of the law.  (Traverse, Doc. No. 21 at 51-52.)  Suffice it to say that a court's summary explanation of its findings does not foreclose a thorough evaluation of a claim, nor does it render the state court's application of federal law unreasonable.

The evidence Murphy's defense counsel presented in mitigation described a family history of dysfunction, alcoholism, criminal conduct, and parental neglect of children.  From the witnesses presented, it was clear that Murphy never lived in a home in which there was any structure, that his surroundings were chaotic and dirty, that he had no worthy role models, and that he was not provided with the nurturing and moral guidance every child deserves.  The record shows that

Murphy's defense counsel did contact many of the individuals Murphy now claims should have been called as witnesses in mitigation. Specifically, defense counsel contacted Jamie Vargas, Joseph C. Woods, Sr., Lamar Murphy, Drema Woods, Sunserraye Bates, and Adrain McConnell, but ultimately did not call them as witnesses. (Appendix, Vol. 5 at 160, 163, 165, 177, 182, 194; Doc. No. 70, Evid. Hrg. Tr. at 59, 85.) In addition, Drema Woods, Jamie Vargas, Michele Murphy, and Sunserraye Bates testified at the evidentiary hearing that each provided Murphy's trial counsel with essentially the same information to which she testified in the evidentiary hearing. (Doc. No. 70, Evid. Hrg. Tr. at 62, 85, 238-39, 254-55.) Vargas' and Bates' evidentiary hearing testimonies differed from what they told Murphy's defense counsel only in the degree of detail they gave. (Doc. No. 70, Evid. Hrg. Tr. at 88, 91.) That said, it is reasonable to conclude that Murphy's defense counsel were aware of the testimony Drema Woods, Jamie Vargas, Michele Murphy, and Sunserraye Bates would have given had they been called as mitigation witnesses.

Terry Sherman, Murphy's defense counsel, testified at the evidentiary hearing in these proceedings that he made the decision whether to present each witness in the mitigation phase after consulting with other members of the defense team. (Doc. No. 79, Evid. Hrg. Tr. at 42.) He does not believe in calling six witnesses to testify about a certain point when the same evidence can be presented through one "good, clean witness." *Id*. at 43. Murphy has provided this Court with no evidence that Sherman's decision not to call Drema Woods, Jamie Vargas, Michele Murphy, and Sunserraye Bates as mitigation witnesses fell below the minimum standard of professional assistance. Indeed, Sherman's testimony at the evidentiary hearing strongly suggests the decision not to present those witnesses was the product of sound trial strategy, specifically to avoid the presentation of repetitive and cumulative testimony. *Id*. at 42-43. Thus, the Ohio Supreme Court's decision rejecting Murphy's ineffective assistance of trial counsel claim because the evidence Murphy claims should have been presented in mitigation was cumulative was neither contrary to nor

an unreasonable application of federal law with regard to Drema Woods, Jamie Vargas, Michele Murphy, and Sunserraye Bates.

In addition to those four witnesses, three others who provided state post-conviction affidavits were contacted by Murphy's trial counsel but were not called to testify at the habeas evidentiary hearing.  Joseph Woods, Sr., Murphy's great uncle, described Murphy's grandmother's difficulties caring for her own children and Murphy's father's arrest for public intoxication at some unspecified date in time.  (Appendix, Vol. 5 at 164-65.)  His affidavit describes the conditions in which Murphy was raised only in the most general sense.  *Id.*  For instance, he stated that Murphy never had nurturing parents, that both parents drank as did Murphy at an early age, and that Murphy sometimes lived with his mother and at other times lived with his grandmother.  *Id.*  All of that information was before Murphy's jury through other witnesses, and in greater detail than Woods provides in his affidavit.  Consequently, the Ohio Supreme Court's determination that the evidence Woods would have given had he been called as a mitigation witness was cumulative is not only reasonable, but correct.

Murphy's half-brother Lamar Murphy also provided an affidavit in post-conviction and was contacted by Murphy's defense counsel during their preparation for the trial.  (Appendix, Vol. 5 at 176-77.)  In his affidavit, he stated that when Murphy was a boy, he lived with his grandmother at times.  *Id.* at 176.  There was no structure or supervision there, just as there was none at Murphy's mother's home.  *Id.*  Lamar Murphy described his mother's drinking briefly, and stated the children in the home were left to their own devices as to meals, etc.  *Id.*  He stated Murphy drank and that he had seen Murphy drunk, but provided no chronological context and did not state how frequently Murphy consumed alcohol.  *Id.* at 177.  Significantly, Lamar Murphy also stated that Murphy began associating with members of the Junior Crips gang in about 1982.  *Id.*  Most of the information contained in Lamar Murphy's post-conviction affidavit was presented to the jury through other

witnesses, and what was not, that Murphy associated with the Junior Crips, was likely viewed by defense counsel as damaging rather than helpful to Murphy's mitigation case.  Murphy's trial counsels' failure to present the cumulative and damaging evidence contained in Lamar Murphy's affidavit cannot constitute ineffective assistance.

Murphy also claims Adrain McConnell, who became involved with Murphy for one year as a Big Brother through the Directions for Youth program, should have been called to testify in the mitigation phase of the trial.  Murphy lived with his grandmother during that time, and McConnell likened her to the old woman in the shoe of nursery rhyme fame.  (Appendix, Vol. 5 at 193.)  Try as she might, McConnell stated, Elnora could not fill every child's needs because so many lived with her.  *Id*. at 193-94.  Murphy was seventeen years old when McConnell knew him, did not miss appointments, was not violent, and was receptive to the types of activities McConnell planned for the two of them.  *Id*. at 194.  McConnell "became aware" of Murphy's alleged heroism in rescuing several people from a fire in his grandmother's home at some unspecified time, but did not profess to have any personal knowledge of any such event.  *Id*.  He assisted Murphy in enrolling in the Job Corps program, but Murphy later told McConnell that he had "messed up" and had not finished the program.  *Id*.  McConnell's affidavit contains little that would have been useful in mitigation.  The information McConnell would have provided respecting the living conditions at Elnora Murphy's home was provided to the jurors through other witnesses.  McConnell's account of Murphy's heroism saving people from a fire was hearsay and would not have been admissible.  And Murphy's enrollment and failure to complete his Job Corps program would likely have been viewed by jurors as a chance to escape the poverty of his upbringing given to and squandered by Murphy.  In other words, if the inadmissible and damaging information is excluded from McConnell's affidavit, what is left is evidence that was already before the jury.  The Ohio Supreme Court's determination that McConnell's testimony would have been cumulative, and that Murphy's trial counsel were not,

therefore, ineffective in deciding not to present McConnell as a mitigation witness, is neither contrary to nor an unreasonable application of federal law.

There remain four individuals Murphy claims his trial counsel should have called to testify at his mitigation hearing.  Two of them, Sandie Head and her daughter, Regina Head, add nothing in their post-conviction affidavits to the evidence presented at trial respecting Murphy's impoverished upbringing.[16]  (Appendix, Vol. 5 at 187-92.)  At the evidentiary hearing in these proceedings, furthermore, Sandie Head testified that she never went to Elnora Woods' home very often, but that when she did, the house was filthy.  (Trial Tr. at 96-99.)  Elnora, Sandie Head said, "just wasn't a housekeeper."  *Id*. at 97.  Her testimony, based upon apparently rare visits to the Woods' home, contains little about Murphy's upbringing that would have been valuable in the mitigation phase of the trial.  Regina Head described Elnora's home as dirty, and a place where she had seen mice and cockroaches.  *Id*. at 115.  That evidence is unlikely to have influenced a juror to deliver a life sentence rather than death, given the other, stronger mitigation evidence presented at trial.  The Ohio Supreme Court's conclusion that their testimony on that topic would have been cumulative is reasonable, and his attorneys' failure to call them as witnesses cannot be characterized as ineffective assistance.

Although Murphy also contends his trial counsel were ineffective for not presenting the testimony of Bobette Peters, the mother of his son, to testify about his family and childhood, he never explains what evidence Peters would have provided about his impoverished life, the omission of which would constitute ineffective assistance by his trial counsel.  Murphy requested and was granted an opportunity to present Peters' testimony at the evidentiary hearing in these proceedings (Doc. No. 31 at 8; Doc. No. 34 at 6), but ultimately did not call her as a witness, effectively

---

[16]Both women describe Murphy as a loving father in their affidavits (Appendix, Vol. 5 at 188, 191), and the question whether they should have been called to testify in that regard is the subject of a separate sub-claim in this ground for relief and is discussed below.

abandoning his sub-claim insofar as it pertains to Peters.  Moreover, aside from her statement that Murphy had been "shot a couple of times," there is nothing relating to his upbringing in her post-conviction affidavit that was not presented to the jury through other witnesses.  (Appendix, Vol. 5 at 178-79.)  For all of these reasons, Murphy's trial counsels' decision not to present the testimony of Bobette Peters in the mitigation phase of his trial cannot be said to have been ineffective assistance.

Finally, Murphy claims his counsel were ineffective for not calling Joseph Woods, Jr., Murphy's uncle, as a mitigation witness.  In the evidentiary hearing, Woods, Jr., testified that he has been imprisoned since Murphy was eight or nine years old and has not seen him or had contact with him since that time.  (Doc. No. 71, Evid. Hrg. Tr. at 215, 220.)  He described Murphy's father as a man who always drank, *id*. at 213, Murphy's mother as a woman who was always drunk, *id*. at 214, and Murphy's grandmother as a woman who tried her best to care for her family but did not have the resources or ability to keep the utilities on and keep the home clean, *id*. at 209-11.  At the time Woods, Jr., knew him, Murphy was a boy who was lonely, quiet, withdrawn, and who wanted company and love.  *Id*. at 215-16.  Neither parent showed much interest in Murphy.  *Id*. at 217.  Except for Woods, Jr.'s, assessment of Murphy's personality as an eight- or nine-year-old boy, nothing in his testimony is significantly different from the evidence actually presented in mitigation at trial.  To the extent that the Ohio Supreme Court held his testimony, if admitted, would have been cumulative, the state court's determination is neither contrary to nor an unreasonable application of federal law.  The failure of Murphy's defense counsel to present Woods, Jr.'s, impressions of Murphy as a young boy, even if it was error, which this Court does not decide, was unlikely to persuade a reasonable juror that Murphy should be sentenced to a life term rather than death and was therefore harmless.  Moreover, Murphy makes no attempt to demonstrate prejudice from his counsels' failure to present Woods, Jr.'s, testimony, a necessary component of a successful claim

of ineffective assistance of counsel.  *Strickland*, 466 U.S. at 687, 694.

Having failed to demonstrate that the Ohio Supreme Court's resolution of Murphy's ineffective assistance of trial counsel claim was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, Murphy's second sub-claim under his fifth ground for relief should be denied.

**3.      Failure to Investigate and Prepare Witnesses**

Murphy contends his trial counsel failed to prepare mitigation witnesses Barbara Murphy and Ulysses Woods, and that their failure constituted ineffective assistance of counsel.  (Petition, Doc. No. 10 at 32-33.)  Respondent argues that the state post-conviction trial court decided the claim on its merits, finding that the additional testimony Murphy claims Barbara Murphy and Woods would have given was cumulative, and concluding that Murphy's trial counsel were consequently not ineffective.  (Return of Writ, Doc. No. 12 at 55-56; Appendix, Vol. 5 at 458-59.)  That is true, as far as it goes, but since the Franklin County Court of Appeals also addressed the merits of Murphy's claim when he pursued it on appeal in post-conviction, it is that court's decision this Court considers under the standard set forth in the AEDPA.  The state appellate court resolved the claim as follows:

> [Murphy] also faults trial counsel for failing to "prepare" his mother and father prior to each being called to testify at trial.  In support of this allegation, [Murphy] offers affidavits from his parents which reiterate the testimony elicited at trial from his mother and father, in addition to his paternal grandmother and other experts, showing that [Murphy] was raised in an abusive and neglectful home.  We doubt [Murphy] intends to claim that trial counsel was ineffective for failing to "coach" or "prepare" the content of his parents' testimony.  Instead, it appears that [Murphy] maintains that trial counsel failed to pursue avenues of examination which [Murphy] now believes would have elicited "profoundly mitigating information."  However, the extrinsic evidentiary material submitted in support of this claim fails to approach a showing that trial counsel failed to function as counsel guaranteed by the Sixth Amendment, or committed errors in professional judgment "so serious as to deprive the defendant of a fair

trial, a trial whose result is reliable." *Strickland*, *supra*, at 687.

*State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *5 (Ohio App. 10th Dist. Dec. 26, 2000).

Thus, this Court evaluates Murphy's claim that his counsel were ineffective by considering the court

of appeals' decision in light of the AEDPA.

First, however, the Court must determine whether the habeas evidentiary hearing testimony

of Barbara Murphy can appropriately be included in the consideration of Murphy's claim, since any

new evidence contained therein was obviously not before the state court when the claim was raised

there.  It is recalled that Barbara Murphy testified in the mitigation phase of Murphy's trial.  (Trial

Tr. at 1416-34.)  She also provided her affidavit in support of Murphy's claim that his trial counsel

were ineffective in not properly preparing her for her mitigation phase testimony.  (Appendix, Vol.

5 at 74-76, 172-75.)  As noted above, the post-conviction court determined that the information

contained in Barbara Murphy's affidavit was cumulative to her trial testimony and that Murphy's

attorneys were not ineffective for not bringing it out in the mitigation phase.  *State v. Murphy*, No.

00AP-233, 2000 WL 1877526 at *5 (Ohio App. 10th Dist. Dec. 26, 2000).  The state court based its

determination on a comparison of Barbara Murphy's affidavit and her trial testimony; the record is

silent as to the court's decision on Murphy's request for an evidentiary hearing (Appendix, Vol. 5

at 76), which in Ohio gives rise to a presumption that the motion was denied.  *State v. Rozell*, No.

95 CA 17, 1996 WL 344034 at *1 (Ohio App. 4th Dist. June 20, 1996)(unreported), *citing Newman*

*v. Al Castrucci Ford Sales, Inc.*, 54 Ohio App. 3d 166, 169 (1988), *Kane v. Ford Motor Co.*, 17 Ohio

App. 3d 111, 112 (1984), *Solon v. Solon Baptist Temple, Inc.*, 8 Ohio App. 3d 347, 351 (1982).  In

addition, the parties' conduct and arguments indicate the motion for an evidentiary hearing was

denied by the state court.

The information Barbara Murphy provided in her post-conviction affidavit that was not

included in her mitigation phase testimony was that Barbara Murphy did not know who her own

father was, her mother gave up custody of Barbara Murphy's infant sister, Barbara Murphy was shown no love as a child and she showed her own children none as well, Ulysses Woods was not involved with his son and never supported him, Ulysses Woods was violent at times, Elnora Woods imposed no discipline at her home, which was extremely messy, and Barbara Murphy took phenobarbital when she was pregnant with one of Murphy's siblings. (Petition, Doc. No. 10 at 32; Appendix, Vol. 5 at 172-75.) Some of that evidence was presented through other witnesses in the mitigation phase. For instance, Dr. Jolie Brams testified that no one nurtured Murphy when he was a child and that there was no actual parenting within the family, as well as the impact such conditions can have on a child. (Trial Tr. at 1465-72.) Gail Peterson, a social worker who was involved with the family during Murphy's childhood, testified that Murphy's parents were interested in meeting their own needs above those of their children, and that his parents often neglected the children's emotional and developmental needs in pursuit of their own interests. (Trial Tr. at 1358-59.) Thus, the state court's determination that the evidence Barbara Murphy could have provided relating to Murphy's lack of nurturing in childhood was cumulative is factually correct.

Other information provided in Barbara Murphy's affidavit, while not actually cumulative in the sense that it repeats what was already presented at trial, is generationally remote. That is not to say that it is completely irrelevant, but the potency of the evidence declines with each generational leap. Thus, that Barbara Murphy did not know who her father was and that custody of her infant sister was given up by her mother are statements that, if uttered in the mitigation phase, would have been unlikely to have persuaded even one juror that Murphy should be spared the death penalty. In addition, that Barbara Murphy took phenobarbital while pregnant with one of her children other than Murphy would, in all likelihood, have barely registered on the scale weighing aggravating circumstances and mitigating factors. Although violence between a defendant's mother and father can be mitigating, in Murphy's case, there is no testimony or evidence showing Murphy witnessed

or was aware of the altercations between his mother and father.

What is left, then, are Barbara Murphy's statements that Murphy's grandmother was inept at disciplining him, and that the grandmother's home was "extremely messy." (Appendix, Vol. 5 at 174-75.) Although Murphy did live with his grandmother for a time when he was a teenager, most of his childhood was spent at his mother's home, which was described at trial as "unkempt" and "deplorable." (Trial Tr. at 1328, 1438-9.) It is unlikely that any juror would have rejected the death penalty for Murphy had he or she learned that his grandmother's home was in no better condition than his mother's.

The state court of appeals' conclusion that Murphy's trial counsel were not ineffective for not presenting more evidence through Murphy's mother rested on a factual determination that the content of Barbara Murphy's affidavit was cumulative to her mitigation phase testimony. *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *5 (Ohio App. 10th Dist. Dec. 26, 2000). Consequently, this Court is required to apply 28 U.S.C. § 2254(d)(2) to the state court's decision. Thus, Murphy can only demonstrate entitlement to habeas corpus relief on the instant sub-claim if the state court's determination that the affidavit evidence was cumulative to Barbara Murphy's trial testimony was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In that regard, the statute places this Court in a position similar to that of an appellate court by limiting consideration of the instant claim to evidence that was before the state post-conviction court. This court, however, has taken additional evidence relevant to Murphy's claim by allowing Barbara Murphy to testify at the evidentiary hearing. (Evid. Hrg. Tr., Doc. No. 70 at 4-42.) Whether that evidence may be properly considered, given the strictures of 28 U.S.C. § 2254(d)(2), is an open question. In Murphy's case, however, it is one that need not be answered, since Barbara Murphy's evidentiary hearing testimony was itself cumulative to the contents of her post-conviction affidavit and her mitigation phase testimony.

-80-

Murphy also claims his attorneys were ineffective for not eliciting from Ulysses Woods his statement made later in his post-conviction affidavit that Barbara Murphy consumed alcohol almost daily while she was pregnant with Murphy. (Petition, Doc. No. 10 at 32.) While those specific words did not come out of Woods' mouth during his testimony in the mitigation phase of Murphy's trial, Woods did testify that Barbara Murphy drank about every other day, that she frequently became drunk, and that he believed Barbara Murphy was an alcoholic at the time he was involved with her, which coincides with her pregnancy with Murphy. (Trial Tr. at 1386-87.) From his testimony, it is reasonable to infer that Barbara Murphy consumed alcohol during her pregnancy with Murphy. The state post-conviction court's conclusion that the information in Woods' post-conviction affidavit was cumulative to his trial testimony, therefore, is not an unreasonable determination of the facts, nor is the state court's concurrent determination that Murphy's trial counsel were not ineffective for failing to present cumulative evidence contrary to or an unreasonable application of federal law. As such, Murphy's third sub-claim in his fifth ground for relief should be denied.

**4.      Failure to Conduct a Reasonable Investigation with Appropriate Expert Assistance**

Next, Murphy claims his trial counsel were ineffective in failing to thoroughly investigate Murphy's background for mitigation purposes. (Petition, Doc. No. 10 at 33-34.) Respondent argues that the state post-conviction court correctly found that Murphy's claim was refuted by the record, and that any additional mitigation evidence that could have been presented was cumulative. (Return of Writ, Doc. No. 12 at 56.) As before, however, Respondent fails to acknowledge the court of appeals' decision on the issue, which reads as follows:

> [D]efendant asserts trial counsel should have presented additional evidence in mitigation of penalty. During the course of the mitigation hearing, defense counsel called [D]efendant's mother, father, and paternal grandmother, as well as professional witnesses who testified regarding the defendant's appalling childhood. In its

> opinion, the trial court summarized the testimony of the nonfamilial witnesses . . . .
>
> As with the previous claims, the trial court properly found no reason this claim cannot be fairly determined from the record on direct appeal. Additionally, the evidence defendant now wishes to submit is largely cumulative of that presented at trial; whereas under *State v. Combs* (1994), 100 Ohio App.3d 90, affidavits establishing additional evidence of a petitioner's theory of mitigation, or which establish alternative theories of mitigation, generally fail to establish a constitutional claim of ineffective assistance of counsel.

*State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at * 4-5 (Ohio App. 10th Dist. Dec. 26, 2000).

Thus, that is the opinion to which this Court must apply the AEDPA. In doing so, however, the Court notes that the Ohio Court of Appeals misapplied its own procedural rule which bars raising errors in post-conviction that could have been litigated on direct appeal. A claim that a lawyer should have presented more evidence in the mitigation phase of a capital trial necessarily relies upon evidence that was not presented during the trial, which is precisely the type of error that cannot be raised on direct appeal in Ohio courts. *State v. Perry*, 10 Ohio St. 2d 175 (1967)(paragraph seven of the syllabus). Thus, this Court disregards the state court of appeals' procedural reason for denying Murphy's claim of error in post-conviction, and applies the AEDPA to the state court's determination that the omitted evidence was cumulative.

The United States Supreme Court has elaborated on a capital defense attorney's duty to conduct a mitigation investigation as follows:

> In this case, as in *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], petitioner's claim stems from counsel's [sic] decision to limit the scope of their investigation into potential mitigating evidence. *Id*. at 673. Here, as in *Strickland*, counsel attempt to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead. In rejecting the respondent's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices

-82-

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*., at690-691.

Our opinion in *Williams v. Taylor*[, 529 U.S. 362 (2000)] is illustrative of the proper application of these standards.  In finding Williams' ineffectiveness claim meritorious, we applied *Strickland* and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." 529 U.S., at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1989)). . . .

In light of these standards, our principal concern in deciding whether [attorneys] Schlaich and Nethercott exercised "reasonable professional judgmen[t]," *id*., at 691, is not whether counsel should have presented a mitigation case.  Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant] Wiggins' background *was itself reasonable*.

*Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003) (parallel citations omitted).  These principles, superimposed upon the governing standards in *Strickland* and the AEDPA, guide this Court's consideration of Murphy's claim.

In his Petition and Traverse, Murphy does not reveal what mitigation evidence would have been discovered by his counsel had they performed an adequate investigation, by his estimation. Instead, he cites Dorian Hall, a mitigation specialist who was called to give expert testimony on the standards applicable to mitigation specialist and defense counsels' presentation of mitigation evidence at trial.  (Doc. No. 71, Evid. Hrg. Tr. at 256-316, Doc. No. 79, Evid. Hrg. Tr. at 94-114.) Since the performance of the mitigation specialist in Murphy's case was not challenged and in any case would not at present constitute a claim of constitutional error – there is no federal constitutional

right to effective assistance of a mitigation specialist – and because Hall, as a mitigation specialist, is not qualified to offer expert testimony on the performance of attorneys, her testimony is excluded from this Court's consideration of Murphy's ineffective assistance of counsel claim.

Murphy also contends that his trial counsels' failed to meet with mitigation specialist Karen Roberts, who worked on Murphy's case with the Ohio Public Defender's Office before new counsel, Terry Sherman and Debra Gorrell, were appointed to the case. (Petition, Doc. No. 10 at 33-34; Appendix, Vol. 5 at 356-57.) Murphy argues that the mere fact of the lack of contact is enough to demonstrate his trial counsels' ineffectiveness in conducting a mitigation investigation. (Petition, Doc. No. 10 at 33-34.) He does not so much as hint at what information his trial counsel would have acquired if they had contacted Roberts. *Id*. In addition, Roberts' state post-conviction affidavit details almost exclusively what she *would have* done had she been kept on the case rather than what she had *actually* discovered about Murphy and his background. (Appendix, Vol. 5 at 356-57.) The two exceptions are that she stated she knew of the existence of several potential mitigation witnesses, and that she had been to Elnora Woods' home and found it "in a run-down, deplorable condition." *Id*. at 357. She stated she would have provided the potential witnesses' names to Sherman and Gorrell if they had contacted her. *Id*. Nothing in the record demonstrates that Murphy's trial counsel were unaware of the potential witnesses, however, and the fact that some of them were not ultimately called as witnesses in the mitigation phase is not evidence of counsels' ignorance or ineffectiveness. Furthermore, evidence that Elnora Woods' home was unkempt and dirty at the time Roberts visited it would have had little relevance to the circumstances of Murphy's upbringing.

In his post-evidentiary hearing brief, Murphy goes into more detail with regard to what evidence he believes would have been and should have been discovered by his trial counsel had they conducted a reasonable and thorough investigation. (Doc. No. 72 at 52-63.) Specifically, he

contends the following evidence should have been presented to the jury during the mitigation hearing:

4.1     Barbara Murphy consumed alcohol while she was pregnant with Murphy (Affidavit of Drema Woods, Appendix, Vol 5 at 162; Affidavit of Ulysses Woods, Appendix, Vol. 5 at 170; Doc. No. 70, Testimony of Drema Woods, Evid. Hrg. Tr. at 47-48.)

4.2     Murphy was exposed to domestic violence between his father and mother, and his father and stepmother (Affidavit of Barbara Murphy, Appendix, Vol. 5 at 173; Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 25-28; Doc. No. 70, Testimony of Drema Woods, Evid. Hrg. Tr. at 50-51; Doc. No. 70, Testimony of Jamie Vargas, Evid. Hrg. Tr. at 66.)

4.3.    Murphy's stepmother and stepsister lived in an unsafe housing project, and he visited them there (Doc. No. 70, Testimony of Drema Woods, Evid. Hrg. Tr. at 49; Doc. No. 70, Testimony of Jamie Vargas, Evid. Hrg. Tr. at 68, 70-72.)

4.4.    Barbara Murphy once threatened Murphy with a firearm (Affidavit of Michele Murphy, Appendix, Vol. 5 at 371; Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 31; Doc. No. 71, Testimony of Michele Murphy, Evid. Hrg. Tr. at 229.)

4.5.    Murphy's stepmother shot his father (Doc. No. 70, Testimony of Drema Woods, Evid. Hrg. Tr. at 51-52.)

4.6.    Several of Murphy's relatives were in prison and were poor role models (Affidavit of Jamie Vargas, Appendix, Vol. 5 at 159; Affidavit of Drema Woods, Appendix, Vol. 5 at 163; Affidavit of Joseph C. Woods, Sr., Appendix, Vol. 5 at 164; Affidavit of Joseph C. Woods, Jr., Appendix, Vol. 5 at 166; Affidavit of Barbara Murphy, Appendix, Vol. 5 at 175; Affidavit of Lamar Murphy, Appendix, Vol. 5 at 176; Affidavit of Regina Head, Appendix, Vol. 5 at 187; Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 17-18; Doc. No. 70, Testimony of Drema Woods, Evid. Hrg. Tr. at 53-54, 57-58; Doc. No. 70, Testimony of Jamie Vargas, Evid. Hrg. Tr. at 81; Doc. No. 70, Testimony of Regina Head, Evid. Hrg. Tr. at 113; Doc. No. 71, Testimony of Joseph Woods, Jr., Evid. Hrg. Tr. at 205-6; Doc. No. 71, Testimony of Sunserraye Bates, Evid. Hrg. Tr. at 243.)

4.7.    Murphy's half-sister is schizophrenic (Affidavit of Barbara Murphy, Appendix, Vol. 5 at 175; Affidavit of Michele Murphy, Appendix, Vol. 5 at 370; Doc. No. 71, Testimony of Michele Murphy, Evid. Hrg. Tr. at 223.)

4.8.    Barbara Murphy told her schizophrenic daughter to keep a gun in her bedroom (Doc. No. 71, Testimony of Michele Murphy, Evid. Hrg. Tr. at 229-30.)

4.9.    Barbara Murphy had inappropriate boyfriends (Affidavit of Bobette Peters, Appendix, Vol. 5 at 179; Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 31; Doc. No. 71, Testimony of Michele Murphy, Evid. Hrg. Tr. at 225-26, 234-35.)

4.10.   Barbara Murphy was raised by an emotionally distant mother (Affidavit of Barbara Murphy, Appendix, Vol. 5 at 174; Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 8.)

4.11.   Elnora Woods was raised in Georgia, was dysfunctional, lived in deplorable conditions, and had many children staying at her house where there was no structure or guidance (Affidavit of Jamie Vargas, Appendix, Vol. 5 at 159; Affidavit of Drema Woods, Appendix, Vol. 5 at 162 (doesn't say how she knows that); Affidavit of Joseph C. Woods, Sr., Appendix, Vol. 5 at 165; Affidavit of Barbara Murphy, Appendix, Vol. 5 at 174-75; Affidavit of Lamar Murphy, Appendix, Vol. 5 at 176; Affidavit of Sunserraye Bates, Appendix, Vol. 5 at 181; Affidavit of Elnora Woods, Appendix, Vol. 5 at 185-86; Affidavit of Regina Head, Appendix, Vol. 5 at 187-88; Affidavit of Sandie Head, Appendix, Vol. 5 at 191; Affidavit of Adrain McConnell, Appendix, Vol. 5 at 193-94, Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 31-33; Doc. No. 70, Testimony of Drema Woods, Evid. Hrg. Tr. at 56-57; Doc. No. 70, Testimony of Jamie Vargas, Evid. Hrg. Tr. at 76-79, 86-87; Doc. No. 70, Testimony of Sandie Head, Evid. Hrg. Tr. at 93-100, 105-6; Doc. No. 70, Testimony of Regina Head, Evid. Hrg. Tr. at 114-16; Doc. No. 70, Testimony of Dr. Robert Smith, Evid. Hrg. at 155; Doc. No. 71, Testimony of Joseph Woods, Jr., Evid. Hrg. Tr. at 208-12; Doc. No. 71, Testimony of Sunserraye Bates, Evid. Hrg. Tr. at 241-43.)

4.12.   The Murphy family had a multi-generational cycle of abuse, neglect, and dysfunction (Affidavit of Jamie Vargas, Appendix, Vol. 5 at 159; Doc. No. 70, Testimony of Jamie Vargas, Evid. Hrg. at 81.)

    4.13.    Murphy consumed alcohol prior to the murder (Affidavit of Bobette Peters, Appendix, Vol. 5 at 183; Affidavit of Regina Head, Appendix, Vol. 5 at 189; Doc. No. 70, Testimony of Sandie Head, Evid. Hrg. Tr. at 103-4; Doc. No. 70, Testimony of Regina Head, Evid. Hrg. Tr. at 121and; Doc. No. 70, Testimony of Dr. Robert Smith, Evid. Hrg. Tr. at 160, 173.)

    4.14.    Murphy was a good father and loved his children (Affidavit of Jamie Vargas, Appendix, Vol. 5 at 160; Affidavit of Barbara Murphy, Appendix, Vol. 5 at 175; Affidavit of Bobette Peters, Appendix, Vol. 5 at 178; Affidavit of Sunserraye Bates, Appendix, Vol. 5 at 181; Affidavit of Regina Head, Appendix, Vol. 5 at 188; Affidavit of Sandie Head, Appendix, Vol. 5 at 191; Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 37; Doc. No. 70, Testimony of Jamie Vargas, Evid. Hrg. Tr. at 82-84; Doc. No. 70, Testimony of Sandie Head, Evid. Hrg. Tr. at 105; Doc. No. 70, Testimony of Regina Head, Evid. Hrg. Tr. at 119; Doc. No. 71, Testimony of Michele Murphy, Evid. Hrg. Tr. at 231-32, 237; Doc. No. 71, Testimony of Sunserraye Bates, Evid. Hrg. Tr. at 246-48, 250.)

(Petitioner's Post-Evidentiary Hearing Brief, Doc. No. 72 at 52-53.)[17]

Murphy called his trial counsel, Terry Sherman, as a witness in his habeas corpus evidentiary hearing. Sherman described his approach to mitigation generally, and in Murphy's case specifically. (Doc. No. 79, Evid. Hrg. Tr. at 14-16.) Sherman was appointed to the case prior to trial after Murphy expressed unhappiness with his original counsel. *Id*. at 12. Because of some apparently unpleasant experiences with mitigation experts, Sherman preferred to use his co-counsel, Debra Gorrell, as the mitigation investigator in Murphy's and other death penalty cases. *Id*. He believed her previous occupation as a psychiatric nurse provided her with "certain skills" in obtaining records. *Id*. at 14. Sherman stated with certainty that he had obtained any information that had been gathered by the previous counsel and mitigation specialist Karen Roberts. *Id*. at 17-18. Investigator

---

[17]Murphy has neglected, in this sub-claim, to inform the Court as to where the evidence he claims his attorneys should have uncovered in their investigation can be found in the record. Thus, although certainly not required to do so, the Court has painstakingly searched the record and indicates as best it can where the evidence may found for the convenience of the reader.

Jerry Knoblaugh also helped interview mitigation witnesses, and Dr. Jolie Brams, a psychologist with whom Sherman had previously worked on at least one death penalty case, was also a member of the defense team. *Id*. at 18-19. Sherman testified that preparation for the mitigation phase was conducted simultaneously with preparation for the guilt phase of Murphy's trial. (Doc. No. 79, Evid. Hrg. Tr. at 29.) Every aspect of the preparation was subject to Sherman's approval, and multiple meetings between the defense team members were held. *Id*. He made every decision about which witnesses to call in the mitigation phase and which would not be called after consulting with co-counsel and Dr. Brams. *Id*. at 42, 53-54. Sherman could not remember which of the potential mitigation witnesses he had interviewed, but stated that he would not have put anyone on the witness stand without first talking with them. *Id*. at 57. He did not recall whether he had instructed anyone on the defense team to interview Murphy's relatives Sandie and Regina Head. *Id*. Nor did Sherman have any recall of Murphy's mention in his videotaped interrogation that he had been drinking gin at Regina Head's party prior to the murder. *Id*. at 65. The defense team recognized that Murphy's case was a "mitigation case" from the beginning, given his confession. *Id*. at 29-30. Gorrell interviewed most of Murphy's family members and had more interaction with Dr. Brams, while Knoblaugh interviewed witnesses, reviewed the evidence, and accompanied Gorrell to the "bad parts of town" when necessary. *Id*. Knoblaugh, Gorrell, and Dr. Brams all participated in interviewing various people, and Knoblaugh, Gorrell, and Sherman visited the scene of the crime. *Id*. at 34-35. In addition, Knoblaugh, Gorrell, Dr. Brams, and Sherman met routinely in the course of Murphy's trial to coordinate the mitigation case. *Id*. at 49. Sherman did not recall Murphy being very enthusiastic about participating in the collection of mitigation evidence, and that he in fact denied being involved in the murder throughout the trial, including during the mitigation phase. *Id*. at 35-36, 58, 60.

Sherman described the theory of mitigation as showing that Murphy's background had,

through no fault of his own, contributed to the kind of person he is, that Murphy could follow the rules in a controlled setting such as prison, and that Murphy is not one of "the worst of the worst" for whom death is an appropriate punishment.  (Doc. No. 79, Evid. Hrg. Tr. at 36-37.)  Sherman recalled Murphy's childhood as one of neglect followed by an adolescence and early adulthood of repeated criminal activity, the latter which Sherman and Gorrell wished to avoid disclosing to the jurors.  *Id*. at 38-39.  Dr. Brams' specialty was in child development and was "good at [explaining] how role modeling and parenting and nurturing affect the develop[ment] and the upbringing of a child and how that impacts them in adulthood."  *Id*. at 48.  Dr. Brams either administered or reviewed an existing MMPI test, and had access to all the interview reports and investigative summaries produced by the defense team.  *Id*. at 48-49.  She never requested any additional records, documentation, or information, and made herself available to meet with Sherman in his office rather than requiring him to come to her office and discuss Murphy's case between her clients' appointments.  *Id*. at 48-50.

Sherman acknowledged that one of the defense's arguments was that Murphy's only role models were "people who were nothing but criminals," but provided a confusing answer as to why none of Murphy's relatives who had been incarcerated were called to testify in the mitigation hearing.  *Id*. at 40.  He stated that he would not call witnesses who were incarcerated unless they could help his case, but did not explain why he believed Murphy's relatives would not have helped, or stated that he even considered calling them to testify.  *Id*.  He testified that the criminal relatives' influence is the reason Murphy is the way he is, but again did not explain why he decided not to call them as witnesses.  *Id*.

During preparations for the mitigation hearing, Sherman recalled, there was some discussion of Murphy's "alcohol problem" and his traffic stop by patrol officers shortly after the murder.  *Id*. at 39.  He told Gorrell that if Murphy had been intoxicated at that time, the officers would have

arrested him.  *Id.* at 58.  Sherman indicated that "every one of these defendants is an abuser [of

substances]," and said "the fact that a person has abused drugs and alcohol in and of itself, so what,

unless you . . . are going to make it a mitigating factor or you are going it a question . . . if he was

high or impaired at the time, that would go to the intent argument, specific intent to kill."  *Id.* at 51-

52.  He acknowledged the possibility that he could have been wrong in that regard, and stated

"[o]bviously, I am, because he's on death row," a *non sequitur*, to be sure.  *Id.* at 52.  He also noted,

however, that none of the witnesses who saw Murphy at the after-hours bar just prior to the murder,

including the only eyewitness to the murder, described Murphy as having displayed any of the

characteristic indications of intoxication or impairment due to alcohol consumption (slurred speech,

staggering, glassy eyes, etc.).  (Doc. No. 79, Evid. Hrg. Tr. at 60-61.)  In addition, Sherman stressed

that it would have been the defense's burden to prove Murphy was intoxicated if they had raised it

as a mitigating factor, and that he had no indication that it should be raised as an issue at that time.

*Id.* at 61-62.  On the contrary, there was a police stop made shortly after the murder during which

Murphy was *not* arrested for driving under the influence of alcohol.  *Id.* at 62.  Sherman testified

there was discussion about alcohol, but that the defense team had nothing with which to pursue it

as a mitigating factor.  *Id.  If* he had evidence Murphy had been "totally impaired" at the time of the

murder, and *if* the prosecutors had called the officer who made the decision to let Murphy go with

a warning as a witness, *then* Sherman would have used the officer's status as a rookie to whatever

advantage he could.  *Id.* at 63.  A substance abuse expert was not consulted as part of the preparation

for the mitigation phase.  *Id.* at 90.

　　　　Sherman had no recall of the mothers of Murphy's children, whether he had contact with

them, or whether they could have added anything beneficial to Murphy's mitigation case.  *Id.* at 44,

71.  He could not say whether Sunserraye Bates was interviewed for mitigation.  *Id.* at 72.  He

likewise did not recall whether he was aware at the time of Murphy's trial that Murphy's father was

abusive to Murphy's mother and stepmother, or that his stepmother once shot his father. *Id*. at 68-69. Sherman acknowledged that he did not investigate Murphy's mother's upbringing, and that he did not know that her mother showed her little affection when she was a child. *Id*. at 72. Similarly, he denied having had any interest in Murphy's grandmother Elnora Woods' upbringing, and questioned how such information would have benefitted the defense during Murphy's mitigation hearing. *Id*. at 74. Sherman remembered that Murphy had lived for a time at Elnora Woods' home and that she could not give Murphy the attention, structure, and guidance he needed, but he did not recall whether he had known of the deplorable condition of her home. *Id*. at 86. He did not know that Barbara Murphy once threatened Murphy with a gun, or that she had told her schizophrenic daughter to keep a gun in her bedroom. *Id*. at 72-73. Sherman did not interview Murphy's uncle, Joseph Woods, Jr., who was incarcerated at the time of Murphy's trial. *Id*. at 37.

Next, the Court considers the evidence Murphy claims his counsel should have presented in the mitigation phase in light of trial counsel's evidentiary hearing testimony.

## 4.1. Barbara Murphy's alcohol consumption during pregnancy

Murphy raised this claim in the state courts as his fourteenth claim for relief in his petition for post-conviction relief. (Appendix, Vol. 5 at 68-70.) As noted above, the Ohio Court of Appeals determined that the evidence Murphy claims should have been presented by his counsel was merely cumulative, which is a determination on the merits of the claim. *Carter v. Mitchell*, 443 F.3d 517, 537 (6th Cir. 2006). Consequently, the claim has been preserved for habeas corpus review.

The evidence Murphy claims should have been presented concerning his mother's alcohol consumption during her pregnancy with him came from Murphy's stepmother, Drema Woods, and his father, Ulysses Woods. Drema Woods states in her post-conviction affidavit that Barbara Murphy drank alcohol when she was pregnant with Murphy, but does not explain how she acquired that knowledge. (Appendix, Vol. 5 at 162.) In her evidentiary hearing testimony in these

proceedings, she stated that she had seen Barbara Murphy drinking in bars when she was pregnant with Murphy, but does not say how frequently that was or how much she saw Barbara Murphy drink. (Doc. No. 70, Evid. Hrg. Tr. at 47-48.) Ulysses Woods stated in his post-conviction affidavit that Barbara Murphy drank almost every day during her pregnancy and that she was usually drunk. (Appendix, Vol. 5 at 170.) Missing from Murphy's argument of his claim is any indication that Murphy suffered ill effects from his mother's alcohol consumption during pregnancy. In particular, when Dr. Smith testified in the evidentiary hearing, he was not asked about the effects of prenatal alcohol consumption by a mother. Instead, he was asked to describe how Barbara Murphy's drinking affected her ability to parent Murphy. (Doc. No. 70, Evid. Hrg. Tr. at 152-53.) Even taking Ulysses Woods' statement at face value, no testimony was presented in the evidentiary hearing or at any other time to the effect that Murphy had suffered fetal alcohol syndrome or any other damaging effects from his mother's conduct. Thus, even if this Court were to find on this skimpy record that Murphy's trial counsel provided ineffective assistance for omitting the evidence of Barbara Murphy's alcohol consumption during pregnancy, Murphy has failed to demonstrate prejudice from the omission. Accordingly, the Ohio court's determination that Murphy had not demonstrated the ineffectiveness of his counsel, albeit on the ground that it was cumulative rather than from his failure to show prejudice, was neither contrary to nor an unreasonable application of federal law. Murphy's first sub-claim arguing his counsel were ineffective during the penalty phase of his trial should be denied.

## 4.2. Murphy's exposure to domestic violence between his parents and stepmother

In the Court's review of the record, it found statements and testimony of Barbara Murphy, Drema Woods, and Jamie Vargas in which they stated violence occurred between Barbara Murphy and Ulysses Woods, and Drema Woods and Ulysses Murphy. (Affidavit of Barbara Murphy, Appendix, Vol. 5 at 173; Doc. No. 70, Testimony of Barbara Murphy, Evid. Hrg. Tr. at 25-28; Doc.

No. 70, Testimony of Drema Woods, Evid. Hrg. Tr. at 50-51; Doc. No. 70, Testimony of Jamie Vargas, Evid. Hrg. Tr. at 66.)  None of them stated Murphy had been present at the incidents of violence or that he witnessed them or that he knew of them at all.  Thus, even if Murphy's second sub-claim is preserved for habeas corpus review, and even if his trial counsel had learned everything Murphy now presents as evidence of the incidents, the claim is meritless, and should be denied.

### 4.3. Murphy visited his stepmother's unsafe home

Similarly, in their testimonies at the evidentiary hearing in these proceedings, Drema Woods and Jamie Vargas described how Murphy would come visit them at their home when he was a child. (Testimony of Drema Woods, Doc. No. 70, Evid. Hrg. Tr. at 49; Testimony of Jamie Vargas, Doc. No. 270, Evid. Hrg. Tr. at 68, 70-72.)  Neither stated the housing was unsafe, however, and the Court has not found, nor does Murphy direct the Court's attention to anyplace in the record where it can be found, any statement describing Drema Woods' home as unsafe.  Accordingly, even if the third sub-claim is preserved for habeas corpus review, it is meritless and should be denied.

### 4.4. Barbara Murphy threatened Murphy with a firearm

Likewise, the Court has found statements referring to a firearm in the record, but none that suggest Barbara Murphy threatened her son with one.  In her post-conviction affidavit and again in her evidentiary hearing testimony, Michele Murphy stated Barbara Murphy told her to go retrieve a gun when Barbara Murphy was arguing with Murphy, but Michele could not find the gun. (Appendix, Vol. 5 at 371; Testimony of Michele Murphy, Doc. No. 71, Evid. Hrg. Tr. at 229.) Barbara Murphy testified at the evidentiary hearing that Murphy had taken a gun when he was a young child, and that she had "whooped him for doing it," but says nothing about ever having threatened Murphy with a weapon.  (Testimony of Barbara Murphy, Doc. No. 70, Evid. Hrg. Tr. at 31.) Because Murphy has not supported his fourth sub-claim with any evidence, it should be denied.

### 4.5. Drema Woods shot Ulysses Woods

Murphy raised the ineffectiveness of his trial counsel with regard to evidence he argues his trial counsel should have presented through Drema Woods as his fourteenth claim for relief in his state petition for post-conviction relief.  (Appendix, Vol. 5 at 68-70.)  He quotes Drema Woods' post-conviction affidavit for support.  *Id.*  (Appendix, Vol. 5 at 161-63.)  Mention of Drema Woods' shooting of Ulysses Woods does not appear in the affidavit or the argument.  Since the instant sub-claim has never been presented to the state courts, and there is no corrective process left for Murphy to pursue at this late date,[18] the sub-claim is procedurally defaulted.

Respondent's failure to advance the procedural default defense as to this sub-claim is attributable to Murphy's lack of specificity in his habeas petition and traverse, which was mentioned above.  Under such circumstances, it is entirely appropriate for the federal court to raise the procedural default defense *sua sponte*, and the Court does so.  Thus, Murphy's fifth sub-claim should be denied as procedurally defaulted.

Even if the sub-claim had been preserved, however, it is meritless.  Drema Woods testified that she shot her husband, Ulysses Woods, when she caught him having sexual relations with another woman in a car.  (Testimony of Drema Woods, Doc. No. 70, Evid. Hrg. Tr. at 51.)  Her testimony on direct examination as to Murphy's knowledge of the incident was as follows:

Q.    How old was Ulysses Murphy when you shot his father?

A.    I'm not certain.  About maybe 10 or 11.

Q.    Did he know, are you aware of whether he knew?

A.    Yes, he knew.

. . .

Court:  How do you know that he knew?

---

[18]A second or successive petition for post-conviction relief to exhaust the sub-claim would no doubt be greeting with a resounding "barred by the doctrine of *res judicata*" response by the state court.  Thus, the claim is exhausted by procedural default.

> A.    By the family, because we had a large, like a large, close-knit family.
>
> Q.    Did Ulysses ever – did you ever talk to him about it?
>
> A.    No. . . .  I mean I knew he was angry, you know, by hearing, which the whole family was angry.  But after it got worked out, it was better.

*Id*. at 52-53.  Drema Woods' testimony that the family was large and close-knit, and that she heard generally that the whole family was angry because she shot Ulysses Woods is insufficient to establish that Murphy witnessed or was aware on any level of Drema Woods' shooting of Murphy's father.  While such evidence may be relevant to the dysfunction present in Drema and Ulysses Woods' relationship, its relevance to mitigation in Murphy's case is diminished considerably because Drema Woods was not Murphy's mother, and Murphy never resided with Drema Woods and Ulysses Woods.  (*See* Affidavit of Drema Woods, Appendix, Vol. 5 at 162, stating that Ulysses Woods would not allow Murphy to live with them.)  Considered in conjunction with the lack of evidence of Murphy's awareness of the incident, the Court cannot say that omission of Drema Woods' admission would constitute ineffective assistance of Murphy's trial counsel.

## 4.6.    Several of Murphy's relatives were in prison

As best the Court can determine, Murphy raised his trial counsels' ineffectiveness for not presenting family members' incarcerations as a mitigating factor in his eighth and twenty-eighth claims for relief in his state post-conviction relief petition.  (Appendix, Vol. 5 at 50-52, 110-12.)[19]

---

[19]It is noted that Murphy argued that his trial counsel provided ineffective assistance by failing to properly investigate and present mitigating evidence about Murphy's character, history, and background in his twelfth claim for relief in post-conviction.  *Id*. at 62-64.  He asserted, almost in passing, that if his attorneys had presented the testimony of his half-brother Lamar Murphy, the jurors would have learned that Murphy's conduct was "not an aberration when viewed in the context of his family."  *Id*. at 63.  Lamar Murphy's affidavit, however, never mentions any relatives having been incarcerated.  Also, in his fifteenth claim for relief in the state post-conviction proceedings, Murphy argued that his trial counsel should have presented the testimony of his uncle, Joseph Woods, Jr., who was incarcerated at the time, and to the best of the Court's knowledge, remains so at this writing.  (Appendix, Vol. 5 at 71-73.)  Woods stated the fact of his own incarceration in his affidavit, and named two other members of Murphy's extended family who were also incarcerated.  *Id*. at 166.  Murphy's argument in his claim, however, was that Murphy's parents never spent time with him when he was a child, and that Murphy was not provided with any guidance or stability in childhood.  *Id*. at 71.  Joseph Woods, Jr.'s affidavit is not referenced in

There, he argued that his relatives' incarcerations, along with his mother's lack of affection, his brothers' picking on him, his own poor personal hygiene as a child, the uncleanliness of his environment both at his mother's house and his grandmother's house, and his early-age drinking demonstrated that Murphy had no adult role models and was left to "drift[] on his own," and that such mitigating evidence outweighed the aggravating circumstances in his case. *Id.* The post-conviction trial court found the material offered merely cumulative of that presented to the jury in the mitigation phase and denied relief. (Appendix, Vol. 5 at 457-58.) As has been noted above, the court of appeals rejected Murphy's claim of error by misapplying Ohio's doctrine of *res judicata* to the instant sub-claim, and also held in the alternative that the evidence submitted in support was largely cumulative to that presented in the mitigation phase. *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *5 (Ohio App. 10th Dist., Dec. 26, 2000.)

Murphy correctly argues that evidence of his relatives' incarcerations was not presented to the jury in the mitigation phase. There was, however, abundant evidence presented to demonstrate the total lack of appropriate role models in Murphy's formative years. Family friend Patricia Armstead testified that the Murphy children were frequently left alone at night. (Trial Tr. at 1409.) Murphy's older brother by nine years was the "adult figure" during those times. *Id.* at 1411, 1417. Evidence was also presented that Murphy' father was and remained an alcoholic who drank every day. (Trial Tr. at 1419, 1436.) Murphy's mother was also an alcoholic and provided her children with a model of going to bars every night to drink rather than staying home to spend time with her children. *Id.* at 1420. Evidence was also presented that during those nights, Murphy's older siblings, including the older brother who was the "adult figure" in their mother's absence, refused to feed him, and would "beat up on him" but not "badly, because there was no marks on him, and they were probably trying to make him mind." *Id.* at 1421, 1437. Murphy's father also

---

Murphy's argument under his eighth claim for post-conviction relief.

acknowledged that he beat his son numerous times when he would "mess up." *Id.* at 1395. Murphy's father's lack of concern for his son was starkly evident when he testified that the police had had to collect him from the bar he had been in on the very morning of his testimony because he had failed to appear in court. *Id.* at 1385, 1387-88, 1392-93. Murphy's mother acknowledged that it was up to her and Murphy's father to "see about him" and that they had both failed to raise Murphy as parents are expected to do. *Id.* at 1425-26. When he was quite young, Murphy's primary contact with his father occurred when Murphy would leave his mother's house on his Big Wheel riding toy to go find his father in bars. *Id.* at 1389. As a teenager, Murphy liked to spend a considerable amount of time with his aunt and her boyfriend, to whom he was closer than he was anyone else in the family. *Id.* at 1430. Although his aunt did not drink, her boyfriend was a heavy drinker. *Id.* Murphy's fifth grade teacher testified that because Murphy never talked about his family, she knew "something was going on, but you weren't quite sure what." *Id.* at 1402. Dr. Jolie Brams testified that experiences and examples of behavior learned in childhood form the central core of how people function in adulthood. *Id.* at 1465. Those who influence the individual's central core are not limited to the person's parents, but the relationship of a child to his or her parents is of primary importance in early childhood. *Id.* at 1465-66. As the child grows into adolescence, others will influence them as well, but the child's world has already been defined by the relationship with his or her parents. *Id.* at 1466. Dr. Brams stated that Murphy's extended family was as dysfunctional as his parents were, and none provided a positive example for Murphy to follow. *Id.* at 1472-74. Further, Murphy was not connected to any organizations outside of his family, such as a church, Boy Scouts, or other youth organization that might have provided positive role models. *Id.* at 1475. "He lived in an isolated, alcoholic, dysfunctional family that was not accepted by the community, that did not engage in normal activities . . . and [Murphy] had none of those connections that could have given him some way of developing in a more positive manner." *Id.* at 1475-76. Dr.

-97-

Brams noted that some people in circumstances similar to Murphy's childhood situation have something or someone in their lives to teach them that it is wrong or different, but that Murphy had no one. *Id.* at 1477-78. She gave the example of a family of alcoholics in which one or two members do not drink and try to impress upon the younger members that alcoholism is destructive, and that other avenues are open to the youths. *Id.* Murphy's grandmother testified, however, that she did just that when she held up Murphy's mother and father as poor examples to follow when Murphy started drinking at a young age. *Id.* at 1439.

Considering the evidence presented in the mitigation phase, it is abundantly clear that Murphy's role models were uniformly poor even without knowing that a number of them had been or were incarcerated. Dr. Brams made a clear connection between Murphy's lack of positive role models, or anyone to intervene and show him alternatives to his family and extended family's dysfunctional behaviors, and Murphy's own behavior as an adult.

The state post-conviction court concluded the evidence of Murphy's relatives' incarcerations was cumulative to that presented in the mitigation phase. *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *5 (Ohio App. 10th Dist., Dec. 26, 2000.) The word "cumulative" in that context means "[a]dditional evidence that supports a fact established by the existing evidence (esp. that which does not need further support)." Black's Law Dictionary 596, (8th ed. 2004). Certainly, evidence that a significant number of Murphy's relatives had been or were incarcerated would have supported his proposition that he had no positive role models as a child, but that proposition required no additional support. The point was made with the evidence presented. The Ohio court's conclusion that Murphy's counsel were not ineffective in failing to present the additional evidence, therefore, was neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court. Accordingly, Murphy's sub-claim 4.6 in his fifth ground for relief should be denied.

**4.7.  Murphy's half-sister is schizophrenic, and;**

**4.8.  Barbara Murphy asked her schizophrenic daughter to keep a gun in her bedroom**

Murphy did not present his seventh and eighth sub-claims to the state courts.  He does not direct the Court's attention to, nor has the Court found in its own review of the record, any evidence presented to the state courts regarding Barbara Murphy's asking Michele Murphy to keep a gun in her room, and although evidence of Michele's schizophrenia in the form of Barbara Murphy's and Michele Murphy's affidavits were presented in state post-conviction proceedings (Appendix, Vol. 5 at 175, 370), Murphy there advanced no claim of error in his attorneys' failure to present that evidence to the jury.  The evidence relating to the hiding of the gun was first offered at the evidentiary hearing in these habeas corpus proceedings.  (Testimony of Michele Murphy, Doc. No. 71, Evid. Hrg. Tr. at 229-30.)  Thus, the claims are technically unexhausted, but because they would unquestionably be denied on *res judicata* grounds were they to be raised there now (especially since the substance of Michele Murphy's evidentiary hearing testimony could have been included in her state post-conviction affidavit) the sub-claims are exhausted by procedural default, and have not been preserved for habeas corpus review.  Accordingly, they should be denied.

**4.9.  Barbara Murphy had inappropriate boyfriends**

For the same reason given in Murphy's fifth through eighth sub-claims, above, the Court finds Murphy's ninth sub-claim procedurally defaulted.  The evidence offered in support of Murphy's ninth sub-claim, as best the Court can tell, consists of Bobette Peters' state post-conviction proceedings affidavit in which she stated that Barbara Murphy had many boyfriends but does not say anything about the boyfriends being "inappropriate" or how she knew of the boyfriends (Appendix, Vol. 5 at 179); Barbara Murphy's evidentiary hearing testimony that her boyfriends were married (Doc. No. 70, Evid. Hrg. Tr. at 31); and Michele Murphy's evidentiary hearing testimony that her mother brought men home on occasion, and that one of them had once asked her if he could

touch her breast (Doc. No. 71, Evid. Hrg. Tr. at 225-26, 234-35).  The substance of Barbara Murphy's and Michele Murphy's evidentiary hearing testimonies was not presented to the state post-conviction court, even though both provided affidavits in those proceedings.  (Appendix, Vol. 5 at 172-75; 370-72.)  Moreover, and leaving aside for the time being the procedural default and how very little support the evidence offered provides for Murphy's claim, Murphy has not demonstrated how the boyfriends were "inappropriate" or how his trial counsels' failure to present the evidence to the jury prejudiced him in his mitigation hearing.  Thus, even if the sub-claim were preserved, it would fail.  Murphy's ninth sub-claim should be denied as procedurally defaulted.

**4.10.  Barbara Murphy was raised by an emotionally distant mother,**

**4.11.  Murphy's paternal grandmother was raised in Georgia, was dysfunctional, lived in deplorable conditions, and had many people and children living at her house where there was no structure or guidance, and;**

**4.12.  The Murphy family had a multi-generational cycle of abuse, neglect, and dysfunction**

During Murphy's trial, substantial evidence was presented demonstrating that Murphy was raised in generally deplorable conditions; that Barbara Murphy was not available to her children either physically or emotionally; that Murphy's father was similarly unavailable, and even abusive toward his son; and that Murphy was neglected by his dysfunctional family, all of which is recounted above.  Thus, any additional information presented would have been cumulative as the state court determined, and Murphy's attorneys' representation did not fall outside the "wide range of reasonable professional assistance."  *See Strickland*, 466 U.S. at 689.

The remaining evidence Murphy claims his attorneys should have presented in the three sub-claims above is that his mother Barbara Murphy was raised by an emotionally distant mother; that his paternal grandmother was raised in conditions even more impoverished than those in which he was raised; that when he lived with his grandmother, there were many others living there, too; and that his grandmother provided no structure or guidance in her home.  Murphy never raised his trial

counsels' failure to present such evidence as error in his state post-conviction proceedings, and the Court attributes Respondent's failure to advance the procedural default defense as to these sub-claims to Murphy's lack of specificity in his habeas petition and traverse, which was mentioned above. Under such circumstances, it is entirely appropriate for the federal court to raise the procedural default defense *sua sponte*, and the Court does so now.

Murphy's family members Joseph Woods, Sr., Joseph Woods, Jr., Ulysses Woods, Barbara Murphy, Elnora Woods, and Sandie Head, each submitted affidavits in the course of Murphy's state post-conviction proceedings. (Appendix, Vol. 5 at 164-75, 185-86, 191-92.) The evidence Murphy claims should have been presented at his trial was available to his post-conviction counsel and yet was not presented in those proceedings. No claims were raised there respecting Barbara Murphy's emotionally distant mother, Elnora Woods' upbringing in Georgia, or the multi-generation pattern of neglect and dysfunction in the Murphy and Woods families. No state process remains with which Murphy could pursue his claims in the state courts, and they are consequently exhausted by procedural default. Thus, even ignoring the remote nature of the evidence Murphy now claims should have been presented[20], the claims themselves are procedurally defaulted and should be denied.

## 4.13. Murphy consumed alcohol prior to the murder

Murphy raised as error his trial counsels' ineffectiveness for their failure to present evidence of his alcohol consumption on the night of the murder in the mitigation phase of his trial as his twenty-second claim for relief in his state post-conviction proceedings. (Appendix, Vol. 5 at 92-94.)

---

[20]In his post-evidentiary hearing brief, Murphy contends his attorneys breached their duty to him by not conducting a multi-generational mitigation investigation, and cites the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases for support. (Doc. No. 72 at 56.) He references, however, the 2003 version of the guidelines, which were not in existence during his 1998 trial. The Court has found no similar direction to counsel in the 1989 predecessor to the 2003 Guidelines. *See* 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guidelines 11.4.1, 11.8.3, and 11.8.6, and comments. At the time of Murphy's trial, the 1989 Guidelines were in effect.

The post-conviction trial court found the evidence Murphy claimed should have been presented to be merely cumulative of that produced during the mitigation phase (Appendix, Vol. 5 at 456-57), and the court of appeals affirmed that determination, *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *5 (Ohio App. 10th Dist. Dec. 26, 2000). Thus, the claim is preserved for habeas corpus review.

During the mitigation phase, and in addition to extensive testimony about Murphy's history of alcohol abuse, Dr. Jolie Brams testified that Murphy was "markedly intoxicated" the night of the murder. (Trial Tr. at 1491-92.) The Court has located five other sources in the record in which Murphy's drinking prior to the murder is mentioned. Three of those sources, the post-conviction affidavits of Bobette Peters and Regina Head, and the evidentiary hearing testimony of Regina Head, have been discussed in the Court's consideration of Murphy's fourth ground for relief, above. The evidentiary weaknesses of those sources identified there remain true here, and render them of little value to the present analysis. The remaining two sources are the evidentiary testimonies of Sandie Head and Dr. Robert Smith.

Sandie Head testified that she remembered seeing Murphy at the birthday party she hosted for her daughter the night of the murder. (Doc. No. 70, Evid. Hrg. Tr. at 103.) In spite of the fact that she was not watching Murphy, she testified that he had "quite a bit" to drink and that he "could have been a little loaded" when he left the party at some unstated hour. *Id*. at 103-4. Dr. Smith testified that Murphy had consumed a fifth of gin and a large amount of beer prior to the murder, but his testimony was derived from Murphy's post-conviction description of how much he had consumed, and the affidavits submitted in post-conviction, namely those of Regina Head and Bobette Peters. (Doc. No. 70, Evid. Hrg. Tr. at 160.) Thus, his testimony, deriving as it did from Murphy himself, and "corroborated" by witnesses whose affidavits and testimonies do not establish how much Murphy drank or how soon before the murder he had drank it, is of marginal evidentiary

value.

Taken together, the intoxication evidence Murphy claims his trial counsel should have presented in the mitigation phase of his trial adds nothing to Dr. Bram's testimony that Murphy was "markedly impaired" on the night of the murder. (Trial Tr. at 1491-92.) Thus, the omitted evidence is, as the state court found, merely cumulative to that presented at trial, and Murphy's counsel were not ineffective in failing to present it to the jury. Accordingly, the state court's resolution of Murphy's claim was neither contrary to nor an unreasonable application of *Strickland*, *supra*, which governs ineffective assistance of counsel claims.

Finally, it is noted that evidence of substance abuse and intoxication at the time of the offense is admissible for mitigation purposes under a "catch-all" mitigating factor set forth in Ohio Rev. Code § 2929.04(B)(7). Ohio courts, however, have generally given little or no weight to intoxication as a mitigating factor. *State v. Turner*, 105 Ohio St. 3d 331, 346 (2005); *State v. Fitzpatrick*, 102 Ohio St. 3d 321, 338-39 (2004); *State v. Brown*, 100 Ohio St. 3d 51, 65 (2003); *State v. White*, 82 Ohio St. 3d 16, 28, 693 N.E.2d 772 (1998); *State v. Moore*, 81 Ohio St. 3d 22, 37 (1998); *State v. Dennis*, 79 Ohio St. 3d 421, 439 (1997); *State v. D'Ambrosio*, 73 Ohio St. 3d 141, 145 (1995); *State v. Carter*, 72 Ohio St. 3d 545, 561-62 (1995). Consequently, had Murphy's counsel presented the evidence he suggests they should have, it is unlikely to have affected the outcome of the mitigation phase of Murphy's trial. Murphy's thirteenth sub-claim should be denied.

### 4.14. Murphy was a good father and loved his children

Murphy raised his trial counsels' failure to investigate and present evidence of his love and care for his children as error in his twentieth claim for relief in his state post-conviction proceedings. (Appendix, Vol. 5 at 86-88.) The trial court rejected Murphy's claim, reasoning that his attorneys' failure to present an alternative theory of mitigation did not constitute ineffective assistance of counsel. (Appendix, Vol. 5 at 459-60.) The court of appeals affirmed the trial court's decision, but

-103-

on grounds that the evidence Murphy claimed should have been presented was merely cumulative of that produced at trial. *State v. Murphy*, No. 00AP-233, 2000 WL 1877526 at *4-5 (Ohio App. 10th Dist. Dec. 26, 2000). Murphy's claim has been preserved for habeas corpus purposes.

It is true that not much evidence was presented to the jury respecting the kind of father Murphy was. No mitigation witness was questioned specifically about Murphy's parenting of his two small children, and it appears that the only mention of his children in mitigation was Dr. Jolie Brams' off-hand comment that after failing to complete the Job Corps program he had been in, Murphy returned home to Columbus, "he ended up having children, and he spent his money on that." (Trial Tr. at 1487.)

At the evidentiary hearing, Murphy's mother testified that he loved his children and cared about his children. (Doc. No. 70, Evid. Hrg. Tr. at 37.) Jamie Vargas, Murphy's stepsister, testified that she had seen him playing with and showing affection toward his son at a family gathering. *Id*. at 83. Murphy took care of his son when he had the child with him, changing his diapers and feeding him. *Id*. Murphy told her he looked forward to playing sports with his son, and Vargas told him he had to be a better man than his own father. *Id*. at 83-84. When it came to his child, Murphy learned something from his experiences as a child that enabled him to be a better parent than the example he was given by his own parents. *Id*. at 89. Murphy's cousin Regina Head also testified that he was happy to be a father and loved his children. *Id*. at 119. He asked her for help when he was learning how to change diapers and feed the children. *Id*. Michele Murphy spent time with Murphy and his children, as well. *Id*. She testified that he played with them, held them, and taught his young son to dance, although she also stated that he never bought the children clothes or food. *Id*. at 232, 237. The mother of Murphy's daughter Ivana, Sunserraye Bates, testified that Murphy was happy when she became pregnant, and that he participated in caring for Ivana after her birth. *Id*. at 246. Murphy would call or come to see the baby almost every day. *Id*. at 253. Sometimes

he would spend the night and on those nights, he would get up with the baby to change her or rock her back to sleep. *Id*. at 247. After Ivana was born, the mother of Murphy's son began to deny him visits with the child, which caused Murphy to become furious. *Id*. at 248-49. Bates also testified that she was contacted by someone from the defense team prior to or during Murphy's trial, but that she could not remember who it was other than that it was a man. *Id*. at 254. He asked her about her and Murphy's relationship, and about their daughter. *Id*. Finally, during Murphy's trial counsel could not recall whether he or anyone on the defense team had spoken to the mothers of Murphy's children, anything they might have said if he had spoken with them, or how any information they might have had would have meshed with his theory of mitigation. (Testimony of Terry Sherman, Doc. No. 79, Evid. Hrg. Tr. at 43-44, 71-72.)

Murphy has not shown that his counsels' performance was deficient. His trial counsel had no recollection of the mothers of Murphy's children, what they might have said to defense counsel or their investigator, or whether he had even contacted them in preparation for the mitigation phase of the trial. That does not mean he did not contact them; it simply means he had no recall in 2005 about having done so. Sunserraye Bates testified that she was contacted by someone from the defense team and that she told that person about her relationship with Murphy, and about their daughter. Thus, it is reasonable to infer that the defense team was aware of Murphy's caring for his infant daughter at the time of trial. Trial counsel Sherman could not say why her testimony was not presented in the mitigation phase, although he speculated that it may not have fit with the theory of mitigation. (Doc. No. 79, Evid. Hrg. Tr. at 71-72.) It may have been a tactical decision not to present evidence that Murphy was able to reject aspects of his own upbringing to become a better parent, while at the same time arguing to the jury that Murphy's actions on the night of the murder were the product of his environment from which he could not rise. But this Court need not rest its recommendation on such speculation, for it is Murphy who has the burden of demonstrating his

counsels' ineffectiveness, and he has failed to do so. Merely showing the availability of evidence of Murphy's love for his children and his trial counsel's inability to recall the children's mothers, what they might have told the defense team, or whether the mothers were even contacted falls short of affirmatively demonstrating error on his counsels' part. Thus, Murphy's claim that his trial counsel were ineffective in failing to conduct a reasonable investigation into Murphy's relationship with his children should be denied.

After considering each of Murphy's sub-claims relating to his trial counsels' alleged failure to conduct an adequate mitigation investigation individually and cumulatively, and for the reasons stated, Murphy's fourth sub-claim of his fifth ground for relief should be denied.

**5.     Failure to Present a Cultural Expert**

Next, Murphy faults his trial counsel for their failure to employ a cultural expert for the mitigation phase of his trial. (Petition, Doc. No. 10 at 34-36.) Respondent argues the sub-claim is procedurally defaulted since the state post-conviction court rejected it on *res judicata* grounds. (Return of Writ, Doc. No. 12 at 57.) In the alternative, Respondent contends counsels' decision to present a psychological expert rather than cultural expert in the mitigation phase was the product of sound trial strategy. *Id*. Murphy makes the convoluted argument that although the claim is one that should *not* have been brought on direct appeal in the state courts, his doing so anyway preserves it for habeas corpus review. (Traverse, Doc. No. 21 at 55.) This, in spite of the fact that when the claim was *appropriately* raised in post-conviction, the state court rejected it as barred by the doctrine of *res judicata*.

It is arguable whether Murphy raised as error on direct appeal his counsels' failure to present a cultural expert during the mitigation phase. His sole "argument" to the state supreme court on that issue was contained in one sentence of his seventeenth proposition of law in his appellate brief: "Counsel also failed to call expert witnesses dealing with cultural diversity and/or the effect alcohol

abuse of Defendant's mother when she was pregnant would have upon him [sic]."  (Appendix, Vol. 3 at 191.)  Worded as it is, Murphy's argument was that his trial counsel erred either by not presenting a cultural expert, or by not presenting a substance abuse expert, or by not presenting both a cultural expert and a substance abuse expert.  That statement is conclusory, and it fails to rebut the strong presumption that counsels' conduct was within the wide range of reasonable professional assistance.  *See Strickland*, 466 U.S. at 689.  In addition, Murphy did not explain to the state court how he was prejudiced by his counsels' alleged error.  *Id*. at 694.  Since the Ohio Supreme Court interpreted Murphy's bare-bones argument as having raised the issue, however, this Court defers to that court's determination.

The Ohio Supreme Court rejected Murphy's claim, reasoning that the "record does not show that defense counsel failed to investigate" the possibility of obtaining a cultural expert.  *State v. Murphy*, 91 Ohio St. 3d 516, 542, 747 N.E.2d 765 (2001).  Ohio law does not provide for the introduction of new evidence in the Supreme Court on direct appeal.  *See State ex rel. Blair v. Balraj*, 69 Ohio St. 3d 310, 313 (1994); Ohio S. Ct. Prac. R. VI, VII.  Murphy acknowledges that his claim required reference to evidence outside the record, and thus its impropriety on direct appeal, even stating that the claim would properly be raised in a post-conviction proceeding.  (Traverse, Doc. No. 21 at 55.)  In its resolution of Murphy's claim, the Ohio Supreme Court merely enforced its own procedural rule, acknowledged by Murphy, that confines the court to the trial record on direct appeal.       Murphy also raised the issue as his twenty-seventh claim for relief in his petition for post-conviction relief.  (Appendix, Vol. 5 at 107-9.)  The trial court rejected the claim on *res judicata* grounds (Appendix, Vol. 5 at 460), as Respondent has correctly argued, (Return of Writ, Doc. No. 12 at 57), but that court clearly misapplied its own procedural rule in holding that a claim dependent upon evidence outside the record could have been, and indeed was, brought on direct appeal.  This Court is consequently free to address Murphy's claim *de novo*.  *Hill v. Mitchell*,

400 F.3d 308, 314 (2005).

The evidence Murphy contends should have been presented by his trial counsel is contained within the state post-conviction proceeding affidavit of Dr. Kwaw David Whitaker.[21]  Murphy requested and was granted permission to call Dr. Whitaker as a witness at the evidentiary hearing in these proceedings.  (Motion for Evidentiary Hearing, Doc. No. 31 at 7; Order, Doc. No. 34 at 6.)  On February 17, 2005, however, mere days before the evidentiary hearing, Murphy filed a revised list of expert witnesses he intended to call and did not include Dr. Whitaker's name on that list.  (Doc. No. 64.)  Murphy's decision not to present Dr. Whitaker at the evidentiary hearing concomitantly deprived the Court of the opportunity to determine whether his testimony met with the requirements for expert witnesses under *Daubert v Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Respondent of the opportunity to cross-examine Dr. Whitaker, and the Court of the benefit of his cross-examination.  The value of cross-examination cannot be overstated.  The United States Supreme Court, in fact, calls it "the 'greatest legal engine ever invented for the discovery of truth.'"  *Lilly v. Virginia*, 527 U.S. 116, 123 (1999); *quoting California v. Green*, 399 U.S. 149, 158 (1970).  The evidentiary value of an uncross-examined statement, such as Dr. Whitaker's affidavit, is significantly less than live testimony before the fact-finder that provides both parties with the chance to question the witness.  Furthermore, Murphy's trial counsel testified at the evidentiary hearing in these proceedings, but was never asked whether he considered obtaining a cultural expert for Murphy's defense, or why he might have decided against such a move.  (Evid. Hrg. Tr., Doc. 79 at 7-93.)  Since Murphy has not supported his ineffective assistance of trial counsel claim with evidence sufficient upon which this Court grant relief, and has not demonstrated that his trial counsels' decision not to present a cultural expert during the mitigation phase of his trial was

---

[21]Dr. Whitaker's name appears in Murphy's petition and traverse as "Kwan David Whittaker." (Petition, Doc. No. 10 at 35; Traverse, Doc. No. 21 at 55.)  In his affidavit, however, Dr. Whitaker signed his name as "Kwaw David Whitaker." (Appendix, Vol. 5 at 208.)  This Court adopts Dr. Whitaker's spelling of his own name.

anything other than a product of trial strategy, his fifth sub-claim of his fifth ground for relief should be denied.

**6.      Ineffective Assistance of the Psychological Expert**

Next, Murphy rather circuitously claims his psychological expert provided ineffective assistance to his defense counsel because defense counsel did not provide her with all available evidence respecting Murphy's background prior to her testimony in the mitigation phase. (Petition, Doc. No. 10 at 36-38.)  Respondent does not advance a procedural default defense, and instead argues the claim is meritless.  (Return of Writ, Doc. No. 12 at 57-8.)

First, "ineffective assistance of the psychological expert" is a claim without a basis in the federal constitution, and is therefore not one upon which habeas corpus relief may be granted.  28 U.S.C. § 2254(a).  Second, the information Murphy claims his counsel should have provided to Dr. Brams, the psychological expert in question, is subsumed by Murphy's other fifth ground for relief sub-claims, to wit, the affidavits appended to his state petition for post-conviction relief.  (Petition, Doc. No. 10 at 37; *see, e.g.*, Appendix, Vol. 5 at 158-95.)  Thus, the instant sub-claim represents a second bite at the habeas apple for what is essentially the same claim, that Murphy's counsel did not place all available mitigation evidence before the jury.  Finally, when the state post-conviction trial court addressed Murphy's claim (Appendix, Vol. 5 at 98-100, 461-62), it held as follows:

> The failure of an expert psychologist to obtain information he or she deems necessary to his or her evaluation does not support a claim of ineffective assistance of counsel.  Dr. Brams' affidavit indicates that she was aware of [Murphy's] high level of intoxication on the evening of the crime, [Murphy's] attempt to obtain custody of his child, and his grandmother's inability to adequately care for him while he lived with her.  However, she states that she was not provided with enough information to adequately address those issues at the mitigation hearing.  Clearly, counsel did provide her with information regarding those issues since she admits that she was aware of them.  Her failure to obtain any additional information needed to complete her assessment is not the fault of counsel.

(Appendix, Vol. 5 at 461-62.)  Recall, too, that Dr. Brams stated that Murphy was "markedly intoxicated" on the night of the murder when she testified during his mitigation hearing.  (Trial Tr. at 1491.)  Whether Murphy's trial counsel provided certain information to Dr. Brams prior to her testimony is a question of fact, and the state court's finding that Dr. Brams had such information is a determination of fact, the unreasonableness of which Murphy has failed to demonstrate.  28 U.S.C. § 2254(d)(2).  Thus, even if Murphy had stated a claim cognizable in habeas corpus, it would fail. For the foregoing reasons, Murphy's sixth sub-claim of his fifth ground for relief should be denied.

**7.**     **Failure to Present Evidence that Murphy was a Loving Father**

Next, Murphy contends his trial counsel were ineffective when they failed to present evidence that he was a loving parent to his son and daughter.  (Petition, Doc. No. 10 at 38-40.)  This claim is subsumed in the Court's discussion of Murphy's sub-claim 4.14, above.  For the reasons stated therein, the instant sub-claim should also be denied.

**8.**     **Failure to Object to Penalty-Phase Prosecutorial Misconduct**

Murphy argues his counsel should have objected to the prosecutor's (1) reference to André Brooks' children's having to grow up fatherless; (2) description of prison system as "lenient," and consisting of recreation time, television, and video games; (3) argument that "[a]lcohol does not make you murder someone," and; (4) implication that Murphy had misbehaved in the courtroom and was therefore a poor candidate for a life sentence.  (Petition, Doc. No. 10 at 40.)  Although Respondent has not advanced a procedural default defense concerning this sub-claim (Return of Writ, Doc. No. 12 at 59), it is noted that only the first and fourth instances of trial counsels' failure to object were brought to the state court's attention on direct appeal.  (Appendix, Vol. 3 at 57-58, 144-45.)  Murphy presented the second and third instances to the Ohio Supreme Court as claims underlying his ineffective assistance of appellate counsel claim in his application to reopen his direct appeal (Appendix, Vol. 4 at 128), which the court summarily denied, *State v. Murphy*, 93 Ohio St.

3d 1402 (2001). There is no indication the state court relied on an independent and adequate state procedural ground in denying Murphy the relief he sought. *Id.* In such circumstances, a federal court may "safely assume that the state court considered the merits of . . . [the] claim." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In the context of an application to reopen a direct appeal, however, the state court considers the merits of the ineffective assistance of *appellate* counsel claim, not the underlying claims, whether they be claims that his appellate counsel should have raised as error trial counsels' ineffectiveness, or the prosecutor's misconduct, or any number of other issues. Here, Murphy argues ineffective assistance of *trial* counsel, not ineffective assistance of *appellate* counsel. Thus, raising *appellate* counsels' ineffectiveness in an application to reopen in the state courts preserves for habeas review only the ineffective assistance of *appellate* counsel claim, not the underlying ineffective assistance of *trial* counsel claims. For that reason, Respondent could have advanced a procedural default defense respecting the second and third instances of his trial counsels' alleged ineffectiveness, but has chosen not to. Consequently, this Court will consider all four instances together.

Although Murphy's trial counsel, Terry Sherman, testified at the evidentiary hearing in these proceedings, Murphy did not question Sherman about why he failed to object to the alleged prosecutorial misconduct. (Doc. No. 79, Evid. Hrg. Tr. at 7-93.) In the complete absence of any evidence tending to show Sherman's decision was anything other than strategic, Murphy cannot show entitlement to habeas corpus relief. Foregoing an opportunity to object has long been recognized as a tactic for avoiding drawing undue attention to the offending remark. *See, e.g., Reed v. Ross*, 468 U.S. 1, 14 (1984); *Cobb v. Perini*, 832 F.2d 342, 347-48 (6th Cir. 1987). Likewise, "interruptions of arguments . . . by opposing counsel . . . are matters to be approached cautiously" at trial. *United States v. Young*, 470 U.S. 1, 13 (1985). In addition, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;

that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689, *quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955).  Murphy has also failed to demonstrate prejudice from his counsels' perceived error.  In that regard, "the threshold issue is not whether defendant's attorney was inadequate; rather it is whether he was so manifestly ineffective that defeat was snatched from the hand of probable victory," or, in Murphy's case, death was snatched from the hand of probable life.  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).  Murphy *claims* he has done just that (Traverse, Doc. No. 21 at 61), but offers no *evidence*. Consequently, his eighth sub-claim of his fifth ground for relief should be denied.

Having considered each of Murphy's ineffective assistance of trial counsel sub-claims and found them unavailing individually and cumulatively, the Magistrate Judge recommends that Murphy's fifth ground for relief be denied.

**Sixth Ground for Relief**

In his sixth ground for relief, Murphy contends his appellate counsel provided ineffective assistance during his direct appeal to the Ohio Supreme Court by failing to raise several meritorious propositions of law.  (Petition, Doc. No. 10 at 42-43.)  Respondent acknowledges that the claim has been preserved for habeas corpus review, but argues it is nevertheless meritless.  (Return of Writ, Doc. No. 12 at 60-64.)

The law governing ineffective assistance of appellate counsel claims is the same as that for ineffective assistance of trial counsel claims, that being *Strickland v. Washington*, 466 U.S. 668 (1984).  The petitioner claiming ineffective assistance of appellate counsel must demonstrate that his appellate counsels' performance was deficient and that the deficient performance prejudiced the defense.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Strickland*, 446 U.S. at 687.  In *Mapes*

*v. Coyle*, a case not cited by Murphy or Respondent, the Sixth Circuit Court of Appeals identified eleven factors to be considered when evaluating a claim of ineffective assistance of appellate counsel:

(1)     Were the omitted issues "significant and obvious"?

(2)     Was there arguably contrary authority on the omitted issues?

(3)     Were the omitted issues clearly stronger than those presented?

(4)     Were the omitted issues objected to at trial?

(5)     Were the trial court's rulings subject to deference on appeal?

(6)     Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7)     What was appellate counsel's level of experience and expertise?

(8)     Did the petitioner and appellate counsel meet and go over possible issues?

(9)     Is there evidence that counsel reviewed all the facts?

(10)     Were the omitted issues dealt with in other assignments of error?

(11)     Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

171 F.3d 408, 427-28 (6th Cir. 1999). Murphy addresses none of those questions.

Murphy alleges his appellate counsel should have raised as error on direct appeal trial counsels' ineffectiveness for (1) failing to properly *voir dire* the prospective jurors, (2) failing to object to prosecutorial misconduct, (3) failing to adequately prepare the expert psychological witness, (4) failing to use the services of a qualified substance abuse expert, and (5) failing to call lay witnesses to testify about Murphy's alcohol consumption the night of the murder. (Petition, Doc.

No. 10 at 42.)  Rather than explaining why those issues are meritless, Respondent argues that Murphy's appellate counsel advanced two ineffective assistance of trial counsel propositions of law on direct appeal, comprised of ten sub-claims, and that since all of them were rejected by the Ohio Supreme Court, counsel was not ineffective in not raising additional meritless sub-claims.  (Return of Writ, Doc. No. 12 at 62.)

Murphy also argues his appellate counsel were ineffective in failing to raise as error on appeal the alleged prosecutorial misconduct described in Murphy's seventh habeas ground for relief.[22]  (Petition, Doc. No. 10 at 42.)  Respondent counters that the state court found the underlying prosecutorial misconduct claims had been waived by trial counsels' failure to object, and that appellate counsel cannot have been ineffective for failing to raise a losing proposition of law. (Return of Writ, Doc. No. 12 at 63.)

Finally, Murphy claims his appellate counsels' representation fell below the wide range of reasonably professional assistance by failing to include the prospective juror questionnaires in the record to the court of appeals.  (Petition, Doc. No. 10 at 42.)  Respondent does not address that sub-claim.  (*See* Return of Writ, Doc. No. 12 at 60-64.)  The Court will consider each of Murphy's three sub-claims in order.

Murphy's first sub-claim, that his appellate counsel were ineffective for not raising as error on direct appeal the ineffectiveness of trial counsel, fails.  Several of the issues Murphy claims appellate counsel should have presented on appeal would have necessarily relied upon evidence from outside the trial record.  Such claims are inappropriately brought on direct appeal in Ohio since the appellate court is limited to the record in those proceedings.  Ohio R. App. Proc. 16(A)(3) and

---

[22]Murphy's seventh ground for relief claims prosecutorial misconduct where the prosecutor (1) mentioned that Brooks' mother identified his body on Mother's Day, (2) argued Murphy disposed of the murder weapon to destroy evidence that could have been used against him, (3) implied Murphy had misbehaved in court, (4) referred to the prison system as "lenient," (5) argued "[a]lcohol does not make you murder someone," (6) argued Murphy had chosen a life of crime, (7) argued Murphy's lack of remorse, and (8) pointed out that Murphy's actions had rendered Brooks' children fatherless.  (Petition, Doc. No. 10 at 44-45.)

(7).  For that reason, Murphy's claims that his appellate counsel should have brought as error trial counsels' failure to properly *voir dire* prospective jurors, adequately prepare the expert psychological expert, use the services of a qualified substance abuse expert, and call lay witnesses to testify about Murphy's alcohol consumption the night of the murder, would each have been rejected by the Ohio Supreme Court.  Appellate counsel were not ineffective for failing to raise those claimed errors in an inappropriate forum.

Murphy also contends in his first sub-claim that his appellate counsel provided ineffective assistance when they failed to raise as error trial counsels' failure to object to prosecutorial misconduct throughout his trial.  (Petition, Doc. No. 10 at 42.)  Murphy does not specify what conduct on the prosecutors' part constituted misconduct, nor does he provide the Court with any clue as to where the alleged misconduct might appear in the record.  *Id*. at 42-43.  Even assuming the prosecutorial misconduct underlying the ineffective assistance of trial counsel claim which underlies the ineffective assistance of appellate counsel claim is the same misconduct Murphy has made the subject of his fourth and fifth habeas grounds for relief, however, the sub-claim is unavailing.  This Court has recommended denial of Murphy's fourth and fifth grounds for relief, finding that Murphy had not carried his burden of demonstrating the ineffectiveness of his trial counsel.  It follows that if Murphy's trial counsel were not ineffective, then Murphy's appellate counsel cannot have been ineffective in failing to raise trial counsels' ineffectiveness as error on direct appeal.  Accordingly, Murphy's first sub-claim of his sixth ground for relief should be denied.

In his second sub-claim, Murphy contends his appellate counsel were ineffective when they failed to raise as error on direct appeal the prosecutors' misconduct in the guilt and penalty phases of his trial.  (Petition, Doc. No. 10 at 42-43, and 44-46 by reference.)  Again, he does not articulate the specific conduct claimed to have been improper, choosing instead merely to reference his seventh habeas ground for relief where he makes a free-standing claim of prosecutorial misconduct.

(Petition, Doc. No. 42, 44-46.)  He addresses none of the questions articulated by the Sixth Circuit to guide the Court's consideration of his ineffective assistance of appellate counsel claim, and he makes no argument whatsoever that had his appellate counsel raised the alleged errors, they would have had a fair chance of succeeding in the Ohio Supreme Court.  Instead, he constructs a laundry list of perceived errors, declares them meritorious, and urges this Court to provide relief.  (Petition, Doc. No. 10 at 44-46; Traverse, Doc. No. 21 at 63-65.)  Included in that list, via Murphy's reference to his seventh habeas ground for relief, are claims that his appellate counsel were ineffective for not raising claims of prosecutorial misconduct that, in reality, *were* raised as error on direct appeal.  Five of the eight instances of alleged prosecutorial misconduct fall into that category, in fact, those being the first, third, sixth, seventh, and eighth, instances referred to in footnote 22, *supra*.  (*See* Appendix, Vol. 3 at 130-31, 186.)  Two of the remaining instances of prosecutorial misconduct were not objected to at trial.  (See Trial Tr. at 1559 (no objection to prosecutor's characterization of the prison system as "lenient"); and 1561 (no objection to prosecutor's argument that "[a]lcohol does not make you murder someone").)  Consequently, those claims of prosecutorial misconduct, had appellate counsel raised them, would have been considered waived by the Ohio Supreme Court.  That leaves only one instance of alleged prosecutorial misconduct that appellate counsel could have raised on direct appeal, specifically, that the prosecutor improperly argued facts not in evidence by suggesting Murphy had disposed of the murder weapon so that it would not be used as evidence against him.  Murphy has not demonstrated appellate counsel error or prejudice therefrom.  Accordingly, for the reasons given, Murphy's second sub-claim of his sixth ground for relief should be denied.

Finally, Murphy claims his appellate counsel provided ineffective assistance when they failed to convey to the Ohio Supreme Court the prospective juror questionnaires as part of the record on appeal.  (Petition, Doc. No. 10 at 42.)  Murphy contends the questionnaires are "essential for evaluating decisions made in *voir dire*" and that appellate counsels' failure to assure their inclusion

in the appellate record prejudiced him. *Id*. It is noted that under Ohio law, prospective juror questionnaires may be supplemented to the record of a case on appeal. *See, e.g., State v. Hand*, 102 Ohio St. 3d 1414, 806 N.E.2d 1004 (2004)(table). In order to demonstrate entitlement to habeas corpus relief, Murphy would had to have requested and been granted discovery to include them in the record in these proceedings. He never requested discovery of the questionnaires, however. (Motion for Discovery, Doc. No. 18.) Consequently, this Court has no evidence whatsoever that Murphy was in any way prejudiced by their omission from the record on appeal. Accordingly, his third sub-claim of his sixth ground for relief should be denied.

**Seventh Ground for Relief**

As noted in the Court's discussion of his sixth ground for relief, Murphy claims here that the prosecutors in his case engaged in misconduct on eight occasions, and although they are recounted in the Court's discussion of Murphy's sixth ground for relief, they bear repeating here, and are as follows:

1. The prosecutor mentioned that Brooks' mother identified his body on Mother's Day,

2. The prosecutor argued Murphy disposed of the murder weapon to destroy evidence that could have been used against him,

3. The prosecutor implied Murphy had misbehaved in court,

4. The prosecutor referred to the prison system as "lenient,"

5. The prosecutor argued "[a]lcohol does not make you murder someone,"

6. The prosecutor argued Murphy had chosen a life of crime,

7. The prosecutor argued Murphy's lack of remorse, and

8. The prosecutor pointed out that Murphy's actions had

rendered Brooks' children fatherless.

(Petition, Doc. No. 10 at 44-46.)

Respondent acknowledges that the first instance of alleged prosecutorial misconduct is preserved for habeas corpus review, but argues that the others are procedurally defaulted, and all are meritless.  (Return of Writ, Doc. No. 12 at 64-68.)  Murphy does not contest Respondent's claim of procedural default, but contends the default is excused by the ineffectiveness of his trial and appellate counsel.  (Traverse, Doc. No. 21 at 66-70.)  This Court considered and rejected Murphy's claims of ineffective assistance of counsel in his fourth, fifth, and sixth grounds for relief, above, so Murphy's trial and appellate counsels' performance cannot excuse any procedural default. Whether the claims have indeed been defaulted, however, must still be evaluated, and it is to that task the Court now turns its attention.  Since Respondent does not advance a procedural default against Murphy's first sub-claim, the Court will consider its merits along with any other sub-claims that may be found not to have been procedurally defaulted after its procedural default analysis.

Murphy claims to have raised his second sub-claim in the state court as part of his eighth proposition of law on direct appeal to the Ohio Supreme Court.  (Petition, Doc. No. 10 at 44.)  He cites no page of the Appendix in making his assertion, however, and the Court finds no reference to the prosecutor's offending comment in Murphy's argument within that proposition of law. (Appendix, Vol. 3 at 129-33.)  Since the issue was not presented to the state courts, it is procedurally defaulted.  Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainwright v. Sykes*, 433 U.S. 72 (1977).  *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).  Murphy has failed to demonstrate cause and prejudice, so his second sub-claim in his seventh ground for relief is procedurally defaulted and should be denied on that ground.

Murphy's third, sixth, seventh, and eighth sub-claims were raised on direct appeal in the

-118-

Ohio Supreme Court. (Appendix, Vol. 3 at 130-31, 186.) The state court rejected each of them because there was no contemporaneous objection by trial counsel at the time of the alleged misconduct. *State v. Murphy*, 91 Ohio St. 3d 516, 534-35 (2001). Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros,* 170 Ohio St. 471 (1960) paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998) — is an adequate and independent state ground. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). The rule applied in Murphy's case, and was relied upon by the state court as noted above. Consequently, Murphy's third, sixth, seventh, and eighth prosecutorial misconduct sub-claims are procedurally defaulted. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). As such, they should be denied.

Murphy states that he raised his penalty-phase prosecutorial misconduct claims on direct appeal in his eighth and sixteenth propositions of law to the Ohio Supreme Court. (Traverse, Doc. No. 21 at 67.) The Court finds no mention of the prosecutor's comment about the lenient prison system or the statement that "[a]lcohol does not make you murder someone" in those propositions of law. (Appendix, Vol. 3 at 129-33, 185-87.) Those comments form the basis of Murphy's fourth and fifth prosecutorial misconduct sub-claims, which should be denied as procedurally defaulted due to Murphy's failure to raise the issues in the state court. *Murray*, 477 U.S. at 485.

Having found Murphy's second, third, fourth, fifth, sixth, seventh, and eighth sub-claims procedurally defaulted, only the merits of the first sub-claim need to be addressed. Murphy contends the prosecutor engaged in misconduct by arguing that André Brooks' mother had to identify her son's body on Mother's Day. (Petition, Doc. No. 10 at 44; Trial Tr. at 1241-42.) The Ohio Supreme

Court held that the comment was improper, but isolated and that it did not affect the outcome of Murphy's mitigation hearing. *State v. Murphy*, 91 Ohio St. 3d 516, 535 (2001). Murphy makes no attempt to demonstrate how the state court's ruling was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, as he is required to do under 28 U.S.C. § 2254(d)(1). Instead, he identifies the statement and states it constitutes prosecutorial misconduct and that it tainted his trial. Murphy has not demonstrated entitlement to habeas corpus relief on the ground stated. Thus, his first prosecutorial misconduct sub-claim should be denied.

Murphy's seventh ground for relief should be denied.

**Eighth Ground for Relief**

In his eighth ground for relief, Murphy contends that the proportionality review mandated by Ohio law deprived him of his Fourteenth Amendment right to due process of law. (Petition, Doc. No. 10 at 47-50.) Respondent argues the claim is procedurally defaulted and that it is without merit. (Return of Writ, Doc. No. 12 at 68-72.) Whether it is preserved or not, the claim is without merit.

Murphy argues that when conducting its statutorily required proportionality review of his death sentence, the state court must compare his sentence not only to cases in which others convicted of aggravated murder with similar aggravating circumstances, but to cases in which the ultimate verdict was a life sentence as well. The same argument has repeatedly been rejected by the Sixth Circuit Court of Appeals, as the court observed in *Williams v. Bagley*, 380 F.3d 932, 962-63 (2004):

> This court has held repeatedly that Ohio's system of proportionality review complies with the dictates of the Due Process Clause. *See Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003); *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003); *Cooey v. Coyle*, 289 F.3d 882, 928 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 368-69 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001); *Greer v. Mitchell*, 264 F.3d 663, 691 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000). "Since proportionality review is not required by the Constitution, states have great latitude in defining

-120-

the pool of cases used for comparison." *Buell*, 274 F.3d at 369.  And this court has held consistently that, in "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed." *Id*.; *see also Wickline*, 319 F.3d at 824-25; *Coleman*, 268 F.3d at 453.  Williams has not mustered any authority compelling this court to revisit these decisions, and we must conclude that the state courts did not unreasonably apply clearly established federal law in rejecting Williams's claim.

The same is true in Murphy's case.  Accordingly, his claim should be denied.


**Ninth Ground for Relief**

In his ninth ground for relief, Murphy argues the cumulation of the errors contained in his first through eighth grounds for relief combine to undermine the reliability of his conviction and death sentence.  (Petition, Doc. No. 10 at 51.)  Considering each of Murphy's grounds for relief individually and cumulatively, the Court finds no error or combination of errors so grave that Murphy was deprived of a fair trial.  Consequently, his ninth ground for relief should be denied.


**Conclusion**


In accordance with the foregoing analysis, it is respectfully recommended that the Petition for Writ of Habeas Corpus be dismissed with prejudice.


December 30, 2006.

s/ Michael R. Merz
Chief United States Magistrate Judge


**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written

objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\Death Penalty\Murphy v. Bradshaw\Murphy Merz Draft R&R.wpd