```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

Ulysses Murphy,                )
                               )
          Petitioner,           )   Case No. 1:03-CV-53
                               )
     vs.                        )
                               )
Margaret Bradshaw, Warden,      )
                               )
          Respondent.           )

O R D E R

This matter is before the Court on Petitioner Ulysses Murphy's petition for a writ of habeas corpus (Doc. No. 10), Magistrate Judge Merz's Report and Recommendation of December 30, 2006 (Doc. No. 80) recommending that Petitioner's petition be denied and the case be dismissed with prejudice, Petitioner's objections to the Report and Recommendation (Doc. No. 83), Magistrate Judge Merz's Supplemental Report and Recommendation addressing Petitioner's objections (Doc. No. 87), and Petitioner's objections to the Supplemental Report and Recommendation (Doc. No. 90).

For the reasons that follow, the Court finds that the trial court's erroneous admission into evidence of Petitioner's taped interview and confession was not harmless beyond a reasonable doubt.  Accordingly, the Court **SUSTAINS** Petitioner's objection to the Magistrate Judge's resolution of his First Ground for Relief. Petitioner's remaining objections, and his objections to the Supplemental Report and Recommendation are, therefore, **MOOT.**  The Court does not adopt the Report and Recommendation.  Petitioner's petition for a writ of habeas

corpus is **CONDITIONALLY GRANTED**, on the condition that the State of Ohio retry Petitioner within one hundred and twenty (120) days of the date of this order or within such further time as the Court may allow for good cause shown.

## I. Factual and Procedural Background

Petitioner Ulysses Murphy was tried and convicted of the capital murder of André Brooks in the Franklin County, Ohio Court of Common Pleas. The facts of this case, as recounted by the Supreme Court of Ohio, are as follows:

> Andre Brooks lived in Mansfield. His sister, Condrea Webber, lived in Columbus. On a weekend in May 1997, Webber went to Mansfield to visit her family. On Saturday, May 10, she drove back to Columbus with Brooks.
>
> They went to the C&S Lounge, a bar on the East Side of Columbus. Arriving sometime before 1:00 a.m., May 11, they left around 2:00 a.m. and went to the F&H Grill.
>
> The F&H occupied a two-story building; the second floor was an "after-hours bar," i.e., an establishment that serves liquor after the lawful closing time. Webber and Brooks stayed until about 3:30 a.m.
>
> Murphy was also in the F&H that night. Frank Green, who frequented the F&H and knew Murphy, later testified that Murphy left "[m]aybe a couple minutes" after Brooks and Webber. Brooks was wearing several gold chains around his neck that evening. These had attracted Murphy's notice, and he decided to rob Brooks to get them.
>
> Brooks and Webber were near the car when Murphy told them to put their hands up and ordered Brooks "to take off his gold." Brooks asked Murphy to let Webber get into the car.
>
> As Webber fumbled with the keys, she accidentally set off the car alarm. Brooks told her how to shut it off, while continuing to ask Murphy to give her a chance to get in. Murphy was pointing his gun at Brooks the entire time. Finally, Webber got in, started the car,

and put it in drive. Brooks and Murphy were standing at the rear of the car, and Webber could see them in her rear-view mirror. (Although it was night, and the car's rear windshield appears to be tinted, the car was near an outdoor light.)

Brooks tried to take his gold chains off, with Murphy continually demanding that he "hurry up." Then Brooks tried to scare Murphy away by telling his sister to "reach underneath the seat." But Webber, afraid to support Brooks's bluff, opened the door and turned around to assure Murphy that she had no gun. It was then that she got her best look at Murphy.

Webber then closed the car door but continued to watch the robbery in the rear-view mirror. Murphy kept yelling at Brooks that he was "moving too slow." Webber then saw Murphy, who was standing slightly over an arm's length from Brooks, take a step back. She heard two quick shots; then her brother screamed and fell. According to Webber, Brooks was shot while still trying to take his chains off. Webber hit the gas pedal and sped to a nearby White Castle restaurant to summon a police officer.

An autopsy showed that Brooks died of two gunshot wounds. One bullet entered the inside of Brooks's upper left arm near the armpit and went into his torso, breaking a rib, which lacerated his lung and caused bleeding. The other entered his lower back and severed an artery.

Police found three spent shell casings where Brooks was shot. Mark Hardy, a Columbus police criminalist and firearms specialist, examined the casings. Based on firing-pin impressions, extractor and ejector marks, and breech marks found on each casing, Hardy concluded that all three had been ejected from the same gun. Hardy also concluded that both bullets extracted from Brooks's corpse were fired from one gun.

Police showed Webber a photographic array, and she identified Murphy as her brother's killer. She later identified him again in court.

Murphy was arrested and interrogated. At first he denied everything. Ultimately, he admitted that he had shot Brooks while trying to rob him of his chains. He claimed that the gun had accidentally gone off because Brooks tried to grab it. However, he admitted firing a second shot at Brooks when, according to Murphy, Brooks tried to run away after the first shot.

3

State v. Murphy, 747 N.E.2d 765, 776-77 (Ohio 2001).  As stated, Petitioner was convicted of aggravated murder with a capital specification, aggravated robbery, and possessing a weapon under a disability.  Petitioner was sentenced to death at the conclusion of the mitigation phase of the trial.

Following the conclusion of his direct appeals and exhaustion of his state avenues for post-conviction relief, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner's petition raises nine grounds for relief.  However, as Petitioner's First Ground for Relief is dispositive of the others, the Court will not recite them here:

> **First Ground for Relief**
>
> The trial court violated Petitioner's Fifth and Fourteenth Amendment rights when it overruled Petitioner Murphy's motion to suppress, failing to recognize that during a custodial interrogation, when a suspect says that he is "ready to quit talking" the police fail to "scrupulously honor" this assertion of his right to remain silent when they do not immediately cease the interrogation.

As is relevant to the First Ground for Relief, the record shows that after his arrest, Columbus police detectives interrogated Petitioner for approximately three hours about his involvement in Brooks's death.  Although the detectives initially advised Petitioner of his Miranda rights, about a half an hour into the interview, Petitioner told one of the detectives that he was "ready to quit talking now and I'm ready to go home too."  This detective left the room and came back a few minutes later with another detective and they resumed interrogating Petitioner.

After this point of the interrogation, Petitioner admitted, among other incriminating statements, that he attempted to rob Brooks for his jewelry and said further that he shot Brooks while they were struggling over the gun.

The trial court denied Petitioner's motion to suppress his confession on the grounds that he failed to unambiguously indicate that he desired the interrogation to cease.  Therefore, the videotape of Petitioner's interrogation was played at trial. Additionally, one of the detectives testified at trial about statements made to him by the Petitioner.  The trial court's ruling on Petitioner's motion to suppress was affirmed throughout his direct appeals and the state post-conviction relief proceedings.

On his review of Petitioner's First Ground for Relief, however, Magistrate Judge Merz found that Petitioner had unambiguously invoked his right to cease the interrogation. Judge Merz further found that the detectives did not scrupulously honor Petitioner's request for the interrogation to halt. Magistrate Judge Merz concluded that the detectives violated Petitioner's Fifth Amendment rights by not ceasing the interrogation and that the trial court erred by not suppressing the evidence of his interrogation.  Magistrate Judge Merz further found that the Supreme Court of Ohio's resolution of these two issues against Petitioner was objectively unreasonable and contrary to federal law as articulated by the U.S. Supreme Court

5

in Miranda v. Arizona, 384 U.S. 436 (1966) and its progeny. Respondent has not objected to either of these findings.

Magistrate Judge Merz concluded, however, that the trial court's error in failing to suppress his confession was harmless because there was strong independent evidence of Petitioner's guilt. Doc. No. 80, at 31-34. In this regard, Magistrate Judge Merz found that Webber's testimony concerning her perception of the event was not undermined either by the lighting conditions of the parking lot or by alcohol consumption. Magistrate Judge Merz also found that Webber's testimony was supported by Green, who testified that he saw Petitioner follow Webber and Brooks from the bar. Judge Merz did not believe that the prosecution overly-relied on Petitioner's confession during either the guilt phase or the mitigation phase of the trial, and that, therefore, his defense was not prejudiced. Finally, Magistrate Judge Merz concluded that Petitioner's defense strategy would not have been different had his confession been suppressed. Based on trial counsel's testimony in the evidentiary hearing in these proceedings, Judge Merz concluded that the other evidence in the case and Petitioner's demeanor during the trial factored into his theory of the defense. In other words, Judge Merz found that even had Petitioner's confession been suppressed, trial counsel's defense strategy would not have been appreciably different.

Petitioner filed timely objections to Magistrate Judge Merz's Report and Recommendation. With respect to Judge Merz's resolution of his First Ground for Relief, Petitioner objects to

the conclusion that the trial court's erroneous admission of his confession was harmless.  Petitioner argues that his confession was the prosecution's best evidence, and that, absent his confession, the rest of the evidence leaves reasonable doubt as to the identity of the shooter.  Petitioner also objects to Magistrate Judge Merz's conclusion that admission of his videotaped confession did not affect his defense strategy.

After Petitioner filed his objections, Magistrate Judge Merz issued a Supplemental Report and Recommendation which addressed those objections. Doc. No. 87.  Petitioner then filed objections to the Supplemental Report and Recommendation.  Doc. No. 90.  However, neither the Supplemental Report and Recommendation nor Petitioner's objections to the Supplemental Report and Recommendation concern the First Ground for Relief. Accordingly, both the Supplemental Report and Recommendation and Petitioner's objections to that Report and Recommendation are **MOOT.**

## II. Standard of Review

Any dispositive report and recommendation by a magistrate judge is subject to de novo review "of those portions of the report or specified proposed findings or recommendations to which objection is made."  Tuggle v. Seabold, 806 F.2d 87, 92 (6th Cir. 1986); 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3).

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, the district court shall

not grant a petition for a writ of habeas corpus on any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court opinion violates the "unreasonable application" clause of § 2254 when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state-court opinion will also involve the "unreasonable application" of Supreme Court precedent if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." Seymour v. Walker, 224 F.3d 542, 549 (6th Cir. 2000). The Supreme Court stated that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. In defining the meaning of the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment

8

that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

### III. Analysis

Petitioner contends that the trial court erred in failing to suppress his confession on the grounds that it was given in violation of his Miranda rights pursuant to the Fifth and Fourteenth Amendments.  Magistrate Judge Merz agreed that Petitioner's Miranda rights were violated but concluded that the constitutional error was harmless.  Petitioner objects to Magistrate Judge Merz's harmless error analysis.  Respondent has not objected to Magistrate Judge Merz's conclusion that the state courts unreasonably applied controlling federal law in its analysis of Petitioner's First Ground for Relief.  Accordingly, this Court's review of the Report and Recommendation is limited to Judge Merz's conclusion that the admission of Petitioner's confession at trial was harmless error.

The Sixth Circuit Court of Appeals recently summarized the constitutional harmless error standard:

> In a § 2254 proceeding, a court must assess whether the constitutional error in the state-court criminal trial "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993); Fry v. Pliler, --- U.S. ----, 127 S.Ct. 2321, 2328 (2007). If we are in "grave doubt" as to whether the error had such an effect, "that error is not harmless." O'Neal v. McAnich, 513 U.S. 432, 436 (1995). The O'Neal Court explained that "[b]y 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. at 435. This inquiry does not assign an affirmative burden of proof on Gray, id. at 436, nor

9

>>does it require Gray to show that the error was outcome-determinative, but instead "plac[es] the risk of doubt on the State." Id. at 439. See also Ferensic v. Birkett, 501 F.3d 469, 481 (6th Cir. 2007) (citing O'Neal for the proposition that "petitioners do not bear an affirmative burden of proof," and holding that "[u]ncertainty in answering this question. . . militates in favor of the habeas petitioner"); Caldwell v. Bell, 288 F.3d 838, 842 (6th Cir. 2002); United States. v. Baugham, 449 F.3d 167, 177 (D.C.Cir. 2006).

Gray v. Moore, ___F.3d___ No. 06-3547, 2008 WL 782467, at *8 (6th Cir. Mar. 26, 2008). On de novo review, the Court has little doubt that the erroneous admission of Petitioner's confession had a substantial and injurious effect in determining the jury's verdict. Accordingly, the Court concludes that the trial court's error was not harmless.

Contrary to Magistrate Judge Merz's view of the record, the Court finds that the independent evidence of Petitioner's guilt was not substantial. As Petitioner correctly points out, the police never recovered the murder weapon and Petitioner did not have any of Brooks's jewelry in his possession. Absent his confession, therefore, the only direct evidence that Petitioner shot Brooks was the testimony of Condrea Webber. Although Webber identified Petitioner as the murderer before and during trial, there were bases to impeach the reliability of her perception, most notably the lighting in the parking lot and the fact that she viewed much of the incident through the rearview mirror of the car. Additionally, Webber's identification of Petitioner as the murderer could plausibly have been impeached as having been suggested by the fact that she saw Petitioner in the bar earlier. Although Petitioner's trial counsel in fact tried to impeach

10

Webber's perception of the event, this line of attack was focused on her ability to see what happened rather than who the perpetrator was. Nevertheless, attempting to impeach Webber's identification of Petitioner as the perpetrator would have carried no weight given his confession and trial counsel's concession to the jury at the outset of trial that Petitioner was responsible both for the robbery and for Brooks's death. See Arizona v. Fulminante, 499 U.S. 279, 296 (1991).[1] It is important to note that Petitioner's trial counsel obviously felt compelled to make this concession to the jury in light of the trial court's decision not to suppress Petitioner's confession.[2]

---

[1] "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have a profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

Id. (quoting in part Bruton v. United States, 391 U.S. 123, 139-40 (1968)).

[2] In a pretrial statement to the trial court, defense counsel stated:

> There is a fundamental disagreement on how to proceed in defense of this case between myself and our client. I believe that I have the highest obligation to defend him appropriately where I can be most effective in saving his life, and, therefore, it is my belief that I need to tell this jury that he did it but he did it without a specific intent to kill. He does not want me to do that.
>
> I think the evidence is overwhelming that he did it. He confessed for three hours. I would lose all credibility with this jury if I tried to do anything

Frank Green's testimony does not directly implicate Petitioner as the murderer. Although it might be inferred from Green's testimony that Petitioner followed Brooks and Webber from the bar, in fact he actually only testified that Petitioner, Brooks and Webber left the bar within a few minutes of each other. Tr. at 1067. Green, however, did not testify that Petitioner followed Brooks and Webber out of the bar. Again, however, in light of the admission of Petitioner's confession, this ambiguity in Green's testimony was of no value to his defense.

It is also apparent to the Court that the prosecution relied heavily on Petitioner's confession in proving its case. The prosecutor commented on Petitioner's confession in his opening statement. Tr. at 991. The entire videotape of Petitioner's interview was played for the jury and, in addition, a detective testified about the interrogation techniques they

---

other than the approach I am taking.

Tr. at 984-98 (emphasis added). The issue of the defense strategy came up again later in the trial. In another statement to the court outside the presence of the jury, defense counsel stated:

> We are faced with not only everybody in the bar that knew Ulysses Murphy, not only an eyewitness who was feet away from Mr. Murphy, but a three hour taped confession that the Court has ruled is admissible. In that confession, Mr. Murphy acknowledges, one, that everybody in the bar knows him; two, that he did follow André Brooks and his sister out of the bar; three, that he did rob; and, four, that there was a struggle for the gun.

Id. at 1191.

12

used in interviewing Petitioner, as well as statements Petitioner made during the interview. Id. at 1195-1220. During closing arguments, the prosecutor argued that two of the elements of the aggravated murder charge were established in whole or in part by Petitioner's confession. Tr. at 1239.[3] The prosecution relied on Petitioner's confession to argue that he shot Brooks purposefully in order to take Brooks's jewelry.[4] The prosecution also argued that Petitioner acted purposefully by disposing of the gun after shooting Brooks. Id. at 1241. This evidence also came from Petitioner's confession. The prosecution relied almost exclusively on Petitioner's confession to establish the aggravated robbery specification.[5] Id. at 1243-44. The

---

[3] "I don't believe that the defense will contest the first three elements [of the aggravated murder charge]. I don't believe the defense will deny that in Franklin County at the F&H Bar on May 11th of 1997, it was the Defendant who shot André Brooks. He admitted that to you on the videotape. You heard Connie Webber in detail about that. I don't believe they are going to contest that it was done while committing or attempting to commit an aggravated robbery. That was admitted as well."

[4] "He decided to slide the gun back and chamber a bullet making it ready to fire. He stepped back and he fired. And that wasn't even enough for him. He still wanted the jewelry. You heard him on the tape, 'I'm trying to pull the necklaces off of him.' So he shot him again at close range."

[5] "If you find the Defendant guilty of aggravated murder, you have already found him guilty of aggravated robbery because aggravated robbery is an element of the charge.

Again, I don't think the defense will dispute this. The Defendant in his taped interview has admitted to essentially all of the elements that make up the offense of aggravated robbery."

prosecutor commented on evidence that came only from Petitioner's confession, such as that he followed Brooks and Webber from the bar, that he had a gun on him at the time, that he shot Brooks, that he fired a third shot at Brooks as he was trying to flee, that he hid the gun under the hood of his car, and that he later got rid of it. Id. at 1246-47. During rebuttal argument, the prosecutor commented at some length as to how Petitioner's videotaped confession showed that he shot Brooks purposefully. Id. at 1262-63. It may be fairly said that Petitioner's confession was both the cornerstone and the linchpin of the prosecution's case against Petitioner.

Finally, contrary to Magistrate Judge Merz's conclusion, the Court finds that the trial court's erroneous admission of Petitioner's confession prejudiced his defense strategy. As already indicated, trial counsel's contemporaneous statements demonstrate that the trial court's admission of Petitioner's confession caused a rift on strategy and compelled him to concede to the jury, against Petitioner's wishes, that Petitioner robbed and shot Brooks, albeit accidentally.[6] The

---

[6] Magistrate Judge Merz found that, based on his testimony during the evidentiary hearing, trial counsel would not have altered his trial strategy had the trial court suppressed Petitioner's confession. Counsel, however, recalled that the prosecution's case was stronger than it actually was. For instance, in addition to the other evidence already discussed, counsel testified that he recalled the police recovering the murder weapon from Petitioner and there being a ballistics match which connected Petitioner to the murder. Doc. No. 79, at 20-21. As stated earlier, however, the police did not recover the murder weapon from Petitioner and, consequently, there was no ballistics match. Therefore, counsel's testimony is not particularly reliable on whether the trial strategy would have been different

trial court's ruling left Petitioner's defense to the very narrow issue of lack of specific intent to kill.  While this may be a sound defense in many other cases, under the facts of this case, Petitioner's trial counsel was relegated to arguing that Brooks was accidentally shot under the highly implausible theory that the first wound was caused when Brooks swatted at the gun and the second wound was caused when the gun discharged again after hitting the ground.  Tr. at 1253-54.[7]  However, whatever credibility this theory might have carried with the jury would have been completely destroyed by the evidence from Petitioner's confession that he tried to shoot Brooks a third time as Brooks was fleeing the scene.  On the other hand, without the erroneous admission of Petitioner's confession, Petitioner might have been able to advance a credible defense that he was not the actual perpetrator of the crime.

---

without Petitioner's confession.

       Finally on this point, the Court notes that in Florida v. Nixon, 543 U.S. 175 (2004), the Supreme Court held that in a death penalty case, trial counsel is not ineffective for conceding the defendant's guilt and focusing on mitigation where counsel believes it to be in the defendant's best interest, the defendant is unresponsive to counsel, i.e., the defendant neither approves or disapproves of the strategy, and the concession is harmless under the Strickland standard. Id. at 192.  Nixon, however, does not apply in Petitioner's case because it is clear that he actively opposed the strategy of conceding to the jury that he shot Brooks.  Moreover, unlike Nixon, in this case, the proof of Petitioner's guilt without his confession was not overwhelming.

    [7]    Trial counsel essentially admitted the weakness of this theory at the evidentiary hearing: "I had trouble explaining the second shot in the back."  Doc. No. 79, at 26.

In summary, on review of the record in this case, it is clear to the Court that the trial court's error in not suppressing Petitioner's confession dominated almost every aspect of this case.  Petitioner's confession was the prosecution's best evidence in proving the aggravated murder charge.  Moreover, as indicated, the prosecution stated that Petitioner's confession alone established the only aggravating circumstance which made Petitioner eligible for the death penalty.  Under all of these circumstances, the Court is convinced that the erroneous admission of Petitioner's confession had a substantial and injurious effect in the determination of the jury's verdict.

Conclusion

Accordingly, Petitioner's objection to Magistrate Judge Merz's Report and Recommendation on his First Ground for Relief is well-taken and is **SUSTAINED.**  The Court does not adopt the Report and Recommendation to the extent that it finds the admission of Petitioner's confession was harmless error.  As stated, the trial court's admission of Petitioner's confession during the guilt phase of his trial was not harmless error.  Therefore, the Court concludes that Petitioner is entitled to a writ of habeas corpus on his First Ground for Relief.  As this ruling is dispositive of the rest of Petitioner's claims for relief, they are **MOOT.**

**IT IS THEREFORE ORDERED THAT**

1.   Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 10) is **GRANTED** unless the State of Ohio

schedules a new trial of Petitioner within one hundred and twenty (120) days of the date of this order, or within such further time as the Court may allow for good cause shown.

       **IT IS SO ORDERED**

Date April 11, 2008            s/Sandra S. Beckwith
                                      Sandra S. Beckwith, Chief Judge
                                       United States District Court